Rachael D. Lamkin (SBN 246066)
rachael.lamkin@bakerbotts.com
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 291-6200
Fax: (415) 291-6300

Julie Albert (*Pro Hac Vice pending*)
julie.albert@bakerbotts.com
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Fax: (212) 408-2501

*Attorneys for Defendant and Counterclaim-Plaintiff The Analytical Moose LLC and Defendant Rachael Brady*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

INTTERRA, LLC,

Plaintiff,

v.

THE ANALYTICAL MOOSE LLC and RACHAEL BRADY,

Defendants.

Case No.: 2:26-cv-00747-WBS-CSK

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT AND COUNTERCLAIM-PLAINTIFF THE ANALYTICAL MOOSE LLC'S MOTION FOR PRELIMINARY INJUNCTION**

Judge: Hon. William B. Shubb
Date: May 26, 2026
Time: 1:30 p.m.
Courtroom: 5, 14th Floor
Trial Date: N/A
Action filed: March 5, 2026

## TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

I. FACTUAL BACKGROUND ....................................................................................3

A. The Analytical Moose, WILDFIRE AWARE® and Its Established Trademark Rights ....................................................................................3

B. Intterra's Solicitation of TAM and Prior Knowledge and Valuation of WILDFIRE AWARE® ....................................................................................5

C. Intterra's Knowing Adoption of AWARE-Formative Trademarks for Competing Offerings ....................................................................................6

II. LEGAL STANDARD ....................................................................................8

III. ARGUMENT ....................................................................................9

A. Intterra's Launch Will Cause Irreparable Harm ....................................................................................9

B. TAM is Likely to Succeed on its Trademark Infringement Claim ........................12

1. WILDFIRE AWARE® is a strong mark by virtue of its distinctiveness, registration, and use (*Sleekcraft* Factor 1). .......................13

2. The parties' offerings are substantively identical (*Sleekcraft* Factor 2). ...15

3. The parties' marks are highly similar (*Sleekcraft* Factor 3). ....................16

4. TAM is likely to encounter actual confusion as to the source, sponsorship or affiliation of Intterra's impending new offerings (*Sleekcraft* Factor 4). ....................................................................................16

5. The parties' marketing channels are identical (*Sleekcraft* Factor 5)..........17

6. Given the parties' offerings, intended for urgent use, purchasers cannot be expected to exercise particular care (*Sleekcraft* Factor 6). ..................17

7. Intterra evinced bad intent in selecting its marks (*Sleekcraft* Factor 7).....18

8. The parties' offerings are already competing, and Intterra's marks would prevent TAM's legitimate business expansion (*Sleekcraft* Factor 8) ....................................................................................18

C. The Balance of the Equities Favors TAM ....................................................................................19

D. The Public Interest would be Served by an Injunction ........................................21

E. Any Bond Requirement Should We Waived, or Nominal....................................21

IV. CONCLUSION ....................................................................................24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*2ONE Labs Inc. v. ITG Brands, LLC*,
No. CV 24-08124-MWF (Ex), 2024 WL 5272973 (C.D. Cal., Dec. 20, 2024) ................19, 21

*All. for Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ................................................................................8, 9

*Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*,
534 F. App'x 633 (9th Cir. 2013)................................................................................21

*Am., Inc. v. Skechers USA, Inc.*,
890 F.3d 747 (9th Cir. 2018) ................................................................................9, 11

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ...........................................................12, 13, 15, 16, 18

*Arizona Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ..................................................................................8

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) ..............................................................................21, 22

*Baron App, Inc. v. OpenAI, Inc.*,
No. 25-cv-09268-EKL, 2026 WL 447428 (N.D. Cal. Feb. 14, 2026)...................................20

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
711 F.2d 920 (10th Cir. 1983) ..................................................................................17

*BNSF Ry. Co. v. Float Alaska IP, LLC*,
No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506 (C.D. Cal. Aug. 28, 2023).........................20

*Branding v. By Lee Tillett, Inc.*,
940 F.Supp.2d 1178 (C.D. Cal. 2013) .....................................................................19, 20

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
174 F.3d 1036 (9th Cir. 1999) ....................................................................13, 16, 17, 18

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
766 F.2d 1319 (9th Cir. 1985) ..............................................................................21, 24

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ..................................................................................9

*Cohn v. Petsmart, Inc.*,
281 F.3d 837 (9th Cir. 2002) ..................................................................................23

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003) ....................22

*CytoSport, Inc. v. Vital Pharms., Inc.*,
617 F. Supp. 2d 1051 (E.D. Cal.), *aff'd*, 348 F. App'x 288 (9th Cir. 2009)....................9, 11, 21

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998) ....................23

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
967 F.2d 1280 (9th Cir. 1992) ....................17

*eBay Inv. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)....................8

*Fleet Feet, Inc. v. Nike*,
419 F. Supp. 3d 919 (M.D.N.C. 2019) ....................10

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
432 F.3d 463 (3d Cir. 2005)....................18

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) ....................24

*Grocery Outlet, Inc. v. Albertson's, Inc.*,
497 F.3d 949 (9th Cir. 2007) ....................12

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
736 F.3d 1239 (9th Cir. 2013) ....................8, 9

*InSinkErator, LLC v. Joneca Co., LLC*,
163 F.4th 608 (9th Cir. 2025) ....................21

*Intenze Prods., Inc. v. TATLAB Corp.*,
No. 2:23-cv-02265-RGK-PD, 2023 WL 5209729 (C.D. Cal. Aug. 1, 2023)....................20

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
2 F.4th 1150 (9th Cir. 2021) ....................12, 14, 16, 18, 22, 23

*Johnson v. Couturier*,
572 F.3d 1067 (9th Cir. 2009) ....................22

*Jorgensen v. Cassiday*,
320 F.3d 906, 919 (9th Cir. 2003) ....................21, 22

*Levi Strauss & Co. v. Connolly*,
721 F. Supp.3d 987 (N.D. Cal. 2024) ....................15, 19

*M2 Software, Inc. v. Madacy Ent.*,
421 F.3d 1073 (9th Cir. 2005) ....................12

*Marketquest Grp., Inc. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017) ....................................................................................18

*Masters Software, Inc. v. Discovery Commc'ns, Inc.*,
725 F. Supp. 2d 1294 (W.D. Wash. 2010)...........................................................22, 23

*Off. Airline Guides, Inc. v. Goss*,
6 F.3d 1385 (9th Cir. 1993) ....................................................................................13, 15

*Pom Wonderful v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ................................................................................16, 17

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) ....................................................................................9

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
875 F.3d 426 (9th Cir. 2017) ....................................................................................18

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) ....................................................................................12

*TPW Mgmt., LLC v. Yelp Inc.*,
No. 16-cv-03063-YGR, 2016 WL 6216879 (N.D. Cal. Oct. 25, 2016) ..................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)............................................................................................................8

**STATUTES**

15 U.S.C. § 1116(a) ..........................................................................................................9

**OTHER AUTHORITIES**

https://www.emberline.com/ (accessed April 3, 2026).....................................................5

## INTRODUCTION

Defendant and Counterclaim-Plaintiff The Analytical Moose LLC ("Defendant and Counterclaim-Plaintiff" or "TAM") brings this motion to prevent irreparable harm to its trademark rights and the public, in extraordinary circumstances. TAM owns WILDFIRE AWARE®, a mobile application which has provided the public with timely access to reliable wildfire data since 2022. Counterclaim-Defendant Intterra, LLC ("Intterra") admits that it knows, values, and tried to buy WILDFIRE AWARE® and its federally-registered trademark. Yet, despite its awareness of and desire to obtain TAM's app and prior rights, after its 2024 and 2025 efforts to purchase the app and brand failed, and notwithstanding multiple cease-and-desist letters asserting TAM's rights, Intterra adopted, and on May 1, 2026, plans to publicly launch AWARECA, a mobile application with a shared purpose, target market, and channels of trade to TAM's, under confusingly-similar branding. And AWARECA is just the start: the California-specific version of a planned family of over a dozen AWARE-branded Intterra offerings that will trade off and undermine TAM's rights. Unless enjoined, Intterra's launch of this competing app and litany of other offerings will introduce confusion to a vulnerable population—people seeking fast, reliable information about impending wildfires—and its comparatively massive scale means that its launch will, through reverse confusion, completely subsume TAM's hard-earned reputation and goodwill.

The WILDFIRE AWARE® app is the result of the grit, determination, and unique expertise of TAM's founder, Rachael Brady. Ms. Brady has 13 years' experience as a CALFIRE dispatcher and a data scientist specializing in GIS data mapping. WILDFIRE AWARE® is a positive outcome of her impressive education, credentials, expertise, and personal experiences with wildfire losses, including having lost her family home in the 2020 Zogg Fire. Encouraged by friends and family seeking access to information when every second counts, Ms. Brady, working on behalf of her technical consulting business, TAM, invested thousands of hours and significant resources to develop, launch and maintain the WILDFIRE AWARE® app, invent patented technology, and seek and obtain registration of the WILDFIRE AWARE® brand.

Recognizing its value, Intterra met with Ms. Brady and TAM on multiple occasions in the hopes of acquiring the WILDFIRE AWARE® app and trademark and of hiring Ms. Brady. When Ms.

Brady declined their offers, and only after meeting with her, the much-larger Intterra simply took TAM's rights and, on May 1, 2026, plans to launch a closely related app, under a confusingly similar trademark. Remarkably in these circumstances, Intterra sued TAM and Ms. Brady. Not only does Intterra's lawsuit seek to prevent TAM from legitimately enforcing its federally-registered rights, but demands that this small, community-oriented business and its individual owner, Ms. Brady, pay Intterra's attorneys' fees and costs. Intterra seeks a finding of non-infringement, but, in its Complaint, admits facts sufficient to establish exactly the opposite.

This is a textbook case of reverse confusion: Private equity-backed Intterra, and its millions of dollars of governmental and institutional resources, is much larger than TAM and will launch at a scale that dwarfs TAM's. Its willful adoption of AWARE as a "house mark" for a variety of related public safety software offerings, and its association with government agencies like CAL FIRE, hijacks and devalues TAM's prior rights. The scale and apparent legitimacy conferred by Intterra's size and partnerships will lead consumers not already familiar with TAM to believe that Intterra, not TAM, is the senior user of AWARE. Those familiar with WILDFIRE AWARE® are likely to falsely conclude that TAM's app is associated with Intterra. And Intterra's planned launch harms the public. Consumers seeking mobile applications for information on wildfires and emergency services will encounter two such apps with similar branding. This risks confusion at every turn: initial interest, misdirected purchases, and post-purchase confusion, all at times of exigency and danger when consumers cannot be expected to exercise extra care in their downloading and purchasing choices.

In this context, TAM seeks a preliminary injunction to avoid irreparable harm to TAM and confusion among consumers who, by virtue of TAM's years of continuous, substantially exclusive use, have come to TAM and see WILDFIRE AWARE® as a source of reliable information in the direst of circumstances. To be clear, TAM supports others' efforts to provide communities with access to public safety information, but this laudable goal should not be achieved by trampling others' rights. Intterra was well aware of TAM's rights, could have selected any brand in the world for its new, competitive offerings, but chose TAM's. To avoid irreparable harm from Intterra's willful infringement, TAM respectfully requests that this Court issue an Order preliminarily enjoining Intterra LLC, together with its members (to the extent acting on behalf of or for the benefit of the LLC),

managers, officers, employees, agents, servants, representatives, affiliates, subsidiaries, successors, assigns, and all persons in active concert or participation with them from, directly or indirectly, promoting, offering, and selling software and related products and services in the field of wildfire alerts and emergency notification under AWARE-formative branding, including its planned launch of AWARECA on May 1, 2026.

## I. FACTUAL BACKGROUND

### A. The Analytical Moose, WILDFIRE AWARE® and Its Established Trademark Rights

TAM, its innovative and important public safety offerings, and its valuable trademark rights are the result of its founder's hard-earned business and technical acumen, and her deeply personal experience with firefighting, wildfire dispatching, and the devastating effects of wildfires.

Ms. Brady, a native of Northern California, has focused her passions and livelihood on wildfire safety since witnessing the 2004 Bear Fire's destruction in the neighboring community of Redding, California. Brady Decl., ¶ 5. Starting just after that fire, Ms. Brady served as a volunteer firefighter and later as a 911 dispatcher with CAL FIRE, where she worked for six years before transitioning within CAL FIRE to their Northern Region office as a GIS Analyst, which used Geographic Information Systems ("GIS"). Ms. Brady used that technology to analyze spatial data, conduct statistical research, and inform decision making in times of emergency, such as providing information to pilots during high fire activity. Brady Decl., ¶¶ 6-7. Ms. Brady's work with CAL FIRE informed her understanding of how wildfire information is generated, communicated, and relied upon. *Id.*, ¶ 7. While working full time at CAL FIRE, Ms. Brady earned a Bachelor of Arts in Intelligence Studies, with an emphasis on terrorism, awarded in February 2014, and a Master's in September 2016—the latter while working up to 80-hour weeks at CAL FIRE. *Id.*, ¶ 8. One of Ms. Brady's GIS projects saw her leveraging her background in criminal intelligence in conjunction with GIS expertise and successfully developing a methodology for identifying likely serial arson patterns, her work on which was implemented and led to arrests and charges for arson-related crime and earned her the national Government Achievement Award. Brady Decl., ¶ 9.

Fire and its dangers are deeply personal to Ms. Brady and her family and community. In 2020, the Zogg Fire west of Redding, California burned down Ms. Brady's childhood home and her great

grandmother's home and devastated their community. Brady Decl., ¶ 11. The fire would have destroyed her mother's home if not for Ms. Brady's husband (a career firefighter) working overnight to successfully save the house. *Id.* During the fire and its aftermath, Ms. Brady's family and community expressed frustration over having to grapple with the lack of information available, particularly with the dangerous information gap observed during wildfires: the delay between when a wildfire starts and when the public receives actionable information. *Id.*, ¶ 12.

TAM was formed in 2020, initially to focus on geospatial intelligence consulting for small businesses, non-profits, and government agencies. Brady Decl., ¶ 10. Her very personal 2020 fire experience encouraged Ms. Brady to use her technical skills to help her community by providing crucial information. Brady Decl., ¶¶ 12-16. This led to WILDFIRE AWARE®. Brady Decl., ¶¶ 16, 19. WILDFIRE AWARE® pulls from various data sources, including the National Weather Service and the National Wildfire Coordination Group, to display authoritative information graphically, with accessibility and speed at top of mind. *Id.*, ¶¶ 15-16. WILDFIRE AWARE® presents information at all relevant times: before a wildfire begins to spread, throughout active fire conditions, and during the post-fire period when secondary safety hazards may persist. *Id.*, ¶ 15. WILDFIRE AWARE® identifies or attributes the source of its displayed information, where feasible. *Id.* ¶ 20. The WILDFIRE AWARE® app launched in November 2022 and has been available since. *Id.*, ¶ 19.

The WILDFIRE AWARE® app is free to download. *Id.*, ¶ 21. There is also a subscription-based model offered at $2.99/month (or $19.99/year). *Id.* The only difference between the free and paid versions is that the paid version actively pushes alerts to subscribers, whereas the free version does not. *Id.* Users have the same information available through the app regardless of subscription status. *Id.* Subscription proceeds cover only the cost of app server hosting, in order to make useful, authoritative information available essentially at cost. *Id.* ¶ 22. WILDFIRE AWARE® serves all of the United States and Canada. *Id.*, ¶ 20. Active subscribers are located throughout the United States and Canada. *Id.* ¶ 23. Since launch, there have been nearly 30,000 unique downloads of WILDFIRE AWARE®, largely based on word of mouth and even without expensive advertising. *Id.*

By virtue of both the inherent distinctiveness of the WILDFIRE AWARE® mark and TAM's substantially exclusive use of the mark in commerce, TAM has acquired significant, and valuable

marketplace goodwill. Brady Decl., ¶¶ 24-27; *see* Exs. 3-7. WILDFIRE AWARE® has been covered in the media and received favorable industry recognition. *See* Exs. 3-7. Recognizing the value of both its app and its brand, TAM sought and obtained federal registration of its trademark, WILDFIRE AWARE®. TAM is the sole and exclusive owner of U.S. Trademark Registration No. 7,403,027 for WILDFIRE AWARE®, which is valid, subsisting, and in full force and effect. *Id.* ¶ 17; Compl. ¶ 1; *See also* Ex. 1. During the trademark prosecution process, in response to a preliminary refusal, TAM affirmed to the USPTO that WILDFIRE AWARE® functions as a distinctive source identifier, and that the mark creates a unique commercial impression in the term AWARE as applied to the covered goods. *See* Compl., Ex. G. The USPTO granted registration, acknowledging that TAM's use of WILDFIRE AWARE® is registrable, that AWARE is a distinctive term not requiring disclaimer, and that TAM's use of WILDFIRE AWARE® is not likely to cause confusion with third parties using AWARE in other contexts. *See id.*; *see also* Ex. 1.

### B. Intterra's Solicitation of TAM and Prior Knowledge and Valuation of WILDFIRE AWARE®

Intterra is a Nevada LLC that purportedly markets and sells software exclusively to government agencies. Compl. ¶¶ 3, 9. Intterra is indirectly majority-owned by Emberline LLC, a private equity firm,[1] through its control of Emberline Fire EMS LLC, which holds a majority interest in Neo Group Holdings, LLC—Intterra's parent company. *See* ECF. No. 2. Recognizing the significant value of TAM's app and brand, in 2024, Intterra and Ms. Brady discussed the possibility of a partnership that would allow Intterra to push information to the public through WILDFIRE AWARE®, or, alternatively, the idea of Intterra acquiring WILDFIRE AWARE®. Brady Decl., ¶¶ 28-29. Intterra's then-CEO made Ms. Brady a written offer to acquire WILDFIRE AWARE® in its entirety via a lump-sum payment and an earnout-style structure based on active users. Brady Decl., ¶ 29. While Ms. Brady was considering this offer, Intterra parted ways with both individuals who had been interfacing with Ms. Brady and acquired a new CEO. *Id.* ¶¶ 30-31. Intterra's new CEO continued the discussions and communicated a new proposal for acquiring WILDFIRE AWARE®, but the new offer was contingent on Ms. Brady's accepting a three-year, full-time employment contract. *Id.* ¶ 32; Compl. ¶ 27. Ms. Brady declined Intterra's new offer despite multiple follow-ups, as she was not

[1] *See* https://www.emberline.com/ (accessed April 3, 2026).

interested in a three-year employment contract with Intterra. *Id.* ¶¶ 32-33.

TAM retains all rights in and to the WILDFIRE AWARE® app and brand.

### C. Intterra's Knowing Adoption of AWARE-Formative Trademarks for Competing Offerings

Despite undisputed knowledge of TAM's prior rights and the value of its federally-registered AWARE-formative trademark, and only after failing to acquire those rights, Intterra adopted, began using, and has filed fifteen (15) trademark applications for AWARE-formative trademarks for public safety software and related goods and services nearly identical to TAM's, including a mobile application and related offerings with overlapping purposes, trade channels, and target markets. Compl. ¶ 15; *see also* Ex. 2. In addition to these applications, Intterra took many other concrete steps toward adoption and launch of AWARE-branded offerings after its discussions with TAM. These include using AWARE branding in obtaining millions of dollars in government contracts, developing an "AWARE" product ecosystem which includes AWARE Intel Hub, AWARE Ops, and developing and promoting a series of nationwide and apparently location-specific AWARE offerings (including, for example, AWAREUS for the United States, AWARECA for California, AWARETX for Texas, and others). *See* Ex. 2. Intterra has also created and distributed promotional materials bearing AWARE branding, and publicly announced an "early-spring" anticipated launch of an AWARE-formative mobile application in press releases and public commentary, since clarified to a May 1, 2026 launch. Compl. Ex. C; *see id.* ¶¶ 16, 40.

In California, Intterra's launch is in partnership with CAL FIRE, and the app prominently touts its association with the agency. *See* Compl., Ex. C. On information and belief, while TAM's app prioritizes speed—providing users with near-immediate updates on dispatched events—Intterra's prioritizes mediation. *See* Brady Decl., ¶ 16, 54-55; Ex. 5 ("Individuals in the town were alerted to the fire by friends and neighbors before getting an alert from [CAL FIRE]"). Intterra's app is intended to serve as a mouthpiece for CAL FIRE, offering more comprehensive updates on wildfire events but using the agency's messaging and relying on the agency's determination that the information warrants distribution. Compl., Ex. C; Brady Decl., ¶ 43.

Intterra's investment in over a dozen AWARE-formative trademark applications demonstrate its belief that AWARE has significant commercial, source-indicating value and strength. These

applications seek registration of AWARE marks in connection with Class 9 goods that directly encompass those covered by TAM's prior registration. *Compare* Ex. 2 *with* Ex. 1. Intterra's applications do not disclaim the term AWARE, acknowledging that Intterra considers this term to be source-signifying and inherently distinctive. *See generally* Ex. 2. Intterra's AWARE-branded offerings are "being offered in the same general field" and ultimately serve overlapping sets of end users as TAM's offerings and mobile application. Compl. ¶ 44.

On January 6, 2026, Intterra issued a press release announcing its new, AWARE branding. Ms. Brady was shocked, given TAM's registered rights and her understanding that Intterra's work would be done under a different brand, and received immediate outreach from others in the industry, seeking comment. Brady Decl. ¶¶ 36-37. On January 28, 2026, after learning of Intterra's intentional and willful misappropriation of TAM's rights, TAM, through counsel, sent Intterra a cease-and-desist letter. Compl., Ex. E. The letter reminded Intterra of TAM's trademark rights in WILDFIRE AWARE® and demanded that Intterra cease its use of AWARE-formative marks or otherwise engage in good faith efforts to resolve the matter short of litigation. Compl. ¶ 23, Ex. E.

Undaunted, Intterra forged ahead, continuing to use and promote the AWARE-formative marks, doubling down on the impending launch of its confusingly-similar app under AWARE branding that it had offered to purchase and applied to register. Then, instead of doing the right thing and simply changing its branding, on March 5, 2026, Intterra filed a lawsuit against TAM and Ms. Brady in her personal capacity. Compl. ¶ 30, 40. Intterra's lawsuit seeks a declaration of <u>non</u>-infringement, injunctive relief, and an award of attorneys' fees and costs from TAM and Ms. Brady. However, the allegations in the Complaint establish the opposite: Intterra is willfully infringing.

Intterra's Complaint affirmatively describes, in detail, its awareness of the existence and value of TAM's rights in its "app and brand," but demonstrates how it then chose, in bad faith, to adopt a confusingly-similar trademark. The Complaint admits Intterra's prior knowledge of and interactions with TAM and Ms. Brady (Compl. ¶¶ 25-30), TAM's prior rights and trademark registration (*Id.* ¶¶ 1, 12), and its subsequent adoption of AWARE-formative branding after failing to acquire such rights from TAM (*id.* ¶¶ 27-28). The Complaint acknowledges TAM and Ms. Brady's January 28 cease-and-desist letter and subsequent correspondence, but filed only a heavily redacted version of the subsequent

correspondence, leaving in self-serving statements about Intterra's admiration of Ms. Brady's "grit" and that "nothing about our client's platform or mission is intended to diminish her efforts or directly compete with her," but blacking out non-confidential arguments and evidence of the opposite, including admissions of the scope of TAM's rights and the audiences for Intterra's rebranded offering, and Intterra's own public statements of its intent to compete with and displace "private apps" like TAM's. *Compare* ECF No. 1-8 *with* Ex. 8.

On March 15, Intterra publicly announced its plans to launch its AWARE-branded app for public use on the App Store on May 1, 2026. Brady Decl., ¶ 57. On March 16, Intterra filed a fifteenth AWARE-formative trademark application. Ex. 2 at 6. TAM was served on March 18, and Ms. Brady was served on March 19. On March 23, counsel to TAM and Ms. Brady sent a letter to Intterra's counsel advising of the rights and irreparable harm at issue, noting that TAM and Ms. Brady are open to a fair and reasonable resolution, but that, given, *inter alia*, the imminent launch of Intterra's AWARE-formative app, that TAM is prepared to seek preliminary injunctive relief. Intterra was not interested in resolution, continues to move towards imminent launch, and this motion for preliminary injunctive relief from Intterra's willful trademark infringement follows.

## II. LEGAL STANDARD

Preliminary injunctive relief is granted upon showing: (1) a likelihood of suffering irreparable harm in the absence of preliminary relief; (2) a likelihood of success on the merits; (3) that the balance of equities favors the relief requested; and (4) that an injunction is in the public interest. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1247, 1249 (9th Cir. 2013) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also eBay Inv. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

In the Ninth Circuit, the party seeking equitable relief "must make a threshold showing of likelihood of success on the merits and irreparable harm, but a stronger showing on one element may offset a weaker showing on another." *TPW Mgmt., LLC v. Yelp Inc.*, No. 16-cv-03063-YGR, 2016 WL 6216879, at *2 (N.D. Cal. Oct. 25, 2016) (citing *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-33 (9th Cir. 2011)). "In that regard, the four factors may be evaluated on a sliding scale." *Id.*

"'[S]erious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies*, 632 F.3d at 1135. A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). Courts "must consider the public interest as a factor in balancing the hardships when the public interest may be affected." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

## III. ARGUMENT

TAM is entitled to preliminary injunctive relief to enjoin Intterra's planned May 1, 2026, public launch of an AWARE-branded app, which will cause irreparable harm to TAM and is likely to cause marketplace confusion.

### A. Intterra's Launch Will Cause Irreparable Harm

Injunctive relief requires a finding of irreparable harm, which is rebuttably presumed in trademark cases that are likely to succeed on the merits. *Herb Reed*, 736 F.3d at 1251. *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756-757 (9th Cir. 2018). *See also CytoSport, Inc. v. Vital Pharms., Inc.*, 617 F. Supp. 2d 1051, 1080 (E.D. Cal.), *aff'd*, 348 F. App'x 288 (9th Cir. 2009) ("Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case."); 15 U.S.C. § 1116(a) ("A [trademark] plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation [] in the case of a motion for a preliminary injunction."). Here, TAM will undeniably suffer an intangible injury from the theft and destruction of the goodwill it has built.

By virtue of the inherent distinctiveness of its mark and TAM's continuous trademark use and investment in its brand and offerings, consumers have come to rely on WILDFIRE AWARE® for timely, accurate wildfire information when minutes matter. *See e.g.*, Ex. 7 (user stating that WILDFIRE AWARE® "has given me back a sense of security during fire season, knowing I will have the information I need when I need it"); Brady Decl., ¶¶ 42, 46-47. Intterra not only plans to imminently launch an app that unfairly free rides on the years of experience and technical expertise

embodied in the WILDFIRE AWARE® app and brand, but Intterra's massive size and scale threatens to swamp the market and usurp TAM's goodwill entirely by causing "reverse confusion." *See* Brady Decl., ¶ 43. On information and belief, Intterra is backed by substantial institutional capital, alleges millions of dollars of value associated with its app, and has publicly signaled its intent to launch and promote AWARE offerings on a scale far exceeding TAM's current reach. *See supra* I.B-C. Put simply, consumer confusion is not speculative; it is a predictable result of a larger, better-resourced entrant offering the same services under a confusingly similar mark. *See Fleet Feet, Inc. v. Nike*, 419 F. Supp. 3d 919, 947 (M.D.N.C. 2019) (finding likelihood of irreparable harm and granting preliminary injunction in reverse confusion matter in light of "Nike's market power, online and social media presence, and the wide-ranging placement of [Nike's infringing marks]"). Intterra's own complaint, along with the evidentiary record, demonstrate that if Intterra launches its app on May 1, 2026, as planned, TAM will suffer immediate and irreparable harm that cannot be remedied.

The harm to TAM's goodwill, reputation, and valuable trademark rights become irreversible as soon as Intterra's AWARE-branded app becomes publicly available. Since at least as early as 2022, TAM has used the distinctive mark WILDFIRE AWARE® as the source identifier for its offerings. *See* Brady Decl. ¶ 19. Through TAM's years of use, consumers have come to recognize WILDFIRE AWARE®, including the dominant term AWARE, as a helpful, credible, and user-friendly source of information at the most critical times for their livelihoods, homes, and families. *See e.g.*, Ex. 7 (user remarking "I will be adding WILDFIRE AWARE® to our list of reliable sources[]"). TAM's actions confirm the value of this designation as a trademark—despite its relatively small size and limited resources, it has invested in a domain name registration, "wildfireaware.ai," and, significantly, a federal trademark registration. *See* Ex. 1. As part of that application, TAM submitted favorably received arguments to the USPTO explaining the distinctiveness and source indicating value of the term AWARE for the services that TAM offers, describing in detail how no other registered marks use AWARE in a manner that is likely to cause confusion with TAM or its offerings. This investment has had a real impact: consumers see WILDFIRE AWARE® as a source indicator, WILDFIRE AWARE® is searchable and downloadable from the App Store, and users have come to associate WILDFIRE AWARE® with TAM and its reputation for developing services for customers in need:

timely, reliable, and continuous information throughout the lifecycle of wildfire events. *See e.g.*, Ex. 5 (noting that evacuation alerts often arrive "too late" and that "those extra five minutes are imperative.").

Intterra admits the goodwill and value associated with the WILDFIRE AWARE® app and brand. Intterra "recognized and deeply respected the significant effort and resources [TAM] had put into building the [WILDFIRE AWARE® app]," but also attempted to hire TAM's founder and purchase "the WILDFIRE AWARE application and brand"—an offer she declined. Compl. ¶¶ 26-27; Brady Decl., ¶ 30-32. Now, Intterra plans to provide: (1) identical wildfire-related services, (2) to the public audience, (3) through the same app-store channels. Inttera's market entry occurs at the precise point where TAM's goodwill resides. Compl. ¶¶ 12, 44. If Intterra's encroachment is not immediately stopped, TAM will lose the ability to control how its mark is perceived by consumers—an injury that this court and the Ninth Circuit have deemed irreparable. *See CytoSport, Inc.,* at 1080.

The fact that the consumers of both TAM and Intterra's apps are individuals who are likely accessing these offerings in times of stress only exacerbates the already imminent, irreversible harm at issue here. *See* Ex. 6 (explaining that wildfire damage can extend "within a heartbeat" and that destruction can occur "within mere hours"); Brady Decl., ¶ 43. Intterra's confusingly-branded app invites confusion immediately at the point of download and use, a time when precision and accuracy matter most. *See e.g.*, Ex. 4 (emphasizing the need for ease of understanding of wildfire information); Ex. 5 ("Those extra five minutes are imperative."); Ex. 7 (user explaining reliance on receiving wildfire information "when I need it"). That confusion will irreversibly undermine trust in the WILDFIRE AWARE® mark if users mistakenly attribute incomplete, delayed, or different alerts to TAM—or assume TAM's app is affiliated with or subordinate to Intterra—TAM will lose control over how its mark is perceived at the exact moment consumers depend on it. *Id.* That loss of control over brand meaning and public trust cannot be remedied through monetary damages. *See adidas Am.,* Inc, 890 F.3d at 756–57 (affirming finding of irreparable harm where injury was loss of control over business reputation and goodwill); *See also* Ex. 7 (describing trust and security provided by the WILDFIRE AWARE® app during emergencies). Therefore, TAM will suffer irreparable harm in a way monetary damages cannot adequately compensate.

### B. TAM is Likely to Succeed on its Trademark Infringement Claim

Intterra acknowledges that TAM owns valid and subsisting trademark rights in an AWARE-formative mark, that Intterra unsuccessfully attempted to buy those rights, and then, only after failing to acquire TAM's rights, proceeded to adopt and seek registration of confusingly-similar AWARE-formative marks for near-identical purposes offered to the same consumers via the same trade channels. TAM is likely to succeed on its trademark infringement claims.

To prevail on a trademark infringement claim, the party alleging infringement must show: (1) that it is the owner of a valid, protectable mark; and (2) that the infringer is using a confusingly similar mark. *Grocery Outlet, Inc. v. Albertson's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007). There are multiple theories of trademark confusion under the Lanham Act, including two applicable here: traditional, "forward" confusion and reverse confusion. "Forward confusion occurs when consumers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder. By contrast, reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005) (internal citations omitted). "Reverse confusion occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021). "[T]he result of reverse confusion 'is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.* (internal quotations omitted).

Likelihood of confusion is assessed based on an analysis of the *Sleekcraft* factors, namely: (1) strength of the infringed mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979) (establishing the "factors relevant to likelihood of confusion"). The *Sleekcraft* factors are also applied in infringement cases involving reverse confusion. *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073,

1080 (9th Cir. 2005). "[T]he relative importance of each individual factor will be case specific." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). For example, risk of confusion is higher "when the goods are complimentary, the products are sold to the same class of purchasers, or the goods are similar in use and function," and so in such cases, the marks need less similarity to each other in order to support a finding of likely confusion, *Sleekcraft*, 599 F.2d at 350 (citation modified), and where a junior user is aware of the senior user's mark, even modest similarity may be actionable, *see Off. Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir. 1993) (finding that knowledge narrows the margin for permissible proximity between marks).

Here, TAM alleges (and Intterra admits) TAM's ownership of the WILDFIRE AWARE® trademark. As this mark is federally-registered, it is entitled to presumptions of ownership and validity. *Off. Airline Guides*, 6 F.3d at 1385 (9th Cir. 1993) ("Marks registered on the Principal Register in the Patent and Trademark Office constitute 'prima facie evidence' of the validity of the registered mark and of the registrant's exclusive right to use the mark on the goods and services specified in the registration."). *See also* Compl. ¶ 1 ("Defendants' Mark is the subject of U.S. Trademark Registration No. 7403027, owned by The Analytical Moose"). Accordingly, the first prong of TAM's trademark infringement claim is easily satisfied.

TAM is also likely to succeed on its claim that Intterra's use of AWARE-formative branding, including its purported AWARECA mark, is likely to cause confusion. An analysis of the *Sleekcraft* factors indicates that all such factors are likely to favor TAM.

**1. WILDFIRE AWARE® is a strong mark by virtue of its distinctiveness, registration, and use (*Sleekcraft* Factor 1).**

TAM's WILDFIRE AWARE® mark—including the predominant term AWARE—is a strong, distinctive source-signifier for the goods at issue. As reflected in TAM's years of use of the term in commerce, meaningful media coverage, and TAM's federal registration and prosecution history, WILDFIRE AWARE® is a commercially strong trademark entitled to a broad scope of protection. See *Sleekcraft*, 599 F.2d at 349 (marks are stronger when they are viewed by the public as an indication of a product's origin). As discussed *supra*, the WILDFIRE AWARE® app and brand have been profiled favorably in numerous articles. *See* Exs. 3-7.

TAM's mark also, significantly, registered without a showing of secondary meaning,

establishing its distinctiveness. *See Ironhawk Techs*, 2 F.4th at 1162 ("Where, as here, the Patent and Trademark Office issued a registration without requiring proof of secondary meaning, the federal registration provides prima facie evidence that the [registered] mark is inherently distinctive."). TAM's trademark registration includes no disclaimer of the term AWARE, and this term comprises a commercially significant portion of TAM's mark, as reflected in TAM's arguments to the USPTO in favor of registration. Intterra's Complaint takes the position that TAM's mark is weak or that, somehow, TAM has disclaimed rights to the term AWARE. Compl., ¶¶ 32-33. However, TAM's federal registration for WILDFIRE AWARE® includes no such disclaimer, and TAM's arguments in support of registration affirm the strength of TAM's exclusive rights to AWARE for software apps in the context of public safety. Compl. Ex. G. Following a preliminary refusal to register WILDFIRE AWARE® based on a prior registration, TAM responded by explaining, in detail, how TAM's applied-for mark differed from that registration, and was entitled to registration and strong, exclusive rights in AWARE for its own offerings and related goods and services. Unlike the GPS cameras, biometric scanning offerings, medical data processing services, and sex education courses identified in TAM's arguments, Intterra's adoption and use of AWARE-dominated branding for use on a competing public safety app that it admits will have the same purpose, function, trade channels, target market as TAM's is likely to cause confusion. TAM's arguments do not impact the strength of its rights for purposes of this analysis.

Intterra's own actions undercut any contention that AWARE is entitled to little (or no) source-signifying value. Intterra filed over a dozen trademark applications for AWARE-formative marks comprised merely of the term AWARE plus the abbreviation of a particular U.S. state, taking the position that such marks are inherently distinctive and entitled to registration. *See* Ex. 2 (U.S. Trademark Application Nos. 99572694 ("AWAREHI"), 99572706 (AWARETX"), 99572700 ("AWAREMO"), 99572711 ("AWAREFL"), 99572641 ("AWARECA"), 99703801 ("AWAREUS"), 99572653 ("AWAREAK"), 99572675 ("AWARE & Design"), 99572691 ("AWAREID"), 99572691 ("AWAREUT"), 99572659 ("AWAREWA"), 99572666 ("AWARE OR"), 99572671 ("AWARENV"), 99572677 ("AWAREAZ"), 99572681 ("AWAREMT")); Compl. ¶ 15 ("On December 20, 2025, Intterra filed fourteen new trademark applications for a number of its AWARE-

formative marks, including Application Serial No. 99572641 for the word mark AWARECA."). The strength of the mark factor thus is likely to favor TAM.

**2. The parties' offerings are substantively identical (*Sleekcraft* Factor 2).**

Both TAM and Intterra will use AWARE-formative marks for the same offerings: publicly available mobile applications intended to provide users with alerts and information regarding public safety, including wildfires. Given the parties' closely-related, competing offerings, this factor is highly likely to favor TAM. "When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected." *Sleekcraft*, 599 F.2d at 348; *see also Levi Strauss & Co. v. Connolly*, 721 F. Supp.3d 987, 996 (N.D. Cal. 2024) (finding a likelihood of confusion where the goods sold under the parties' marks comprised "many of these same types of apparel"). Given Intterra's admitted prior awareness of TAM and its rights, even more limited similarity can create a likelihood of confusion. *See Off. Airline Guides*, 6 F.3d at 1394 (9th Cir. 1993).

Both TAM and Intterra sought registration with the USPTO in Class 9, with TAM's registration covering "Downloadable software in the nature of a mobile application for providing public information on wildfires" and Intterra's applications covering, in pertinent part, "Downloadable computer application software for mobile phones, and handheld and tablet computers, namely, software for use in the communication of public safety information." Beyond these representations, Intterra acknowledges that its app, like TAM's:

- Is intended for public alert purposes: as "supporting various disciplines of emergency response efforts" (Compl. ¶ 44) and disseminating "real-time information, collected from multiple authoritative governmental sources" (Compl. ¶ 22);
- Is intended to provide information relating to wildfire risk. Compl., Ex. C (Compl. at 32) ("AwareCA will deliver: ... Wildfire activity and hazard information."); and
- Is intended to "serv[e] overlapping sets of end users." Compl. ¶ 44.

In fact, Intterra's CEO has stated that Intterra's AWARE app is intended to displace "private apps" like TAM's. Compl. ¶ 40 n. 7, Ex. C at 33. Accordingly, Intterra cannot argue that the apps are unrelated; Intterra *designed* its app to be an effective replacement for TAM's. *See id.* Under similar

marks, confusion is likely to follow.

**3. The parties' marks are highly similar (*Sleekcraft* Factor 3).**

WILDFIRE AWARE® and Intterra's purported AWARE family of marks unquestionably comprise the same literal, distinctive, and dominant term: AWARE. "Similarities [between marks] weigh more heavily than differences." *Sleekcraft*, 599 F.2d at 351. Intterra's marketing and advertising materials emphasize the AWARE name and use it as a 'house mark' across a variety of related product offerings. Compl. ¶ 14 ("Intterra markets and supplies (and intends to market and supply) its mobile application to its governmental consumers under the mark AWARE, and an AWARE-formative mark customized for each state . . . such as AWARECA for California agencies, AWAREHI for Hawaii."); *id.* ¶ 16 ("[T]he mobile application will be made available to end users under Intterra's AWARECA mark.").

Intterra's Complaint asserts that confusion is less likely because "consumers will encounter Intterra's AWARECA mark only in connection with a government-provided service offered by first-response agencies, and always under the official names or seals of such agencies." Compl. ¶ 45. But the Ninth Circuit has recognized that the connection of the infringing mark with well-known, authoritative 'house marks' such as official agency names or seals "can also aggravate confusion by reinforcing the association between the mark and the junior user," and thus "may serve to create reverse confusion that [Intterra or the government], and not [TAM], is the source of" TAM's mobile application. *Ironhawk*, 2 F.4th at 1164-65. This factor favors TAM.

**4. TAM is likely to encounter actual confusion as to the source, sponsorship or affiliation of Intterra's impending new offerings (*Sleekcraft* Factor 4).**

In light of the immediate response to Intterra's announcement of its AWARE-formative branding, actual confusion is likely to follow a public launch. Brady Decl ¶ 43. Failing "to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Brookfield*, 174 F.3d at 1050. When a defendant's product is new on the market, an absence of evidence is expected. *See Pom Wonderful v. Hubbard*, 775 F.3d 1118 (9th Cir. 2014) (holding district court erred in finding actual evidence weighed against plaintiff enforcing its trademark rights when defendant's product was new on the market). The absence of evidence of actual

confusion is expected here because Intterra's app has not yet been released to consumers. Once Intterra's app launches—particularly where it will be marketed directly alongside WILDFIRE AWARE® in mobile app stores—instances of actual consumer confusion are likely to follow. This factor is therefore neutral at this stage.

**5. The parties' marketing channels are identical (*Sleekcraft* Factor 5)**

In assessing this factor, courts "consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130. Here, both TAM's and Intterra's mobile applications will be marketed and available for download by the same audience using the same channels: the Apple App Store and the Google Play store. *See* Compl. ¶ 44 (Intterra's and TAM's offerings are "being offered in the same general field and ultimately serving overlapping sets of end users[.]"); Compl. ¶ 12 ("[Intterra's] mobile application is intended for use by the general public").

**6. Given the parties' offerings, intended for urgent use, purchasers cannot be expected to exercise particular care (*Sleekcraft* Factor 6).**

"What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999). The circumstances here weigh against an assumption of heightened consumer care.

Intterra's forthcoming app, like TAM's, aims to deliver crucial information at times of moments of intense urgency and stress, including impending wildfires. Compl. ¶ 44 ("Intterra's software is a comprehensive platform for supporting various disciplines of emergency response efforts, for all types of hazards."); Compl., Ex. C. ("AwareCA will deliver: ... Wildfire activity and hazard information."). Under such conditions, consumers cannot be expected to carefully deliberate at the time of acquisition, only increasing the potential for confusion. That risk is amplified, where the consumer is encountering two free-to-download mobile applications readily available to the general public through mobile app stores. *See Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 920, 927 (10th Cir. 1983) ("buyers typically exercise little care in the selection of inexpensive items that may be purchased on impulse"). *See also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992) (acknowledging that "the district court found that consumers tend to exercise less care when purchasing lower cost items") This factor favors TAM.

**7. Intterra evinced bad intent in selecting its marks (*Sleekcraft* Factor 7).**

In the Ninth Circuit, a junior user who adopts or continues use of a mark with actual knowledge of a senior user's rights is required to keep a greater distance from the senior mark; failure to do so supports an inference of bad faith and weighs heavily in favor of likely confusion. *See Brookfield*, 174 F.3d at 1394 (holding that where defendant adopted its mark with knowledge of plaintiff's mark, the intent factor strongly favored plaintiff and supported a likelihood of confusion); *see also Sleekcraft*, 599 F.2d at 354 ("When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."). Indeed, in this Circuit, knowledge and continued use is <u>incompatible</u> with good faith. *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 436 (9th Cir. 2017) (holding that the infringer's knowledge of the senior user's prior rights "defeats any claim of good faith"). Given Intterra's actual knowledge of TAM's prior rights before adopting its infringing mark, Intterra's bad intent is inferred, and it cannot argue that it acted in good faith. At best, Intterra "culpably disregarded the risk of reverse confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934-35 (9th Cir. 2017) (citing *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 473 (3d Cir. 2005)).

Intterra learned of WILDFIRE AWARE®, tried to buy it, failed, and then proceeded to adopt a similar, AWARE-formative literal mark as the name of an app it intended to compete with WILDFIRE AWARE®. *See supra* I.B; Compl. ¶ 26 ("Intterra learned that Ms. Brady had developed her own mobile application and was providing it under the WILDFIRE AWARE mark," and Intterra "review[ed] Ms. Brady's app."). That Intterra not only appropriates the term AWARE, but also targets its app to wildfires in association with CAL FIRE, and that it uses red coloring and shield iconography like TAM's app only amplifies its apparent bad intent.

**8. The parties' offerings are already competing, and Intterra's marks would prevent TAM's legitimate business expansion (*Sleekcraft* Factor 8)**

"[A] trademark owner is afforded greater protection against competing goods." *Sleekcraft*, 599 F.2d at 354. Intterra chose to adopt an infringing mark and expand its business directly into TAM's competitive space. *See supra* I.B. Intterra's proposed use—including nationwide registrations—not only encroaches directly on TAM's current offerings but also prevents TAM from its *own* legitimate expansion under mark. "Reverse confusion can foreclose the senior user from expanding into related

fields and could place the senior company's goodwill in the hands of the junior user." *Ironhawk Techs.*, 2 F.4th at 1160. *See also Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F.Supp.2d 1178, 1199-200 (C.D. Cal. 2013) ("If, as in this case, the junior user is barred from using its mark in only those areas in which the registrant does business, then it is free to occupy the rest of the country. That presence could be significant enough to eliminate the registrant's identity. . . And even if the registrant can preserve its identity in some areas, it has no incentive to expand its business into any territories occupied by the junior user.")

As one example, while TAM's offerings are currently targeted towards end users, there is no reason that WILDFIRE AWARE® could not be marketed, customized, or sold to businesses or governmental entities using other trade channels. Intterra's Complaint posits that TAM and Intterra's marketing, trade, and consumer channels are fundamentally different because, according to Intterra, though both parties offer their products to individual consumers, "the business-to-government (B2G) trade channels through which Intterra markets and sells its software are vastly different from traditional business-to-consumer (B2C) [through which TAM markets and sells] and business-to-business (B2B) marketing channels." Compl. ¶ 13. Not only does this argument fail to obviate the parties' common users or account for harm to TAM's existing market but highlights an entire as-yet-untapped market for TAM's offerings that would be cut off by Intterra's infringement.

It is not often the case that the *Sleekcraft* factors so heavily weigh in favor of one party as they do here. *See Levi Strauss & Co.*, 721 F.Supp.3d at 996-97 ("no reasonable trier of fact could find in [accused infringer]'s favor with respect to the majority of the *Sleekcraft* factors" on the issue of likelihood of confusion, where accused infringer admitted that the infringer offered overlapping goods, targeted the same consumers, knew about the senior mark before adopting his mark, and used the same channels of trade). In view of Intterra's willful, knowing infringement of admittedly registered trademark rights, TAM is highly likely to succeed on the merits of its claim.

**C. The Balance of the Equities Favors TAM**

TAM's narrowly-targeted preliminary injunctive relief—enjoining Intterra from launching a mobile application under confusingly-similar branding—is reasonable and well-supported. *2ONE Labs Inc. v. ITG Brands, LLC*, No. CV 24-08124-MWF (Ex), 2024 WL 5272973, at *12 (C.D. Cal.,

Dec. 20, 2024) (granting narrowly-tailored preliminary injunction, where defendants would "be enjoined only from engaging in any future sale of products bearing a confusingly similar mark").

TAM is not seeking to prevent competition or deter others from providing valuable public services to populations in need of reliable information, but merely to avoid irreparable harm caused by brazen trademark infringement: Intterra is free to develop a competing offering, but it can't steal or diminish TAM's rights in doing so. As in the 2026 case of *Baron App v. OpenAI*, "[Defendant's] harm arises from its own likely infringing use of a registered mark. . . . [Defendant] is not at risk of losing its business or even direct sales loss as [the newest version of its product] is free. It must simply rename its feature…" *Baron App, Inc. v. OpenAI, Inc.*, No. 25-cv-09268-EKL, 2026 WL 447428, at *16 (N.D. Cal. Feb. 14, 2026).

Materially, any harm to Intterra stemming from the requested injunction is self-inflicted and entitled to little weight. *See, e.g., Intenze Prods., Inc. v. TATLAB Corp.*, No. 2:23-cv-02265-RGK-PD, 2023 WL 5209729, at *9 (C.D. Cal. Aug. 1, 2023) ("Defendants' alleged hardship is of little weight . . . Defendants were given advance notice of their alleged infringement prior to the filing of this action, as Plaintiff sent a cease-and-desist letter giving them the opportunity to cease their allegedly infringing conduct.") An infringer cannot manufacture hardship by rushing a launch under a legally risky name and then cite that hardship to defeat an injunction. *See Boldface Licensing*, 940 F. Supp.2d at 1195 (granting preliminary injunction where accused infringer quickly moved forward with product rollout despite being "unquestionably aware of [senior mark holder]'s rights and still proceed[ing]").

Intterra has been aware of TAM's rights since it discussed purchasing WILDFIRE AWARE® in 2024. Since then, Intterra has received multiple notices of TAM's pertinent rights and intent to enforce against any infringement, including on January 28, March 23, and March 31 yet continues unabated towards its planned May 1, 2026, launch. Removal of infringing branding is logistically straightforward, common in the technology sector, and far less costly than post-launch rebrands. There is minimal hardship associated with pre-launch or even early-stage renaming, particularly of a mobile application. *BNSF Ry. Co. v. Float Alaska IP, LLC*, No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506, at *10 (C.D. Cal. Aug. 28, 2023) (Granting preliminary injunction and agreeing with senior mark holder that accused infringer "is just starting operations and could more easily rebrand from the outset

of its business."). Any harm to Intterra is monetary and therefore reparable. Any costs to re-brand or re-name Intterra's mobile application materials are quantifiable and recoverable through money damages, in the unlikely event that Intterra later prevails. In contrast, the infringement of TAM's trademark causes a loss of control over TAM's reputation; this is irreparable. *See supra* III.A.

**D. The Public Interest would be Served by an Injunction**

The public interest will be served by an injunction preventing Intterra from using infringing AWARE-formative marks with its planned mobile app release. "In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused." *CytoSport, Inc.* 617 F.Supp.2d at 1081. Trademark law exists to protect consumers from such confusion, and courts routinely hold that preventing consumer confusion through injunctive relief serves the public interest. *See, e.g., Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.,* 534 F. App'x 633, 636 (9th Cir. 2013) ("An injunction that prevents consumer confusion in trademark cases . . . serves the public interest."); *2ONE Labs*, 2024 WL 5272973, at *12; *InSinkErator, LLC v. Joneca Co., LLC*, 163 F.4th 608, 623-24 (9th Cir. 2025). As discussed *supra*, TAM is likely to succeed on the merits in demonstrating a likelihood of confusion between its WILDFIRE AWARE® mark and Intterra's planned app launch using AWARE-formative mark. Preventing this confusion before a launch of a second AWARE-branded app is far preferable to attempting to correct public misconceptions later.

The requested injunction serves the public interest because it is narrowly tailored to prevent likely, and irreparable, harm to TAM and the public. TAM seeks only to preclude Intterra from using its infringing AWARE-formative marks with its planned mobile application release—not to prevent Intterra from releasing its mobile application or from providing the public with information. This limited relief ensures the public can continue to access wildfire-related information while avoiding deception as to the qualities or source of that information.

**E. Any Bond Requirement Should We Waived, or Nominal**

In view of the foregoing, TAM should not be required to post a substantial bond, or any bond, pursuant to Federal Rule of Civil Procedure 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). A "likelihood of

success on the merits . . . tips in favor of a minimal bond or no bond at all." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). Here, TAM has demonstrated a uniquely strong likelihood of success on the merits of its trademark infringement claim, with strong arguments in its favor on each of the eight *Sleekcraft* factors. *See supra* III.B. Intterra's prior knowledge of TAM's rights before adopting its infringing mark precludes any argument that it adopted its AWARE-formative branding in good faith. *See supra* I.B-C. Granting preliminary injunctive relief without bond, or with minimal bond, is especially appropriate in a reverse-confusion case, where the parties' relative size is a central issue. The doctrine of reverse confusion protects the rights of smaller, resource-limited senior users from being overwhelmed by a larger second comer through market saturation. *See, e.g.*, *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021). Any alleged wound suffered by Intterra is entirely self-inflicted and TAM should not be required to post a bond to insure Intterra against its own misconduct. Imposing a cost-prohibitive bond on a small business seeking only to exercise its legitimate trademark rights and avoid reverse confusion caused by a larger infringer's swamping the market is inequitable and unwarranted.

Where the alleged infringer offers no competent evidence of likely costs or damages from wrongful restraint, a court may set no bond or only nominal security. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003) (the mandatory language of Rule 65(c) does not absolve[ ] the party affected by the injunction from its obligation of presenting evidence that a bond is needed, so that the district court is afforded an opportunity to exercise its discretion in setting the amount of the bond."); *see also Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp. 2d 1294, 1309 (W.D. Wash. 2010). Intterra is unlikely to be able to provide evidence that a large bond (or any bond at all) is needed,o given the narrowly-targeted relief sought and its position that AWARE is of limited source-signifying value. Importantly, TAM does not seek to prevent Intterra from developing, marketing, or launching a wildfire-warning application, nor does she seek to bar Intterra from partnering with CAL FIRE. TAM instead seeks only narrow, trademark-specific relief from harm caused by Intterra's knowing use of confusingly-similar branding. Even if TAM's injunctive relief is granted, Intterra may continue with its product and CAL FIRE rollout, so long as it does not use AWARE branding – circumstances not demanding a bond. *See Masters*, 725 F. Supp. 2d, at 1309

(allowing injunction without bond in matter concerning title of television program where "[t]he injunction does not prevent the show from airing, it merely requires it to be renamed after the conclusion of the current schedule."). Additionally, Intterra has taken the position that, for the goods and services at issue, the term is of limited value. *See* Compl. ¶ 43 ("The element AWARE has become a relatively weak source indicator for the pertinent goods and services, such that the scope of protection for such designation is quite limited."). If AWARE has such limited value, Intterra cannot claim that operating under a different brand is so commercially significant as to require a substantial bond.

In this context, even if the Court concludes some security is appropriate, it should be nominal. The Ninth Circuit has held that a court has discretion to "dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985), amended on other grounds, 775 F.2d 998 (9th Cir. 1985); *see also GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1211 (9th Cir. 2000) ("Were we to grant Disney's request, we would risk denying GoTo access to judicial review since the preliminary injunction would not take effect until GoTo posted the bond. We decline to do so."). TAM is a small business of limited means, *see* Brady Decl., ¶ 22, and should not be required to put even more money on the table to obtain narrowly-tailored relief that will prevent the irreparable harm of Intterra's reverse confusion. The Court should therefore waive security under Rule 65(c), or, in the alternative, set a nominal bond of no more than $1,000.

## IV. CONCLUSION

For the reasons stated above, the Court should grant Counterclaim-Plaintiff TAM's motion for a preliminary injunction, and enjoin Plaintiff Intterra, LLC, together with its members (to the extent acting on behalf of or for the benefit of the LLC), managers, officers, employees, agents, servants, representatives, affiliates, subsidiaries, successors, assigns, and all persons in active concert or participation with them from, directly or indirectly, promoting, offering, and selling software and related products and services in the field of wildfire alerts and emergency notification under AWARE-formative branding, including its planned launch of AWARECA on May 1, 2026.

DATED: April 3, 206 BAKER BOTTS L.L.P.

By: */s/ Rachael D. Lamkin*

Rachael D. Lamkin (SBN 246066)
rachael.lamkin@bakerbotts.com
101 California Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 291-6200
Fax: (415) 291-6300

Julie Albert (*Pro Hac Vice pending*)
julie.albert@bakerbotts.com
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Fax: (212) 408-2501

*Attorneys for Defendant and Counterclaim-Plaintiff The Analytical Moose LLC and Defendant Rachael Brady*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system on April 3, 2026 pursuant to Local Rule 135.

*/s/ Rachael D. Lamkin*
Rachael D. Lamkin