Rachael D. Lamkin (SBN 246066)
rachael.lamkin@bakerbotts.com
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 291-6200
Fax: (415) 291-6300

Julie Albert (*Pro Hac Vice pending*)
julie.albert@bakerbotts.com
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Fax: (212) 408-2501

*Attorneys for Defendant and Counterclaim-Plaintiff The Analytical Moose LLC and Defendant Rachael Brady*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| INTTERRA, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE ANALYTICAL MOOSE LLC and RACHAEL BRADY,<br><br>Defendants. | Case No.: 2:26-cv-00747-WBS-CSK<br><br>**DECLARATION OF RACHAEL BRADY IN SUPPORT OF DEFENDANT AND COUNTERCLAIM-PLAINTIFF THE ANALYTICAL MOOSE LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. William B. Shubb<br>Date: May 26, 2026<br>Time: 1:30 p.m.<br>Courtroom: 5, 14th Floor<br>Trial Date: N/A<br>Action filed: March 5, 2026 |

I, Rachael Brady, hereby declare:

1. I am over the age of 21 and am fully competent to make this declaration. I have personal knowledge of all facts recited herein, and state that such facts are true and correct to my personal knowledge or, where so indicated, on information and belief.

2. I submit this declaration in support of The Analytical Moose LLC ("TAM")'s motion for a preliminary injunction seeking to prevent Intterra, LLC ("Intterra") from using AWARE-formative marks in connection with the imminent launch of its planned public-facing mobile application.

3. I am the founder and owner of TAM. In addition to my work as part of TAM, I am currently the deputy director of research at ALERTCalifornia, a UC San Diego public safety program. I additionally offer consulting services related to wildfire mapping.

4. My background has informed my career and personal trajectory and given me the expertise that allowed me to create the WILDFIRE AWARE® app as part of TAM.

5. I am a California native with deep, personal experiences with the complexity, challenges, and devastation of wildfires and other natural disasters. My interest and passion for fire safety and community alerting began on my 18th birthday, in 2004. At the time, I was living with my family in Ono, California. When we were out to dinner, I saw smoke from the nearby Bear Fire. When I saw the devastating impact this fire caused to the community, I felt compelled to do something and began volunteering at the volunteer fire department in Igo/Ono, California.

6. Shortly thereafter, I took a job as a 911 dispatcher with the California Department of Forestry and Fire Protection ("CAL FIRE") Mendocino dispatch center in Willits, Mendocino County, California. As a dispatcher, I worked long shifts, up to ten days on, two days off, for approximately a year and a half, then transferred to the CAL FIRE Shasta-Trinity dispatch center in Redding, California where I continued in my role as a dispatcher and took on new responsibilities. I was also managing Shasta-Trinity's Computer Aided Dispatch ("CAD") system, where I was introduced to GIS.

7. In 2013, I transitioned to CAL FIRE's Northern Region office as a GIS Analyst, which used Geographic Information Systems ("GIS") for intelligence gathering, emergency management,

and decision making. This work involved analyzing and pushing spatial information to pilots and airspace coordinators during high fire activity, assisting law enforcement with intelligence gathering and evidence collection, providing cell phone analysis and location verification, and evaluating many kinds of spatial data and using it to solve problems and inform decision making in times of emergency. This work informed my understanding of how wildfire information is generated, communicated, and relied upon in times of emergency.

8. I attained a Bachelor of Arts in Intelligence Studies from the American Public University System, with an emphasis on terrorism, in February 2014, while working full time, and attained a Master's degree in Professional Studies, Geographic Information Technology, from Northeastern University in September 2016, having split my Master's program studies with working up to 80-hour weeks at CAL FIRE. While at Northeastern, I was spotlighted as a student with a "unique and exemplary path."

9. By 2018, I was working on and managing many projects with GIS. One of those projects, taken on as a capstone for my Master's studies, involved the complex problem of whether and how to use GIS data to evaluate and recognize serial arson patterns. I was able to use my expertise and technical skills to develop a methodology for identifying likely serial arson patterns, which was implemented and led to arrests and charges for arson-related crime. I was awarded the national Government Achievement Award by the United States Geospatial Intelligence Foundation (USGIF) for this work.

10. In 2020, After spending over a decade with CAL FIRE, a rewarding but deeply challenging experience, I formed an LLC, The Analytical Moose ("TAM"), to facilitate my business and consumer-facing ventures and ensure that work done for TAM is owned by, and on behalf of, the LLC. The name "The Analytical Moose" recalls my love of wildlife and puts that wildlife in the context of technical analysis. I wanted a name that reflected technical acumen but also had a bit of whimsy.

11. On September 23, 2020, a wildfire, the Zogg Fire, devastated my community west of Redding, California. My childhood home was burned down, my great grandmother's home was burned down, and my husband (a career firefighter) fought heroically through the night to keep my mother's

house standing.

12. In the aftermath of that fire, I helped with my neighbors' recovery efforts. My community and I grappled with the lack of information available to the public in times when seconds count. What frustrated us so much was that there was an information gap between when wildfires start and when government notifications about wildfires are sent out.

13. My mother encouraged me to use my skills to benefit my community; she said there has to be some better way to notify the public about fires and get information out quickly, and I knew that I could help create a solution.

14. At the time, there were limited avenues for the public to access timely, usable information on wildfires, one of which was an app that later became known as Watch Duty. As I understand it, at that time, Watch Duty relied on radio traffic as its source of data. Based on my dispatch experience, I did not believe that this source of data was the best solution, as radio traffic can be sensitive, incomplete, or change rapidly.

15. Instead, I focused my development on authoritative sources, including publicly available data from the National Weather Service, the National Wildfire Coordination Group (NWCG), and CAL FIRE, and developing software to rapidly and efficiently aggregate and deliver official information to users when a fire starts, throughout active fire conditions, and during the post-fire period when secondary safety hazards may persist.

16. By spring 2022, I solidified the idea for what became WILDFIRE AWARE®: a mobile application that could quickly aggregate and disseminate information from authoritative data sources. The goal of WILDFIRE AWARE® is immediacy. Information is presented without commentary, alerting the user to a potential wildfire concern and giving the public time to use their judgment on what to do next in times when every second counts.

17. In July 2022, after engaging trademark counsel, I selected the name "Wildfire Aware" for my app and submitted a trademark application to the USPTO on August 10, 2022. My application registered on May 28, 2024.

18. On October 4, 2022, I filed a provisional application for a patent for an invention covering, broadly speaking, wildfire modeling and prediction. I filed a non-provisional application for

my invention on October 3, 2023, and my patent issued on June 4, 2024, as U.S. Patent No. 11,998,783.

19. On November 18, 2022, WILDFIRE AWARE® launched in both the Apple App Store and the Google Play Store and has been available ever since.

20. WILDFIRE AWARE® is designed to provide users with source clarity. Where feasible, the application identifies or attributes the source of information displayed (for example, by labeling the originating agency or data provider). WILDFIRE AWARE® serves all of the United States and Canada and has users across North America.

21. The WILDFIRE AWARE® application is free to download. There is also a paid subscription model. Subscription costs $2.99/month or $19.99/year. The paid version includes all free features and has the added feature of actively pushing alerts to subscribers. The only difference is notification - the same information is available to all users regardless of subscription status.

22. The paid application cost is priced intentionally low, and available on a short-term (monthly) basis to maximize access. The base application is free because I want people to have useful, authoritative information available to them that can save lives, homes, and livestock. The subscription rate is priced essentially at cost: the revenue generated from WILDFIRE AWARE®'s subscriptions cover only the cost of hosting the application on the servers that are needed to offer the application and its alerts, and WILDFIRE AWARE® has, to date, not generated a profit.

23. While I have not done any meaningful advertising, according to metrics that I have access to, there have been nearly 30,000 unique downloads of WILDFIRE AWARE® from the Apple App Store and the Google Play Store, which I believe is largely through word-of-mouth from users who have downloaded WILDFIRE AWARE® and found it helpful or through app store searches. Location information connected with subscription sales indicates active users throughout the United States and Canada, including the US states of Washington, Wyoming, Pennsylvania, California, Oregon, Montana, Alabama, Arizona, and Texas, and the Canadian province of Newfoundland and Labrador, among others.

24. WILDFIRE AWARE® is well-known and has a strong reputation in the field of public safety apps and in the wildfire community. The app has received positive media coverage and has received favorable feedback from users. True and accurate copies of media coverage featuring

WILDFIRE AWARE® are attached hereto as Exhibits 3-7.

25. Since launch, I have continued to maintain and develop the WILDFIRE AWARE® app, including its data-source integrations, user experience, and notification functionality. I believe that consistent and active maintenance is a part of WILDFIRE AWARE®'s reputation. Users know that if something breaks, I will fix it. I read all of the reviews of WILDFIRE AWARE® personally, and take all of the feedback into consideration. While I am pleased that most reviews are highly favorable, any 'negative' review, for example, is followed promptly by a response from TAM, in which I consider and address their constructive feedback. Anything that can be fixed based on the feedback, I either fix myself if I am able, or work with the developer to assist with more complex coding changes as necessary.

26. As part of TAM, I have invested significant time and resources into WILDFIRE AWARE®. I estimate that I have spent upwards of 2,500 hours to develop, update, and maintain WILDFIRE AWARE®, and (setting aside this lawsuit) estimate to have spent between $150,000-$200,000 in connection with WILDFIRE AWARE®, including to engage a developer, obtain and maintain intellectual property rights, obtain and maintain domain registrations, and obtain and maintain access to source data. Some of these costs are covered through subscriptions, but this has been a significant personal investment and labor of love – I am not a wealthy person and while I'm proud of my professional achievements, income from my consulting work and my work at ALERTCalifornia are not significant, and the majority of TAM's profits are reinvested into WILDFIRE AWARE®.

27. WILDFIRE AWARE® has been an important offering for TAM and, over the past years of availability and use, has generated meaningful business and public interest.

28. On July 31, 2024, I met with Mr. Robert Edson, Chief Customer Officer of Intterra. I understood that Intterra had access to information from fire departments, but was not pushing that information to the public. Mr. Edson and I discussed ways Intterra could push relevant information to the public through WILDFIRE AWARE®. We discussed the idea of a partnership between Intterra and WILDFIRE AWARE®, or, alternatively, the idea of Intterra acquiring WILDFIRE AWARE®. Shortly after, I was invited to meet with Intterra's then-Chief Executive Officer, Mr. Mike Soldan, to

discuss Intterra potentially acquiring WILDFIRE AWARE®. I said I was open to that discussion. Mr. Soldan contacted me almost immediately after to schedule a meeting.

29. On August 5, 2024, I met with Mr. Soldan. We discussed a potential partnership and what an acquisition of WILDFIRE AWARE® could look like. On August 12, 2024, Mr. Soldan emailed me with a written offer to acquire WILDFIRE AWARE® in its entirety via a lump-sum payment and an earnout-style structure based on active users.

30. As I was considering Intterra's offer, I learned from Mr. Soldan that he had been let go, and he advised me to stay in touch with Mr. Edson. Shortly thereafter, it is my understanding that Intterra underwent additional restructuring, and Mr. Edson also left the company.

31. On October 23, 2024, I was introduced to Mr. Rob Wolf, Intterra's new CEO. Mr. Wolf and I met on October 30, 2024, to discuss WILDFIRE AWARE®, including acquisition and additionally, the possibility of my personal employment at Intterra.

32. In November 2024, Mr. Wolf continued to communicate with me about Intterra potentially acquiring WILDFIRE AWARE® and employing me. On November 14, 2024, he sent me a proposed compensation structure, including payments for WILDFIRE AWARE® in its entirety and employment compensation. This new offer from Intterra was contingent on my working at Intterra full-time for a minimum of three years. A three-year contract with Intterra was simply not something I was interested in, as I had a job and other work that was important to me. On November 18, 2024, I declined the offer.

33. Mr. Wolf contacted me again on December 19, 2024, and again in February 2025, in continued efforts to employ me and acquire WILDFIRE AWARE®. On March 3, 2025, via text, I declined a final time.

34. Between March 2025 and January 2026, I had no conversations with Intterra employees about WILDFIRE AWARE®.

35. On January 6, 2026, Intterra issued a press release announcing that "CAL FIRE selects Intterra's 'AwareCA'," and stating that AwareCA would be available for download in the Apple App Store and Google Play Store in early spring 2026. The press release characterized AwareCA as a statewide public safety information platform providing "fast, authoritative information" and described

it as an "official channel" as contrasted with "private apps."

36. I was genuinely shocked at this announcement. I had understood that Intterra had been working on an app, but it had always been under different branding, which I understood was "ReadyCA." I could not believe their announcement that they had adopted a trademark so similar to mine, for a mobile app that would directly compete with my app, which they had previously tried to buy from me.

37. Within the first 24 hours of that press release, multiple people contacted me, shared the press release with me, and asked what I thought.

38. The very next day, on January 7, 2026, I consulted a lawyer to assess next steps, and on January 28, 2026, my lawyer sent Intterra a cease-and-desist letter.

39. I understand that my lawyer had additional calls and emails with Intterra's lawyers following the initial cease-and-desist letter. A true and correct copy of follow-up email correspondence between my lawyer and counsel for Intterra is attached hereto as Exhibit 5.

40. Intterra did not cease-and-desist. My lawyer's email had also included a request to discuss a business resolution and asked for a response from Intterra by March 4, 2026. Instead of responding to that offer, Intterra sent a copy of the complaint that it filed on March 5, 2026, against me and against TAM. I felt disheartened at the lack of integrity and decision to jump into a lawsuit.

41. At a conference on March 15, 2026, Intterra's CEO, Mr. Wolf, publicly announced Intterra's plans to launch its AWARE-branded app for public use on May 1, 2026.

## IRREPARABLE HARM

42. I was (and remain) very concerned about the impact and irreparable harm that Intterra's new use of AWARE will cause to TAM, WILDFIRE AWARE®, and its users.

43. Intterra is a much larger organization than TAM, and its size, plus Intterra's messaging emphasizing government backing and "official" status, provides scale and the perception of authority that, even after years in operation, TAM and WILDFIRE AWARE® cannot match. If Intterra launches with AWARE branding, there are going to be two mobile apps side by side using a similar name and providing a similar service, one of which is backed by a much larger organization and CAL FIRE, which only increases the potential for confusion between WILDFIRE AWARE® and AWARECA for

an app, in partnership with CAL FIRE, that is intended for use directly with wildfires. Not only would this weaken the source-signifying value of the WILDFIRE AWARE® brand by introducing another AWARE to the very same space where TAM has built up rights over years of use, but when time and information matters, the extra time required to try and differentiate between two similar looking apps is just not feasible. And if something goes wrong with Intterra's app, there is a real risk of harm to the WILDFIRE AWARE® brand by association.

44. I'm also unaware, beyond what Intterra has generally announced about its app, specifically how it will work, but based on my understanding, I believe AWARECA will not provide the same type and speed of information as WILDFIRE AWARE®. As I understand it, both apps are intended to provide information to end-users about wildfires and other emergencies, but have different goals and use different methods and data sources. WILDFIRE AWARE® receives data directly from active feeds and immediately provides users with that information in an easy-to-understand way, through maps and notifications, and without commentary. In rural areas affected by high fire risk and high wind speeds, conditions change so rapidly that the speed of information is crucial. In contrast, I understand that AWARECA receives information from government agencies and necessarily relies on those agencies' decisions about what information to push, and when.

45. This difference in approach matters and mistaking Intterra's app for TAM's could have dire consequences. As an example, during the Zogg Fire in 2020, I could see the smoke, and someone alerted me to the fire's presence. The community started a phone tree, and because of that rapid information distribution, my best friend's mother had exactly enough time to grab essentials and her keys and get out of danger. CAL FIRE did not publish information about that fire until after it was already impacting homes. WILDFIRE AWARE® is intended to be like that phone tree – as soon as its data source indicates a fire, that fire appears on WILDFIRE AWARE®'s map, or for paid subscribers, generates an alert. If my best friend's mom had been using AWARECA as I understand it operates, but thought it provided the near-real-time information WILDFIRE AWARE® offers, the alert would have come to her too late and she would not have had enough time to evacuate.

46. By introducing a practically different, but closely-related app with a confusingly similar name, Intterra has taken away the certainty I've had for years that, when people search for

wildfire-related mobile apps on app stores, they will encounter TAM's app, see the WILDFIRE AWARE® brand, receive the high-quality services TAM provides, and know that TAM is the source and the contact point for any questions or concerns. Taking away, or diverting, that goodwill and reputation would be irreparable.

47. Intterra saw the value of WILDFIRE AWARE® and its branding but apparently didn't believe my company or I were large or important enough to stand in the way of just taking it. I am proud of the years of work and resources I've put in to develop WILDFIRE AWARE® and offer my community a useful tool in moments of crisis. I am disheartened at Intterra's actions, but ready to stand up in support of my hard work and to prevent irreparable harm to TAM's trademark rights and the public.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on April 3rd, 2026, in Ono, California.

/s/ *Rachael Brady* (original signature retained by Rachael D. Lamkin

Rachael Brady