Daniel P. Kappes
CA State Bar No. 303454
Daniel.Kappes@hklaw.com
HOLLAND & KNIGHT LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Telephone:   (415) 743-6900

Daniel C. Neustadt (*pro hac vice pending*)
NY State Bar No. 4532958
Dan.Neustadt@hklaw.com
Sara J. Benson (*pro hac vice forthcoming*)
DC Bar No. 1767612
Sara.Benson@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Telephone:   (202) 955-3000

*Attorneys for Plaintiff Intterra, LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| INTTERRA, LLC,<br><br>              Plaintiff,<br><br>    v.<br><br>THE ANALYTICAL MOOSE LLC and<br>RACHAEL BRADY,<br><br>              Defendants. | Case No. 2:26-cv-00747-WBS-CSK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF AND COUNTERCLAIM-DEFENDANT INTTERRA, LLC'S OPPOSITION TO THE ANALYTICAL MOOSE LLC'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. William B. Shubb<br>Date: April 20, 2026<br>Time: 1:30 p.m.<br>Courtroom 5<br>Action filed: March 5, 2026 |

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

# TABLE OF CONTENTS

I. FACTUAL BACKGROUND ....................................................................................4

    A. INTTERRA PUBLIC SAFETY OFFERINGS AND IMMINENT AWARECA LAUNCH ...........4

    B. THE HARM AN INJUNCTION WOULD CAUSE ........................................................7

    C. FACTORS RELEVANT TO LIKELIHOOD OF CONFUSION ...........................................9
        1. TAM's Office Action Response..............................................................9
        2. The Government Procurement Process ...............................................10
        3. Intterra's Interactions with Ms. Brady ..............................................11

    D. TAM'S CLAIM OF IRREPARABLE HARM ...........................................................12

    LEGAL STANDARD ...........................................................................................14

II. ARGUMENT.........................................................................................................14

    A. THE BALANCE OF THE EQUITIES OVERWHELMINGLY FAVORS INTTERRA ...............14
        1. The Harm to Intterra from an Injunction Would Be Devastating.............15
        2. TAM's Alleged Harm is Minimal and Speculative ...................................17

    B. THE PUBLIC INTEREST WEIGHS HEAVILY AGAINST AN INJUNCTION ......................18

III. TAM HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS ...............................21

    A. THE MARKS ARE NOT SIMILAR.......................................................................22
        1. AWARE Is Inherently Weak and Dilute for the Pertinent Goods and
            Services. Marks Containing AWARE, for the Pertinent Goods,
            Are Therefore Entitled Only to a Narrow Scope of Protection ...........22
        2. In View Of The Inherent and Marketplace Weakness Of AWARE, the
            Difference Between the Marks as a Whole Suffice To Obviate Any
            Risk of Confusion ................................................................................34

    B. INTTERRA'S NON-CONSUMER-FACING OFFERINGS: NO POSSIBILITY OF

    CONFUSION .....................................................................................................36

    C. FOR INTTERRA'S CONSUMER-FACING AWARECA MOBILE APP, THE

    POSSIBILITY OF CONFUSION REMAINS VERY REMOTE ....................................41

IV. TAM CANNOT ESTABLISH IRREPARABLE HARM ................................................46

V.  IF ANY RELIEF IS GRANTED, A SUBSTANTIAL BOND SHOULD BE

    REQUIRED .......................................................................................................48

VI. CONCLUSION.......................................................................................................48

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

**TABLE OF AUTHORITIES**

**Cases**

*Abbott Labs. v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ...................................................................................................19

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ...............................................................................................21

*Apple Inc. v. Pepper*,
   587 U.S. 273 (2019) .............................................................................................................43

*Century 21 Real Est. LLC v. Century Ins. Grp.*,
   No. 03-0053-PHX-SMM, 2007 WL 484555 (D. Ariz. Feb. 8, 2007) ...................................23

*De Anda Enters., Inc. v. JL Deanda Enters. LLC*,
   No. SA CV 16-2049-DOC, 2017 WL 2960796 (C.D. Cal. Apr. 11, 2017)................14, 16, 18

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) .................................................................21, 23, 34, 41

*Good Meat Project v. GOOD Meat, Inc.*,
   716 F. Supp. 3d 783 (N.D. Cal. 2024). ........................................................................1, 19, 43

*In re Google Play Store Antitrust Litig.*,
   147 F.4th 917 (9th Cir. 2025) ..............................................................................................43

*Halo Mgmt., LLC v. Interland, Inc.*,
   308 F. Supp. 2d 1019 (N.D. Cal. 2003) ............................................................................15, 18

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
   736 F.3d 1239 (9th Cir. 2013) .............................................................................................14

*Independent Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*,
   572 F.3d 644 (9th Cir. 2009) ...............................................................................................19

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*,
   559 F.3d 985 (9th Cir. 2009) ......................................................................................... 19-20

*Karoun Dairies Inc. v. Los Altos Food Prods. Inc.*,
   107 F. App'x 785 (9th Cir. 2004) .........................................................................................22

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
   402 F. Supp. 3d 877 (N.D. Cal. 2019) ......................................................14, 15, 16, 17, 18

*Lodestar Anstalt v. Bacardi & Co. Ltd.*,
   31 F.4th 1228 (9th Cir. 2022) ..........................................................................................23, 24

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

*Marketquest Grp., Inc. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017) ...............................................................................40, 45

*Mazurek v. Armstrong*,
520 U.S. 968 (1997)..............................................................................................1

*Miss World (UK) Ltd. v. Miss Am. Pageants, Inc.*,
856 F.2d 1445 (9th Cir. 1988), *abrogated in part on other grounds by Eclipse*
*Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114 (9th Cir. 1990)...............................................24

*Network Automation, Inc. v. AdvancedSys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) .................................................................21, 22, 43

*Outcomes Pharm. Health Care, L.C. v. Nat'l Cmty. Pharmacists Ass'n*,
No. 4:05-cv-00682, 2006 WL 3782905 (S.D. Iowa Dec. 22, 2006)...................................19, 20

*Playmakers, LLC v. ESPN, Inc.*,
297 F. Supp. 2d 1277 (W.D. Wash. 2003) *aff'd*, 376 F.3d 894 (9th Cir. 2004) ......................22

*Surfvivor Media, Inc. v. Survivor Prods.*,
406 F.3d 625 (9th Cir. 2005) .................................................................34, 40, 46

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..........................................................................................14, 19

**Statutes**

15 U.S.C. § 1116(a) ...................................................................................46, 47

**Treatise**

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition at
Section 11:85 (4th Ed. 2012) ...................................................................................24

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition at
Section 23:10 (4th Ed. 2012) .................................................................40, 45

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

**INTRODUCTION**

The Analytical Moose LLC ("TAM") seeks extraordinary relief: a sweeping preliminary injunction that would bar Intterra, LLC ("Intterra") from using any mark containing the word AWARE in connection with its public safety software and mobile application, all on the eve of a government-contracted, taxpayer-funded product launch publicly announced more than three months ago. If granted, this injunction would delay and potentially derail a platform selected by CAL FIRE to be California's statewide public safety information system—a free mobile application designed to push authoritative, real-time evacuation orders, and emergency alerts from government agencies directly to tens of millions of California residents. The Court should deny TAM's motion in its entirety.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(emphasis in original); *Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 795 (N.D. Cal. 2024). TAM has not come close to carrying that burden here.

TAM's requested relief is remarkable not only in its scope, but in its brazenness. TAM asks this Court to bar Intterra from using any branding that includes the word AWARE—a request that, if granted, would prohibit marks such as AWARECA, AWAREHI, AWAREUS, INTERRA AWARE, AWARE INTEL HUB and AWARE OPS, among others, none of which bears any meaningful resemblance to WILDFIRE AWARE. The breadth of this request is particularly striking in light of what TAM represented to the U.S. Patent and Trademark Office ("USPTO") to secure the very registration it now seeks to enforce. TAM's September 20, 2023 submission, responding to a refusal to register due to a perceived likelihood of confusion with a prior registered mark – AWARE – is a ten-page brief arguing that WILDFIRE AWARE and the standalone mark AWARE are not confusingly similar. The arguments TAM made—in its own words—directly contradict the statements in their motion before this Court.

1

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

TAM represented to the U.S. Patent and Trademark Office that its mark and AWARE "are not confusingly similar" because AWARE "creates a markedly different overall commercial impression than the Applicant's Mark WILDFIRE AWARE." TAM argued that "the two marks at issue are visually very different." TAM declared that "the word WILDFIRE of Applicant's Mark is the most important term" in its mark. TAM insisted that "[w]hen the marks are viewed in their entireties, as required under law, there is no doubt that consumers are left with completely different impressions." And TAM argued that AWARE exists in a "crowded field" and is "not entitled to a broad scope of protection." ECF No. 1-7 at 7. Now, having obtained its registration by arguing that marks containing AWARE are not confusingly similar, TAM asks this Court to bar Intterra from using any branding that includes the word AWARE. TAM cannot have it both ways.

TAM now asks this Court to find the exact opposite of everything it told the USPTO: that AWARE is a strong, distinctive element entitled to such broad protection that Intterra should be barred from using *any* branding that includes the word AWARE. But TAM cannot argue to the USPTO that WILDFIRE AWARE and the standalone word AWARE are "visually very different" marks that create "completely different impressions," and then turn around and argue to this Court that WILDFIRE AWARE and AWARECA (and AWARE INTEL HUB and AWARE OPS)— marks even more visually distinct from WILDFIRE AWARE than the standalone AWARE—are so confusingly similar that extraordinary injunctive relief is warranted. TAM's own arguments and admissions to the federal government constitute powerful evidence that the relief it seeks is vastly overbroad and that AWARE, the only element shared between the parties' marks, is a weak designation entitled to narrow protection at most.

What TAM is really after is not protection of its trademark; it is a payday and a deliberate effort to undermine trust in Intterra. Just prior to filing its motion, TAM demanded a seven-figure payout from Intterra, with a deadline of just four days to accept. *See* Declaration of Daniel C. Neustadt, attached hereto as **Exhibit 2,** Ex. A (hereinafter "Neustadt Decl."). When Intterra refused to pay, TAM filed the preliminary injunction motion now before the Court, seeking to hold Intterra's government contracts and its imminent public-safety offerings hostage. But TAM's aim

2

extends beyond extracting a settlement. TAM seeks to stunt Intterra's growth and erode agency and consumer confidence in Intterra's ability to deliver. This is not a case about protecting consumers from confusion. It is an attempt to inflict maximum damage on a company that TAM knows cannot afford to have its government-contracted launch derailed—and to leverage that vulnerability for a windfall.

TAM's delay also undermines its claim that the injunction is urgently needed. Intterra and CAL FIRE announced the Spring 2026 launch of AwareCA on January 6, 2026. Ms. Brady, TAM's principal and an ALERTCalifornia employee, learned of the announcement immediately. But rather than acting promptly, TAM waited to send its initial cease-and-desist letter until the very end of January, engaged in protracted back-and-forth correspondence, and ultimately delayed approximately three months before filing its motion for a preliminary injunction on April 3, 2026. By waiting until the eve of launch rather than moving in January, when a rebranding effort, though significant, would have been more manageable, TAM ensured that an injunction would cause maximum harm to Intterra and maximum leverage for TAM. This delay belies the urgency TAM now, belatedly, alleges.

Ultimately, none of the four preliminary injunction factors favor TAM. The balance of equities and public interest overwhelmingly favor Intterra, which stands to lose tens of millions of dollars in existing and pending government contracts, forfeit years of development and integration work with agencies across the country, and jeopardize a critical public safety platform, one that regional agencies serving the majority of California's population are expected to adopt by the end of 2026. TAM has no likelihood of success on the merits because there is no likelihood of confusion between the parties' marks. And TAM's claims of irreparable harm are speculative at best, particularly given that TAM has offered no concrete evidence of any impact on its downloads or retention, and TAM has not alleged that any individual was actually confused by the announcement of Intterra's AWARE branding.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

## I.    FACTUAL BACKGROUND

### A.    Intterra Public Safety Offerings and Imminent AwareCA Launch

Since 2010, Intterra has developed software to support public service agencies on the front lines of response to public safety threats—not just wildfires, but earthquakes, floods, hurricanes, law enforcement incidents, and other emergencies. Compl. ¶ 9. Today, over 350 government agencies—including fire, EMS, law enforcement, and search-and-rescue agencies at the municipal, regional, state, and federal levels rely on Intterra's software. Compl. ¶¶ 10-11, 18. Since December 2025, Intterra has worked tirelessly to rebrand and refine its software offerings into a suite of three distinct public safety products, each serving a different audience and fulfilling a different function in the chain of emergency response, and all branded under marks containing the word AWARE. The requested injunction would erase thousands of person-hours devoted to those efforts, and require thousands more that would otherwise be spent on refining and delivering an essential public safety tool to tens of millions of citizens. The injunction TAM seeks would bar Intterra from using any branding that includes the word AWARE—a word that unifies this entire suite. *See* Declaration of Robert P. Wolf ("Wolf Decl."), ¶ 3 attached hereto as **Exhibit 1**.

First, AWARE INTEL HUB is a secure, single-pane-of-glass software platform that unifies real-time data from multiple agencies and disciplines into actionable intelligence for faster, smarter decisions. Compl. ¶¶ 11, 20. It serves as the common operating platform for agency command centers, enabling chief officers and command points of public safety agencies to manage GIS data, incident response frameworks, airborne intelligence, and inter-agency coordination—all in one place. Compl. ¶ 11. Command centers of fire service, law enforcement, search and rescue, and other public service agencies across the country use AWARE INTEL HUB to maintain a centralized, real-time view of public safety incidents. *Id.* AWARE INTEL HUB is available only to government agencies, only via direct installation by Intterra, and only after an exhaustive procurement process. The anticipated revenue from licensing of Intterra's AWARE INTEL HUB software is substantial—approximately $6 million per year—and the degree of care exercised by

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

government agents in their procurement of such licenses is correspondingly high. Wolf Decl. ¶ 3(a).

Second, AWARE OPS is a secure mobile application designed specifically for first responders in the field. Built to FedRAMP Moderate-ready architecture and exceeding CJIS and HIPAA security requirements, AWARE OPS provides authenticated login and two-way communications so that firefighters, law enforcement officers, and emergency personnel can access agency-only intelligence alongside public information while responding to incidents. Compl. ¶ 21; Wolf Decl. ¶ 3(b). AWARE OPS enables two-way communication between commanders and the field, meeting the highest security standards—a critical capability when first responders need reliable intelligence delivered in real time. Wolf Decl. ¶ 3(b). The authenticated login dictates that access to the functionality of the AWARE OPS mobile application is limited to first responders employed or contracted by Intterra's partner government agencies; *i.e.*, those that have installed and activated the AWARE INTEL HUB software platform.

Third, AwareCA is the consumer-facing mobile application, the final spoke that delivers authoritative public safety information from government agencies directly and immediately to the communities they serve. AwareCA is an all-hazards, all-discipline application that integrates data from law enforcement, emergency management, utilities, fire service, and other disciplines, covering everything from 911 calls and evacuations to floods, earthquakes, red flag warnings, and routine public safety incidents. Wolf Decl. ¶ 3(c). Of the data displayed on the platform's maps, wildfires constitute less than 1% of the total. *Id*. The application is free to download and free to use—no subscription is required. AwareCA will be prominently featured and promoted on CAL FIRE's official website and other partner agency webpages, with direct links to the Apple App Store and Google Play Store listings. *Id.* Those app store listings will clearly display state-level branding and indicia of the government partnerships, ensuring that users immediately recognize AwareCA as an authorized public safety tool provided in partnership with their state and local emergency response agencies. *Id.*

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Unlike social media platforms or services that scrape and republish information from the internet, AwareCA delivers information directly from first responder organizations, attributed to those organizations, providing the public with a single, trusted, authoritative source for all public safety information. Wolf Decl. ¶¶ 3(c), 4. Users can even receive critical alerts via SMS, email and within the application. Wolf Decl. ¶ 3(c). AwareCA is one of very few—if any—mobile resources that will deliver near real-time incident updates verified by first responders, official push notifications for nearby threats, and statewide consistency so that users can look to one authoritative source for information. Wolf Decl. ¶ 3(c).

Together, these three products form an integrated ecosystem: AWARE INTEL HUB gives agencies the tools to integrate and coordinate; AWARE OPS gives first responders the intelligence they need in the field and the ability to provide timely updates; and AwareCA gives the public the authoritative information they need to stay safe. An injunction would not merely block one of these applications—it would destroy the ecosystem entirely. Wolf Decl. ¶¶ 3-4, 31-42.

On December 16, 2025, CAL FIRE awarded Intterra a contract for this entire suite of public safety software products. Wolf Decl. ¶ 5. Intterra had initially intended to name the consumer-facing mobile application "ReadyCA," but California authorities requested a change because of a conflict with the California Office of Emergency Services' existing website, ready.ca.gov, and the potential for confusion with the federal Ready.gov program. Wolf Decl. ¶ 16. Intterra presented CAL FIRE with three alternative names; after internal consultation with state stakeholders, CAL FIRE selected "AwareCA," subject to diligence by Intterra. Wolf Decl. ¶¶ 17-22. On January 6, 2026, Intterra and CAL FIRE jointly announced that the Aware suite of products would serve as California's statewide public safety information platform, ensuring that tens of millions of Californians would have a single source for emergency response and up-to-date safety information. Compl. ¶ 16; Wolf Decl. ¶ 13. Seventy-nine partner agencies are currently onboarding onto the platform (Wolf. Decl. ¶ 38), and by the end of 2026, Intterra expects that regional public safety agencies serving the majority of California's nearly 40 million residents will be using the Aware products. Compl. ¶ 22.

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

### B.   The Harm an Injunction Would Cause

An injunction barring Intterra from using any branding that includes the word AWARE would cause immediate, concrete, and devastating harm. Beyond CAL FIRE, which is substantial, Intterra has an extensive sales funnel with government customers at various stages of procurement for AWARE-branded software and services. Compl. ¶ 19. In total, tens of millions—and potentially hundreds of millions—of dollars in government contracts are at stake. Wolf. Decl. ¶ 34.

The harm of an injunction is not simply changing the name of an application. It is akin to being ordered to rename "Microsoft Word" to "Microsoft Language." It is not a matter of swapping out a label. The word AWARE is embedded in every layer of the platform: the applications themselves, the underlying code and architecture, all documentation, marketing materials, training guides, landing pages, graphics, API references, and user-facing interfaces across three distinct products. An injunction would require a cascading rework of the entire software ecosystem mid-rollout. Intterra's team is currently working 18 hours a day, seven days a week to prepare for an anticipated early-May launch, with teams operating across the globe. Wolf. Decl. ¶ 3. Beyond Intterra's own materials, every proposal, contract, and city council or county council approval currently in progress references the AWARE name. All would need to be amended. Each of the 79 partner agencies has been preparing internal messaging and communications directing the public to AwareCA, all of which would need to change. Wolf Decl. ¶¶ 33, 38, 42. Countless hours of person-power would be redirected from the substantive work of building, testing, and optimizing a life-saving platform, to the clerical demands of rebranding—updating training manuals, revising onboarding guides, reprinting materials, and re-educating agency staff. Every hour spent changing a name is an hour not spent helping the public.

The broader and potentially more lasting harm is to trust—and trust is the very thing this entire platform is designed to deliver. The entire goal of the AWARE ecosystem is to get government agencies and the public to place their confidence in a single, authoritative source of emergency information. Police chiefs and fire chiefs have chosen to work with Intterra based on

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

trust in the company and its software suite, in Intterra's ability to build reliable software, and in its ability to deliver that software on time. Wolf Decl. ¶ 35. For an application whose essential purpose is to make authoritative information available instantaneously, what could undermine goodwill more than a failure to deliver the actual application by the promised date? And so an injunction that derails the launch would be shattering. An injunction would be especially damaging for the 79 new agencies currently onboarding, agencies that are building new relationships with Intterra and making public commitments to their communities based on the AWARE brand. These agencies would be forced to explain to their communities why a platform they publicly endorsed is suddenly unavailable or has changed its name, eroding not only the public's confidence in Intterra but also in the agencies themselves. And for the over 350 existing agencies that already rely on Intterra's software, an injunction would erode their confidence that Intterra can be counted on to deliver. For a provider of life-saving information, that erosion of trust—from agencies and the public alike—cannot be undone by a damages award. Such harm, *to Intterra*, would be irreparable.

The harm to the public would be equally severe. There is currently no mobile application that delivers authoritative public safety information at scale directly from government agencies to the communities they serve. Wolf Decl. ¶ 4. AwareCA was designed to fill that gap—and CAL FIRE and agencies across California have been counting on it. Fire season is upon us, and CAL FIRE trusted that Intterra's Aware products would be ready, to ensure the safety of the tens of millions of Californians the agency serves. Wolf Decl. ¶¶ 41-42. Delays in launching AwareCA would deprive users of access to the only mobile platform providing immediate, potentially life-saving information direct from state agencies. Wolf Decl. ¶ 41. Every day of delay is a day that tens of millions of Californians will lack access to this critical tool.

Intterra was so concerned about the threat TAM's claims posed to its government contracts and imminent launch that it filed a declaratory judgment action on March 5, 2026—a full month before TAM filed its motion for a preliminary injunction. Compl. ¶ 42. The seriousness with which Intterra treated this threat—by filing suit proactively to protect its contracts and the launch, and

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

maintain the trust of the public and Intterra's agency partners—underscores the magnitude of the harm at stake.

### C. Factors Relevant to Likelihood of Confusion

Notwithstanding the enormous public benefit AwareCA will deliver and the staggering harm an injunction would cause, TAM asks this Court to issue an order barring Intterra from using any branding that includes the word AWARE. But TAM's own conduct reveals that this motion is not about protecting consumers from confusion—it is about leveraging the threat of an injunction to extract a payday or stunt Intterra's growth.

### 1. TAM's Office Action Response

TAM's claim that all marks containing the word AWARE are confusingly similar to WILDFIRE AWARE is directly contradicted by TAM's own representations to the U.S. Patent and Trademark Office ("USPTO"), representations that were critical to TAM securing the registered rights it now seeks to enforce. On August 10, 2022, TAM submitted a trademark application to the USPTO for WILDFIRE AWARE, covering "[d]ownloadable software in the nature of a mobile application for providing public information on wildfires." ECF No. 14-3. When the examining attorney refused registration of WILDFIRE AWARE due to a likelihood of confusion with the standalone mark AWARE, TAM submitted a ten-page brief arguing the exact opposite of the position it has now adopted before this Court. Compl. ¶¶ 31-32; Wolf Decl. ¶ 11. TAM represented to the Trademark Office that the marks "look different, create very different connotations, and impart different commercial impressions." TAM declared, to the federal government, that "the word WILDFIRE of Applicant's Mark is the most important term." TAM argued, to secure the registered rights it now seeks to enforce, that AWARE exists in a "crowded field" of at least ten coexisting Class 9 registrations—including marks for computer software, medical data processing, educational materials, and biometric scanning—and is "not entitled to a broad scope of protection." ECF No. 1-7 at 7. TAM's conclusion was unequivocal: "When the marks are viewed in their entireties, as required under law, there is no doubt that consumers are left with completely different impressions." *Id.* at 10. Having secured its registration on the

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

9

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

strength of those representations, TAM now declares the opposite to be true—*see, e.g.,* Response to Office Action at 3 ("the word WILDFIRE of Applicant's Mark is the most important term" *as compared to* Mot. at 21 ("The parties' marks are highly similar"; AWARE is the "dominant term")—and presents it to the Court as unimpeachable gospel. *See* Mot. at 24 ("It is not often the case that the *Sleekcraft* factors so heavily weigh in favor of one party as they do here.")

### 2.      The Government Procurement Process

The only software for which Intterra actually requires payment is the AWARE INTEL HUB. AWARE INTEL HUB is marketed and sold exclusively through B2G channels, to government agencies. Wolf Decl. ¶ 2. The fees to license Intterra's AWARE INTEL HUB software are substantial and expected to yield at least $6 million in annual revenue, and the degree of care exercised by government agents in their procurement of such licenses is correspondingly high, especially when the software carries the promise of delivering potentially life-saving information. The sophistication of this process is evident in the CAL FIRE contract itself: CAL FIRE evaluated Intterra's platform, requested a name change from ReadyCA to avoid confusion with existing government websites, consulted with other state stakeholders, and only then selected AwareCA as its preferred alternative—a deliberative, multi-step process reflecting the highest degree of care at every stage. Wolf Decl. ¶¶ 16-21.

The Government agencies cannot purchase goods or services without following formal procurement processes. A typical procurement begins with the agency developing a plan to meet a specific need, inviting prospective suppliers to submit competitive bids, evaluating those bids based on specified criteria, and conducting detailed contract negotiations before awarding a contract. *See, e.g.,* Wolf Decl. ¶¶ 5-6. This process requires governmental customers to adhere to strict budgets and to conduct significantly more diligence than private customers seeking goods and services through standard business-to-consumer or business-to-business channels. *Id.*

For potential consumers of Intterra's mobile applications – e.g., AWARECA, AWAREHI, or AWAREFL – the degree of care exercised is equally high, though the imperative is not cost, but rather how critical the decision may be to their safety and that of their loved ones. Logic

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

dictates that emergency-preparedness applications are downloaded at only one of three times: before, during or after a disaster or other type of impactful event. Those who download before are likely to exercise care in selecting their source of potentially life-saving information. Those who download during are likely to limit themselves only to sources they already know and trust. And those who download after are blessed with the luxury of time, to again diligently consider their chosen source and not blindly click on the first among many of AWARE apps they find.

### 3.    Intterra's Interactions with Ms. Brady

The facts surrounding Intterra's mark selection undercut any suggestion of bad intent. TAM's narrative is that Goliathan, private-equity-backed Intterra wanted to acquire the WILDFIRE AWARE app, was denied, and therefore chose its AWARE branding either to extract revenge or with willful disregard to any impact. Not true. First, the evidence shows that Intterra wanted to acquire Ms. Brady's services, not her app (and not its branding). Second, the evidence also establishes that California state authorities—not Intterra—expressed preference for the AWARE branding.

Intterra originally intended to name its consumer-facing mobile application "ReadyCA." California state authorities requested a change because of a perceived potential for confusion with the existing ready.ca.gov website and the federal Ready.gov program. Wolf Decl. ¶ 16. Intterra presented CAL FIRE with three alternative names to ReadyCA, and CAL FIRE selected "AwareCA" as its preferred option. Wolf Decl. ¶¶ 16-21.

TAM nonetheless casts Intterra's interactions with Ms. Brady as evidence of bad intent. But those past interactions had nothing to do with how Intterra came to adopt the AWARE marks. Rather, Intterra originally intended to use a different mark entirely: "ReadyCA". It was California state authorities, not Intterra, who requested a change and ultimately expressed preference for the AWARE branding from the provided alternatives. *Id*. While Intterra was aware of TAM's mark, it was reasonable for Intterra to conclude—as TAM itself had concluded in its representations to the Trademark Office—that there was no likelihood of confusion between AWARE-formative marks.

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

To be sure, Intterra's current leadership did seek to hire Ms. Brady for a product management role because of her experience in the fire service industry. Compl. ¶ 25. However, after reviewing Ms. Brady's app, Intterra determined that it was not interested in building its application on her existing software, as it considered the technology inadequate for its purposes. Compl. ¶ 26. Intterra structured its offer to include a bonus tied to three years of employment—as an incentive for Ms. Brady to join the company, not as a purchase price for the WILDFIRE AWARE mark. Compl. ¶¶ 27, 29. Ms. Brady declined the offer in November 2024 and ultimately declined the role on March 3, 2025. Compl. ¶ 28. None of these interactions had any bearing on Intterra's subsequent adoption of the AWARE marks, which was resulted from a government agency's stated preference—not by any desire to acquire or trade on TAM's brand.

### D.     TAM's Claim of Irreparable Harm

TAM's own conduct fatally undermines any claim that injunctive relief is urgently needed. Ms. Brady learned of Intterra's AWARE branding on January 6, 2026, the day of the public announcement. Brady Decl. ¶¶ 35-36. Yet TAM did not to file its motion for preliminary injunction until nearly three months later, and almost a full month after Intterra sought declaratory relief. By waiting until the eve of launch rather than moving in January—when a rebranding effort, though significant, would have been more manageable—TAM delayed to ensure that an injunction would cause maximum harm to Intterra and maximum leverage for TAM. This deliberate delay is the hallmark of a party seeking strategic advantage, not one facing genuine irreparable injury. Moreover, by such delay, TAM materially diminished its prospects of securing the relief it claims it so desperately needs; again, not the expected behavior of a party confronting grave peril.

Were TAM facing irreparable harm, it would have moved when its chances of securing an injunction to prevent that harm were at their zenith. Certainly in January, the likelihood of success on the merits would still have been equally low. But the balance of equities—when Intterra and its partner agencies had not yet invested the thousands of January and February and March hours in the Aware initiative, and the word was not yet so intrinsically woven through the fabric of nearly 100 agency communications platforms—would have tipped more toward TAM than does it now.

12

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Instead, TAM waited, and by doing so deliberately diminished its chance of enjoining what it alleges to be irreparable harm. A party honestly pleading to avoid harm that cannot be repaired, to avoid damage that cannot be undone, would not wait and give up its best chance of relief.

But threats and press are far more impactful in April than in January, when fire season is not yet looming. So TAM waited, deliberately diminishing its hopes of securing injunctive relief to itself inflict irreparable harm on Intterra. Days before filing the instant motion, TAM demanded a seven-figure payout from Intterra, with a four-day deadline to accept. Neustadt Dec., Ex. A, B. This demand was made on behalf of an application with approximately 6,000 downloads per year, the subscription revenue from which, by Ms. Brady's own declaration, covers only server hosting costs and has never generated a profit. Brady Decl. ¶ 22. When Intterra did not capitulate, TAM escalated to this motion for preliminary injunction seeking an order that would force Intterra to choose between capitulating to TAM's demands or losing millions of dollars in government contracts. Indeed, even the filing of the motion has already caused Intterra harm. Partner agencies have begun questioning Intterra's ability to deliver, media coverage has cast doubt on the launch, and Intterra has been forced to divert resources from launch preparation to litigation defense. Wolf Decl. ¶¶ 12, 37-38. This appears to have been TAM's intent.

TAM's irreparable harm claims also rest entirely on speculation about what might happen after Intterra's AwareCA app launches. There is no evidence of actual consumer confusion, lost sales, or diminished goodwill. TAM has identified no impact on user retention, the metric that matters most for a mobile application's goodwill and reputation. TAM does not allege that the marketing and promotion surrounding the launch has caused any confusion. TAM does not allege that any of Ms. Brady's contacts who asked her about the announcement were actually confused about whether there was some association between the parties. To the contrary, they wanted to know if she was upset about it, which reflects awareness of two separate entities, not confusion between them. TAM admits that its success is driven by word-of-mouth referrals, not paid advertising. ECF No. 14-1 at 9. Users who learn of WILDFIRE AWARE through personal referrals are already familiar with TAM as the source, and users who download based on such

13

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

referrals have already been directed to the specific app by the referrer—making it highly unlikely they would download the wrong application. Without evidence that existing WILDFIRE AWARE users are likely to abandon their app or that TAM's reputation has been concretely damaged, TAM's claim of irreparable harm is precisely the kind of speculative assertion that cannot support the extraordinary remedy of injunctive relief.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In the Ninth Circuit, the movant must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013). The movant must carry each element "by a clear showing." *Mazurek*, 520 U.S. at 972.

## II.    ARGUMENT

### A.    The Balance of the Equities Overwhelmingly Favors Intterra

The balance of the equities tips sharply against granting the injunction TAM seeks. An injunction issued on the eve of Intterra's anticipated early-May 2026 launch would inflict severe, concrete, and quantifiable harm upon Intterra, upon the governmental agencies that have contracted for its services, and upon the public those agencies serve, all to remedy alleged harm to TAM that is, at this stage, entirely speculative.

Courts routinely deny preliminary injunctions where, as here, the harm to the non-moving party from an injunction would vastly outweigh any harm the moving party might suffer absent one. *See Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877, 899 (N.D. Cal. 2019) (denying preliminary injunction where "[t]he hardship to [the defendant] in granting an injunction and forcing it to undergo a massive rebranding of a name it has built up for about nine years would therefore be much greater than the hardship to [the plaintiff] in denying an injunction and thereby maintaining the status quo"); *De Anda Enters., Inc. v. JL Deanda Enters. LLC*, No. SA CV 16-2049-DOC, 2017 WL 2960796, at *6 (C.D. Cal. Apr. 11, 2017) (finding that the balance of equities

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

14

weighed in the defendant's favor and denying preliminary injunction because "Defendant would face greater hardship as the result of a preliminary injunction because it would incur significant expenses and possibly lost revenue from having to cease using the name of its restaurant"); *Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1039 (N.D. Cal. 2003) (denying preliminary injunction where "the balance of hardships tips heavily in [the defendant's] favor" because the defendant "will be forced to sacrifice the substantial business expenditures related to developing [its] mark").

### 1.    The Harm to Intterra from an Injunction Would Be Devastating

Intterra has been awarded government contracts expected to yield revenue in the tens of millions of dollars for its AWARE-branded public safety platform. Intterra has over 350 existing government agencies leveraging its software platform, and an extensive sales funnel with government customers in various stages of procurement. Compl. ¶ 18-19. CAL FIRE selected Intterra's mobile application to serve as California's statewide public safety information platform, and by the end of 2026, Intterra expects that regional agencies serving the majority of the state's population will have adopted the platform. Compl. ¶¶ 16, 22. The CAL FIRE contract alone represents yearly recurring anticipated revenue in the millions of dollars; delay of even two weeks cuts associated monthly revenue in half. Wolf Decl. ¶ 34. Beyond this single contract, tens to potentially hundreds of millions of dollars in government contracts are implicated by the relief TAM seeks. *Id*. TAM's motion and its corresponding efforts in the press are already inflicting considerable harm on Intterra.

An injunction barring Intterra from using AWARE-formative branding would imperil tens, if not hundreds of millions of dollars of government contracts, force a costly and disruptive last-minute rebranding effort, and damage Intterra's reputation as a reliable provider of life-saving public safety information—a reputation that, as a government contractor, is perhaps its most valued asset. Courts have recognized that this type of harm—where a defendant must sacrifice substantial investments and undergo an extensive rebranding—weighs heavily against an injunction. In *Kiva Health Brands*, for example, the court denied a preliminary injunction where the defendant had

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

spent "years on product development, sales, brand recognition, and geographic expansion" and demonstrated that "the cost for it to rebrand would exceed $3 million." 402 F. Supp. 3d at 899; *see also Halo Management,* 308 F. Supp. 2d at 1039[1]; *De Anda Enterprises*, 2017 WL 2960796, at *6.

Here, the hardship to Intterra equals or exceeds that of the defendants in any of these cases. As detailed above, the rebranding effort would be enormous—requiring extensive rework of all applications, documentation, marketing materials, training documents, and naming conventions, while Intterra's team works around the clock to prepare for launch. Beyond Intterra's own materials, every pending proposal, contract, and government approval references the AWARE name and would need amendment. Each of the 79 partner agencies has prepared communications directing the public to AWARECA, all of which would need to change. An abrupt, court-ordered rebranding would jeopardize contractual commitments and undermine Intterra's credibility in a marketplace where reliability is paramount. Resources that would otherwise optimize the product and serve the public would instead be diverted to rebranding—a monumental waste of taxpayer dollars.

The broader and potentially more significant harm is to trust, the very foundation of the Aware ecosystem. As explained above, public safety agencies have partnered with Intterra based on confidence in its ability to deliver reliable software on time. The threat of an injunction is already undermining that trust, and such reputational harm cannot be remedied by money damages.

The balance of hardships tips sharply in Intterra's favor for another reason: the harm TAM seeks to inflict is not incidental—it is the point. TAM's conduct reveals that this litigation is not a good-faith effort to protect trademark rights, but a calculated campaign to cripple Intterra at the most vulnerable moment in its business trajectory. As detailed above, TAM demanded a seven-figure payout from Intterra with a four-day deadline, an ultimatum designed to exploit the pressure of an imminent, high-stakes government launch. Neustadt Dec., Ex. A, B. When Intterra refused to capitulate, TAM escalated immediately to a motion for injunctive relief timed to inflict

---

[1] Notably, TAM itself cited *Halo Management* in its own office action response to the U.S. Patent and Trademark Office.

16

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

maximum damage. TAM identified a company with deep government contracts and an imminent, high-stakes launch, and attempted to extract payment under threat of injunctive relief. It was precisely this concern over coercive tactics that led Intterra to file its declaratory judgment action.

This Court should not permit its injunctive authority to be co-opted in service of such a strategy. The equities here are not a close call. On one side stands Intterra, which has invested years and millions of dollars building a public safety platform that serves hundreds of government agencies and, through them, millions of members of the public. On the other stands TAM, a party that timed its litigation to coincide with Intterra's most critical public safety launch, demanded an extortionate payout, and—when rebuffed—sought emergency relief calculated to destroy the very contracts and relationships Intterra has spent years cultivating.

### 2.    TAM's Alleged Harm is Minimal and Speculative

On the other side of the ledger, the harm TAM alleges is speculative at best. Courts have consistently held that where the moving party's evidence of harm is insubstantial, the balance of equities weighs toward denial of injunctive relief. *See Halo Management*, 308 F. Supp. 2d at 1039 (finding the moving party faced only "a relatively insubstantial burden, viz., the loss of weak trademark rights it has opted not to protect very seriously"); *Kiva Health Brands*, 402 F. Supp. 3d at 897–99 (plaintiff's evidence of harm was "not substantial" where the plaintiff offered only "weak evidence" consisting of a "conclusory and self-serving declaration by the head of [the] plaintiff's company").

TAM's app has been available since November 2022, and Intterra's app has not yet launched. There is no evidence or even an allegation that TAM has experienced any concrete injury from Intterra's announced plans. The most that would result from Intterra's launch is the addition of one more app with the word "AWARE" on app stores—a word that, as demonstrated below, already appears in numerous marks used and registered for similar goods.

TAM admits its success is driven by word-of-mouth referrals, not paid advertising. ECF No. 14-1 at 9. Users who learn of WILDFIRE AWARE through personal referrals would already be familiar with TAM as the source and would pass that information on to new users. The most

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

likely impact of any conceivable confusion is that some users might initially download WILDFIRE AWARE by mistake; but upon use, they would immediately distinguish TAM's app from Intterra's, as the apps differ in content, branding, functionality, and presentation:

 

*See* Neustadt Dec., ¶ 5.

To the extent any inadvertent downloads occurred, it would not constitute irreparable harm.

In sum, the balance of equities could not be more lopsided. On one side, Intterra faces the imminent loss of tens or hundreds of millions of dollars in government contracts, the disruption of an imminent product launch serving the public interest, and the irreversible shattering of trust. On the other side, TAM offers nothing more than speculative assertions of harm from a product that has not yet launched. Under the weight of authority, the balance of equities overwhelmingly favors Intterra, and TAM's motion should be denied. *See Kiva Health Brands*, 402 F. Supp. 3d at 899; *Halo Mgmt.*, 308 F. Supp. 2d at 1039; *De Anda Enters.*, 2017 WL 2960796, at *6.

### B.    The Public Interest Weighs Heavily Against an Injunction

An injunction would operate severely against the public interest. Intterra's entire mission is directed toward improving public safety—increasing the quality of information provided to the

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

public and the speed with which such information can be delivered during emergencies. The AWARECA mobile application was developed in partnership with CAL FIRE specifically to ensure that the public receives accurate, real-time updates directly from government agencies and allied responders during all types of public safety emergencies, not just wildfires. As CAL FIRE's Director and Fire Chief stated: "By partnering with Intterra on AwareCA, we are ensuring that the public receives accurate, real-time updates directly from CAL FIRE and our allied responders." Compl. ¶ 16.

A "plaintiff seeking a preliminary injunction must establish ... that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff cannot meet their burden where "there exists some critical public interest that would be injured by the grant of preliminary relief." *Independen. Living Ctr. of So. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (citation omitted).

Courts routinely deny preliminary injunctions where the requested relief would deprive the public of products or services implicating health and safety concerns. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 18–19 (7th Cir. 1992) ("It is a rare case where purging a safe and effective product serves broad societal interests"); *Outcomes Pharm. Health Care, L.C. v. Nat'l Cmty. Pharmacists Ass'n*, No. 4:05-cv-00682, 2006 WL 3782905, at *15–16 (S.D. Iowa Dec. 22, 2006) (denying preliminary injunction where it would leave approximately 110,000 elderly Medicare members without medication therapy management services, reasoning that "[e]xposing members of the public to the risk of being without MTM services to which they are entitled ... for any period of time is a significant public interest which weighs in favor of the denial of injunctive relief"). Courts also decline to find a public interest in "avoiding confusion" where no likelihood of confusion has been shown. *Good Meat Project*, 716 F. Supp. 3d at 806 ("Having found that GMP has not clearly shown a likelihood of consumer confusion or irreparable harm, the Court does not find that there is any significant threat to the public interest in the absence of injunctive relief"); *see also Internet Specialties W., Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

(9th Cir. 2009). An injunction in this case would cause harm to public safety with no corresponding benefit.

A core element of the public interest in this case is the erosion of trust in public safety information. Currently, the public often receives safety information from social media platforms like Facebook, Instagram, and Nextdoor, or from services like Watch Duty, which scrape information from the internet and republish it. Wolf Decl. ¶ 40. AWARECA delivers information directly from first responder organizations, attributed to those organizations. The entire intent of AWARECA is to provide the public with a single, trusted, authoritative source for all public safety information—from the mundane (why there is an ambulance outside) to the critical (real-time evacuation information). There is currently no app that delivers authoritative public safety information at scale to the public.

If the injunction is granted, the 79 government agencies currently onboarding onto the platform would not lose the ability to disseminate information entirely—they currently do so through X, Facebook, and press releases—but they would lose the ability to do so through the organized, centralized platform that AWARECA is designed to provide. In *Outcomes Pharmaceutical Health Care*, the court found that an injunction risked depriving elderly Medicare members of prescription drug services—and that "an injunction could expose MemberHealth to CMS sanctions, including possible termination for breach of contract, and potentially expose MemberHealth's elderly members to health risks and even the possibility of a period of time without any prescription drug coverage." 2006 WL 3782905, at *14. In this case, blocking the launch of a government-partnered emergency notification platform imposes a cost measured not merely in dollars but in lives saved or hospital visits avoided. This Court should not issue an order that would deprive the public of a critical, taxpayer-funded tool for receiving official government communications during emergencies.

TAM's stated concern—that consumer confusion will result—is woefully insufficient to support a preliminary injunction given the public safety concern at issue here. ECF No. 14-1 at

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

26. The public interest strongly favors the dissemination of life-saving information, not its suppression.

## III.    TAM HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

TAM cannot demonstrate a likelihood of success on its trademark infringement claims because there is no likelihood of confusion between the parties' marks. In determining likelihood of confusion, courts in the Ninth Circuit look to the *Sleekcraft* factors, which include: (1) strength of the movant's mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) types of goods and consumer's degree of care; (7) opposer's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). The factors are "intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. AdvancedSys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011). It is TAM's burden to establish a likelihood of confusion by providing evidence that "an appreciable number of people" are likely to be confused. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

As a threshold matter, any confusion analysis must account for the fact that Intterra provides three distinct product offerings under its AWARE family of marks: (1) AWARE INTEL HUB, a software platform sold exclusively to government agencies; (2) AWARE OPS, a secure mobile application for first responders with authenticated login; and (3) AWARECA (and other state-specific and federal variants, such as AWAREHI, AWAREFL and AWAREUS), a consumer-facing mobile application distributed by government agencies as a public service.

The analysis below first addresses the weakness of "aware" as a source identifier for goods and services directed toward awareness and the dissimilarity of the parties' marks—factors that apply across all of Intterra's offerings. It then applies the *Sleekcraft* factors in two parts: Section IV.B addresses Intterra's non-consumer-facing products—its government agency platform and first-responder application—where every factor overwhelmingly favors Intterra and confusion is inconceivable; Section IV.C then addresses Intterra's consumer-facing mobile app—where, as

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

21

demonstrated below, the possibility of confusion remains very remote. This two-part structure also underscores the extreme overbreadth of TAM's requested injunction.

**A.    The Marks Are Not Similar**

Similarity of marks is the "most important factor in any likelihood of confusion analysis," as "without similarity, there can be no confusion." *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 1282 (W.D. Wash. 2003) *affd*, 376 F.3d 894 (9th Cir. 2004). "Similarity of the marks is tested on three levels: sight, sound, and meaning," which are "considered as they are encountered in the marketplace." *Network Automation*, 638 F.3d at 1150. Under the anti-dissection rule, "the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Karoun Dairies Inc. v. Los Altos Food Prods. Inc.*, 107 F. App'x 785, 788 (9th Cir. 2004).

As TAM argued and represented to the U.S. Patent and Trademark Office to secure registration for its WILDFIRE AWARE: "In determining whether a likelihood of confusion exists, the fundamental inquiry goes to the cumulative effect of the differences in the marks at issue. … When comparing the marks, they should not be dissected, but rather the total commercial impression of each mark should be considered. Upon a comparison of the marks in question in the present instance, [WILDFIRE AWARE] and the [Intterra's AWARE mark] are not confusingly similar as AWARE… creates a markedly different overall commercial impression than … WILDFIRE AWARE as to obviate any likelihood of confusion." ECF No. 1-7 at 8.

**1.    AWARE Is Inherently Weak and Dilute for the Pertinent Goods and Services. Marks Containing AWARE, for the Pertinent Goods, Are Therefore Entitled Only to a Narrow Scope of Protection**

**a)    "Aware" is Inherently Weak For Goods and Services Directed Toward Increasing Awareness**

"Aware" is inherently weak for goods and services that make consumers more "aware," including with respect to emergencies and safety information. "Aware" means "knowing that something exists, or having knowledge or experience of a particular thing" or "having or showing

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

realization, perception, or knowledge."[2] Accordingly, AWARE is highly descriptive for goods and services intended to increase awareness, including with respect to wildfires. For that reason alone, as TAM itself argued to the Trademark Office to secure its WILDFIRE AWARE registration, "aware" is "not entitled to a broad scope of protection." ECF No. 1-7 at 7. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142–43 (9th Cir. 2002)(descriptive marks are "conceptually weak").

b)      "Aware" is Dilute For the Pertinent Goods and Services

To persuade the Trademark Office to approve its WILDFIRE AWARE trademark application, TAM submitted evidence of at least ten third-party registrations coexisting on the Principal Register for AWARE and AWARE-formative marks for Class 9 goods similar to its own, and argued: "As can be appreciated by the issuance of these Third Party Registrations, this is not simply a case where the Mark of the Cited Registration is the only other mark which consists of the word AWARE. Due to the coexistence of the numerous Third Party Registrations, all in class 009, customers are more likely to consider each of these marks more carefully in order to ascertain the source of the goods or services rendered under the respective marks." ECF No. 1-7 at 15.

Terms which are subject to common third-party use in the relevant product or service field have only a limited capacity to distinguish source, and are entitled to a narrow scope of protection accordingly. *See Lodestar Anstalt v. Bacardi & Co. Ltd*., 31 F.4th 1228, 1259 (9th Cir. 2022) ("[u]se of similar marks by third-party companies in the relevant industry weakens the mark at issue"); *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373, 73 USPQ2d 1689, 1693 (Fed. Cir. 2005). "The common presence in marks of elements extensively used by others cause purchasers not to rely upon such elements as source indicators but to look to other elements as a means of distinguishing the source of the services" *Century 21 Real Est. LLC v. Century Ins. Grp.*, No. 03-0053-PHX-SMM, 2007 WL 484555, at *6, fn. 4 (D. Ariz. Feb. 8, 2007). Professor J. Thomas McCarthy notes the following in this regard:

> The ultimate test of relative strength is the distinctiveness of a mark in the mind and perception of the relevant customer group.  But the mark that is hemmed in on

---

[2] Neustadt Dec., Ex. C.

23

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

all sides by similar marks on similar goods cannot be very "distinctive." It is merely one of a crowd of marks. In such a crowd, customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other. (*footnote omitted*).

When numerous sellers in a product line use similar marks, individual distinctiveness may be blurred and consumers may have difficulty telling one seller from another. (*footnote omitted*). "[I]f consumers don't have a clear sense of what plaintiff's mark represents, they are unlikely to purchase defendant's product or services thinking it is plaintiff's." (*footnote omitted*).

Thus, in a "crowded" field of similar marks, each member of the crowd in relatively "weak" in its ability to prevent use by others in the crowd.

J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> at Section 11:85 (4th Ed. 2012); *see also Miss World (UK) Ltd. v. Miss Am. Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988), *abrogated in part on other grounds by Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n. 1 (9th Cir. 1990) ("a mark which is hemmed in on all sides by similar marks on similar goods cannot be very 'distinctive'. It is merely one of a crowd of marks.").

Third-party registrations are relevant to show that the mark or a portion of the mark is so commonly used that the public will look to other elements to distinguish the source of the goods or services. *See Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir. 1988); *see also Lodestar Anstalt v. Bacardi & Co. Ltd.,* 31 F.4th 1228, 1259 (9th Cir. 2022).

In addition to the ten third-party registrations submitted by TAM to secure its WILDFIRE AWARE registration—all of which are subsisting—the following registrations and allowed applications show that AWARE is commonly used in connection with software goods and services to increase awareness across a variety of disciplines, to the effect that the public will look to other elements of the marks to distinguish the source of those goods and services:[3]

---

[3] Downloads from the USPTO's Trademark Data Status & Document Retrieval database reflecting the current status of the cited registrations are attached to the Neustadt Declaration as Exhibit D.

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

| No. | Mark | RN/SN | Pertinent dates | Owner | Pertinent Goods/Services |
|-----|------|-------|-----------------|-------|--------------------------|
| 1 | AWARE | RN 4695899 | Registered: Mar. 03, 2015 | Ambient Clinical Analytics, Inc. | **Class 9:** Computer software for managing, analyzing and synthesizing medical information and patient data |
| 2 | AWARE | RN 5291635 | Registered: Sep. 19, 2017 | NANOLUMENS, INC. | **Class 9:** Systems comprised of computer hardware, software, and network connection hardware for configuring, controlling, and managing media presentations on electronic display boards and electronic display screens |
| 3 | AWARE | RN 4782003 | Registered: Jul. 28, 2015 | Alliance Enterprises, Inc. | **Class 9:** [*Computer software … in the fields of vocational rehabilitation case management, social service case management, and independent living case management…*[4]][5] |
| 4 | AWARE | RN 4807984 | Registered: Sep. 08, 2015 | eduphoria! Incorporated | **Class 9:** Computer software for use in the educational field in planning and evaluation of student assessments, analyzing the performance of students, and managing test item banks |
| 5 | TALK AWARE | RN 6455939 | Registered: Aug. 17, 2021 | KARMAGREEN, LLC DBA Mt Lotz | **Class 9:** Computer software for communicating with users of hand-held computers; Computer application software for mobile phones, namely, software for text messaging; Computer application software for mobile phones, namely, software for voice recognition; Computer application software for mobile phones, namely, software for modifying voice-to-text data |
| 6 | AWARE | RN 5136712 | Registered: Feb. 07, 2017 | NIHON KOHDEN AMERICA, LLC | **Class 9:** Medical and patient alarm management software [ and hardware ] for use in evaluating, reviewing and analyzing alarm occurrences |

---

[4] Goods and services identified in italics represent summaries of the covered goods and services. Full identifications are available in the corresponding TSDR exhibits.

[5] Registrant deleted the Class 9 goods from its registration in 2025, long after TAM's registration had issued.

25

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

| No. | Mark | RN/SN | Pertinent dates | Owner | Pertinent Goods/Services |
|---|---|---|---|---|---|
| 7 | MEDIA AWARE | RN 6208381 | Registered: Dec. 01, 2020 | Innovation Research and Training, Inc. | **Class 9:** Downloadable educational course materials in the fields of substance use, sexual assault, sexually transmitted infections and unplanned pregnancy prevention, health education, and social-emotional learning |
| 8 | PROJECT AWARE | RN 6725109 | Registered: May 24, 2022 | Hackensack Meridian Health, Inc. | **Class 9:** Downloadable electronic publications, namely, instructional texts, brochures, scripts, informational pamphlets and plays featuring educational information on the issue of substance abuse |
| 9 | ΛWΛRE | RN 6823782 | Registered: Aug. 23, 2022 | Aware, Inc. | **Class 9:** *Downloadable computer software for data processing and data management for use in the fields of biometrics, identity, security, and authentication for fingerprint, voice, face and iris modalities…* **Class 42:** *Platform as a service (PAAS) featuring computer software platforms for data processing and data management for use in the fields of biometrics, identity, security, and authentication for fingerprint, voice, face and iris modalities…* |
| 10 | Aware | RN 6774715 | Registered: Jun. 28, 2022 | Alliance Enterprises, Inc. | **Class 9:** *Downloadable computer software for use in tracking, maintaining, organizing, and indexing a wide range of information related to financial accountability, employment, case outcomes, case activities, educational courses, training, performance accountability, and case status, in the fields of vocational rehabilitation case management…* |
| 11 | AWARE | RN 3099983 | Registered: Jun. 06, 2006 | SITUATION AWARENESS SYSTEMS LLC DBA Quantaero | **Class 9:** situation awareness system, namely computer hardware, software and sensors, used to provide real-time or near-real-time GIS information regarding emergency incidents or aerial mapping projects |

26

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

| No. | Mark | RN/SN | Pertinent dates | Owner | Pertinent Goods/Services |
|---|---|---|---|---|---|
| 13 | U/AWARE | SN 99215124 | Allowed: Jan. 20, 2026 | Uniden America Corporation | **Class 9:** Downloadable computer application software for mobile devices, namely, software for controlling and operating a radio scanner |
| 14 | OMNI-AWARE | RN 5899776 | Registered: Nov. 05, 2019 | Omni-Aware Holdings | **Class 9:** Instruments for monitoring traffic, namely, a computer with multiple sensors comprised of video image, LiDAR, and radar sensors and downloadable operating system and application software to detect vehicles and pedestrian location |
| 15 | AWARE | SN 98847605 | Allowed: Sept. 30, 2025 | Axient LLC | **Class 9**: Downloadable application software for critical asset monitoring, security and threat management decision making **Class 42**: Providing online, non-downloadable software for critical asset monitoring, security and threat management decision making |
| 16 | ChildAware | RN 7033092 | Registered: Apr. 25, 2023 | Child Aware Technology Holdings Pty Ltd | **Class 9 and 42:** *software goods and services for "searching, compiling, indexing and organising information for administration, compliance and audits in child related settings…"* |
| 17 | TALKAWARE | RN 6329492 | Registered: Apr. 20, 2021 | KARMAGREEN, LLC | **Class 9:** *Downloadable computer application software for mobile phones, namely, software for text messaging…* |
| 18 | 360° AWARE | RN 5783228 | Registered: Jun. 18, 2019 | Knowmadics, Inc. | **Class 9:** *Downloadable software, namely, mobile applications for use in communicating public safety information…* **Class 42:** *Computer services, namely, providing an interactive website featuring technology that enables the exchange of data and information related to public safety among users…* |

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

| No. | Mark | RN/SN | Pertinent dates | Owner | Pertinent Goods/Services |
|---|---|---|---|---|---|
| 19 | WⓈrldAware | RN 6511745 | Registered: Oct. 05, 2021 | CRISIS24, INC. | **Class 9:** *Computer application for mobile phones and devices, namely, software for providing information on travel risks, country and health risks, travel information and crisis and emergency impact…* **Class 42:** *Providing temporary use of non-downloadable computer programs for providing location specific intelligence, for sending and receiving alerts, incident reports, emails, intelligence information, notifications and responses, for analyzing, tracking and reporting risk factors and threats around the world …* |
| 20 | WORLDAWARE | RN 6511750 | Registered: Oct. 05, 2021 | CRISIS24, INC. | **Class 9:** *Computer application for mobile phones and devices, namely, software for providing information on travel risks, country and health risks, travel information and crisis and emergency impact…* **Class 42:** *Providing temporary use of non-downloadable computer programs for providing location specific intelligence, for sending and receiving alerts, incident reports, emails, intelligence information, notifications and responses, for analyzing, tracking and reporting risk factors and threats around the world …* |
| 21 | DISASTERAWARE | RN 5421260 | Registered: Mar. 13, 2018 | University of Hawaii | **Class 42:** *providing online nondownloadable software and web-based software applications for coordinating and planning emergency responses to natural disasters for disaster management, disaster planning…* |

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

28

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

| No. | Mark | RN/SN | Pertinent dates | Owner | Pertinent Goods/Services |
|---|---|---|---|---|---|
| 22 | AWARE360 | RN 5230222 | Registered: Jun. 27, 2017 | Aware360 Ltd. | **Class 9:** *Computer software and hardware for use in tracking, locating and monitoring the health and safety of remotely located persons, for displaying information related to the tracking, locating and monitoring of the health and safety of remotely located persons…* **Class 42:** *Providing temporary use of non-downloadable software for use in tracking, locating and monitoring the health and safety of remotely located persons, vehicles, mechanized equipment and physical assets and for displaying information related to the tracking…* |
| 23 | ALERTAWARE | RN 7010162 | Registered: Mar. 28, 2023 | Alertus Technologies LLC | **Class 42:** providing temporary use of online non-downloadable computer software for mass notification and other communication using multi-channel delivery methods |
| 24 | | RN 6323182 | Registered: Apr. 13, 2021 | KARMAGREEN, LLC | **Class 9**: *Computer software for communicating with users of hand-held computers that may be downloaded from a global computer network…* |
| 25 | SENSAWARE | RN 6281318 | Registered: Mar. 02, 2021 | ThetaData L.L.C. | **Class 9:** Downloadable computer application software for mobile phones, namely, software for tracking personal data from wearable device that is connected through wireless technology to the application; Wearable activity trackers |
| 26 | U/AWARE | SN 99215118 | Allowed: Jan. 20, 2026 | Uniden America Corporation | **Class 9:** Downloadable computer application software for mobile devices, namely, software for controlling and operating a radio scanner |

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

| No. | Mark | RN/SN | Pertinent dates | Owner | Pertinent Goods/Services |
|---|---|---|---|---|---|
| 27 | SITAWARE | RN 7700998 | Registered: Feb. 25, 2025 | SYSTEMATIC A/S | **Class 9:** *Downloadable computer software for providing logistics and operational planning in the military and paramilitary policing and surveillance of coastal and open land borders, and for use in command and control in the defense field…* |
| 28 | ElderAware | RN 7039133 | Registered: May 02, 2023 | Australian Early Learning Centres Pty Ltd | **Class 9:** Downloadable or recorded application software for searching, compiling, indexing and organising information; downloadable or recorded computer software used for administration, compliance and audits in aged care related settings, including aged care homes and facilities and community and group activities for the elderly… |
| 29 | MAXAWARE | RN 6175271 | Registered: Oct. 13, 2020 | Maxaware, LLC | **Class 9:** Downloadable software in the nature of a mobile application for managing audio-visual integration projects |
| 30 | AWAREX | SN 98170569 | Allowed: June 18, 2024 | Deer Management Systems, LLC | **Class 9:** *Downloadable software in the nature of a mobile application for viewing, sharing, and saving data about rodents* |
| 31 | AWARE | RN 6264870 | Registered: Feb. 09, 2021 | GlobalFlyte, Inc. | **Class 42:** Providing online non-downloadable software for transcription and aggregation of messages and data from multiple sources during an emergency |

Not only is AWARE is generally used and registered in connection with software goods and services to increase awareness across a variety of disciplines, but it is also ubiquitous among mobile applications in the App Store and Google Play Store themselves, the very arena where TAM alleges consumer confusion is likely to occur. Given the ubiquity of applications that feature AWARE branding for services directed toward increased awareness, including in connection with emergency response and public safety, the public is already conditioned to look to other elements of the apps, including their design, descriptions, and overall presentation to distinguish the source of the goods and services, or even just additional elements in the associated branding, such as

30

"CA". Exhibits to the declaration supporting this memorandum evidence the sheer volume of AWARE-branded apps strewn across the vast app store catalogs, as well as use of AWARE branding in for information-related goods and services generally. *See* Neustadt Decl., Exs. E-1, E-2, F-1, F-2, G-1, G-2. The following screenshots serve as veritable snapshots of the ubiquity of AWARE-branded app offerings:

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910



INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION



Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR
PRELIMINARY INJUNCTION

*See* Neustadt Decl. ¶¶ 14-15.

The evidenced third-party use and registration of AWARE marks in connection with goods and services directed toward increase awareness demonstrates that the AWARE element is weak for the goods at issue and entitled only to a narrow scope of protection. TAM agrees. *See* ECF No. 1-7 at 7 (AWARE is part of a "crowded field" that is "not entitled to a broad scope of protection").

### 2.     In View Of The Inherent and Marketplace Weakness Of AWARE, the Difference Between the Marks as a Whole Suffice To Obviate Any Risk of Confusion

Because the term AWARE is inherently weak and subject to widespread third-party use for goods and services whose purpose is to increase awareness, including with respect to public safety events, consumers have been conditioned to consider the entire composition of marks containing such terms and look to other elements for purposes of distinguishing source (including, but not limited to, visual presentation and the presence or absence of additional wording, whether distinctive or descriptive). Under these circumstances, where the elements common to respective marks are not perceived by consumers as source-distinguishing, additional distinguishing matter may suffice to avoid a likelihood of confusion. *Entrepreneur Media, Inc*, 279 F.3d at 1142–43 (descriptive marks are "conceptually weak"); *see also Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 633 (9th Cir. 2005). In view of these marketplace circumstances, the visual and aural differences between the marks, as well as the different commercial im pressions created by the respective marks, suffice to permit consumers to distinguish the source of Intterra's goods from the goods offered under the TAM's mark.

Here, the additional elements in the parties' respective marks—on the one hand, WILDFIRE, and on the other hand, state codes such as CA, Intterra indicia, and government agency identifiers—are more than sufficient to avoid any likelihood of confusion. TAM's mark is WILDFIRE AWARE. Intterra's marks include AWARECA, AWARE (and Shield Design), AWARE INTEL HUB, and AWARE OPS. While both parties' marks include the word AWARE,

34

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

that word is a common English dictionary term that TAM itself told the USPTO creates only a narrow scope of protection. The additional elements in each mark—WILDFIRE on the one hand, and, for example, CA, INTEL HUB, OPS, or state postal codes on the other—create markedly different overall commercial impressions.

TAM itself made precisely these arguments to the USPTO when seeking the registration upon which it now relies.  When the AWARE mark cited by the UPSTO is replaced with the references to Intterra's mark, the arguments carry the same weight:

[TAM's m]ark contains two distinct elements: WILDFIRE and AWARE. This is markedly different from the appearance of the [Interra's m]ark … which is comprised simply of the term AWARE. As can be appreciated from a visual comparison of the two marks, the first and foremost term of [TAM's m]ark is not at all present in the [Interra's m]ark …. Accordingly, the two marks at issue are visually very different.…. Not only does [TAM's m]ark differ visually from [Intterra's m]ark…, but the overall marks impart distinct disparate connotations. It is important to note that the term WILDFIRE of [TAM's m]ark is not at all present in [Interra's m]ark…. … The absence or presence of a term is especially important when considering the nature of the respective parties' goods in an environment in which consumers are sensitized to encountering similar terms in a broad product category. Arguably, the word WILDFIRE of [TAM's m]ark is the most important term for the purpose of informing consumers as to the specific nature of the mobile apps. On the other hand, [Intterra's m]ark … imparts a very vague and open-ended connotation. This notable difference in the connotations of the respective marks serves to further obviate a finding of confusion in the present instance. …When the marks are viewed in their entireties, as required under law, there is no doubt that consumers are left with completely different impressions. Given the widespread use of the term AWARE, [TAM's m]ark can come closer to [Intterra's m]ark … without causing a likelihood of confusion."

35

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

If WILDFIRE AWARE and the standalone AWARE mark are dissimilar enough to coexist on the register and in the marketplace—as TAM argued, and as the Trademark Office agreed—then WILDFIRE AWARE and AWARECA (or AWARE INTEL HUB, AWARE OPS, etc.) are dissimilar enough to avoid any likelihood of confusion. AWARECA is even more visually distinct from WILDFIRE AWARE than the standalone word AWARE: it adds a geographic suffix that further distinguishes its commercial impression. TAM cannot credibly stand before this Court and argue that *any* mark containing the word AWARE is confusingly similar to WILDFIRE AWARE when it represented to the Trademark Office, less than three years ago, that even AWARE alone would not be a source of likely confusion. Yet that is precisely what TAM asks this Court to accept. Moreover, the Intterra marks will always be presented in conjunction with and in close proximity to state level branding and indicia of the government partnerships. Wolf Decl, ¶ 3(c).

TAM's attempt to reduce the comparison to the shared element "AWARE" should be rejected. Considered in their entirety, WILDFIRE AWARE is materially different from each and every AWARE mark to which Intterra claims rights: AWARE INTEL HUB, AWARE OPS, AWARE (& Shield) design, AWARECA, and its family of other state-specific AWARE-formative marks. The respective marks are not confusingly similar.

### B.    Intterra's Non-Consumer-Facing Offerings: No Possibility of Confusion

Intterra's AWARE-branded product ecosystem includes two categories of offerings that are provided exclusively to government agencies and first responders: AWARE INTEL HUB, an enterprise command-center platform for public safety agencies, and AWARE OPS, a secure mobile application for authenticated first-responder communications. Compl. ¶¶ 11, 20-21. For these offerings, there is absolutely no possibility of confusion with TAM's consumer wildfire alert app. TAM does not operate in this space, its federal registration does not cover enterprise software platforms, and it has never sold to a government agency or offered a first-responder tool. An analysis of each *Sleekcraft* factor as applied to these products confirms that every factor either strongly favors Intterra or is neutral.

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

*Strength of the mark.* As detailed in Section IV.A, the AWARE element is dilute and inherently weak for software goods and services, and TAM itself argued to the federal government that it is "not entitled to a broad scope of protection." ECF No. 1-7 at 7. This weakness applies with particular force here because Intterra uses distinct AWARE-formative marks for these offerings—AWARE INTEL HUB and AWARE OPS—each of which contains additional distinguishing matter beyond the shared term AWARE. Intterra's agency and first responder marks are even further removed from WILDFIRE AWARE than the standalone AWARE mark that TAM represented to the Trademark Office was "not confusingly similar" to its own mark. ECF No. 1-7 at 8. This factor strongly favors Intterra.

*Proximity of the goods.* Intterra's non-consumer-facing products operate in a fundamentally different segment of the market than TAM's consumer wildfire alert app. The AWARE INTEL HUB software offering is a secure, single-pane-of-glass enterprise platform that unifies real-time data from multiple agencies and disciplines into actionable intelligence for agency command centers. Compl. ¶¶ 11, 20. AWARE OPS is a secure mobile application for first responders with authenticated login, two-way communications, and architecture built to FedRAMP Moderate-ready standards exceeding CJIS and HIPAA security requirements. Compl. ¶ 21. TAM, by contrast, offers a consumer wildfire alert app available for download on the App Store and Google Play. While both parties operate broadly in the field of public safety, these products serve materially different functions for materially different users through materially different channels. Critically, TAM's federal registration covers only "downloadable software in the nature of a mobile application for providing public information on wildfires"—it does not extend to enterprise command-center platforms or secure first-responder communications tools. This factor strongly favors Intterra.

*Similarity of the marks.* As discussed in Section IV.A, the parties' marks are not confusingly similar when viewed in their entirety. This conclusion is reinforced here because the marks for Intterra's non-consumer-facing products contain even greater distinguishing matter. AWARE INTEL HUB and AWARE OPS each include substantial additional wording—"INTEL

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

HUB" and "OPS"—that further differentiates them from WILDFIRE AWARE. Moreover, these products are always presented in connection with Intterra's own corporate branding and the official names, seals, and indicia of the government agencies that use them—providing layers of additional distinguishing context that eliminate any risk of confusion. Wolf Decl. ¶¶ 3-4. This factor favors Intterra.

*Evidence of actual confusion.* There is no evidence of actual confusion, nor could there be. Government procurement officials purchasing an enterprise software platform through formal bidding processes are not going to confuse that platform with a consumer wildfire alert app on the App Store. First responders accessing a secure, authenticated application for agency communications are not going to mistake it for an independently developed consumer app with no government affiliation. And consumers who are not first responders will not be able to complete the authenticated login, immediately signaling to them that the application is intended only for first responders. The complete absence of any opportunity for confusion is dispositive for these product categories. This factor favors Intterra.

*Marketing channels.* The marketing and trade channels for these products do not overlap in any respect. Intterra markets its AWARE INTEL HUB and AWARE OPS software offerings exclusively through business-to-government procurement channels—formal bidding processes, budget approvals, contract negotiations, and—in some circumstances—legislative or executive approval. TAM markets its app only by word of mouth, and provides it directly to individual consumers through the App Store and Google Play. Brady Decl, ¶ 23. TAM has never entered the B2G market, has no B2G infrastructure, and holds no government contracts. Even its registered rights only cover mobile application software. ECF No. 14-3 ("Downloadable software in the nature of a mobile application for providing public information on wildfires.") The total divergence of trade channels eliminates any possibility of confusion. This factor strongly favors Intterra.

*Type of goods and degree of consumer care.* The degree of care exercised by purchasers of these products is exceptionally high. Government procurement officials must follow formal

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

38

processes requiring strict budget adherence and significantly more diligence than private customers. The CAL FIRE procurement exemplifies this sophistication, including with respect to trademarks and branding: the agency evaluated Intterra's platform, requested a name change from "ReadyCA" to avoid confusion with existing government resources, consulted with state stakeholders, and selected "AwareCA" through a deliberative, multi-step process. First responders accessing AWARE OPS do so through authenticated login after their agencies have selected and deployed the platform through the same rigorous procurement process. No government procurement officer evaluating an enterprise software platform—and no first responder using a secure authenticated tool—is going to confuse either product with a consumer wildfire alert app. This factor strongly favors Intterra.

*Intent.* TAM has not, and cannot, adduce sufficient evidence to show that Intterra acted with bad intent in selecting its AWARE-formative marks—in large part because Intterra itself did not alone select its AWARE-formative marks. TAM's narrative on this point—that Intterra tried to buy the WILDFIRE AWARE app, failed, and then simply took TAM's brand—reads as a compelling tale and makes for good media. But it lacks both for evidentiary support and truth.

The word AWARE connotes "awareness" in the context of public safety—a natural and descriptive choice for a suite of situational awareness tools. More importantly, Intterra originally intended to name its consumer-facing product "ReadyCA" and changed course only at the direction of California state authorities. It was the government that expressed preference for the AWARE branding; Intterra didn't select the mark alone. TAM's tale crumbles on this critical point.

Although TAM devotes much of its argument to reverse confusion, it expressly states that its argument is based on both forward and reverse confusion theories. Both fail.

On forward confusion, there is no evidence that Intterra adopted the AWARE branding for its enterprise platform or first-responder tool with any intent to trade off any goodwill associated with TAM's consumer wildfire app—and TAM bears the burden of proving otherwise.

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

In a reverse confusion case, the relevant inquiry is not whether the junior user knew of the senior user's mark, but whether the junior user was "at fault for not adequately respecting the rights of the senior user." 3 McCarthy on Trademarks and Unfair Competition § 23:10. "[K]nowingly proceeding to use a similar mark after reasonably determining that there would be no conflict does not qualify as the kind of intent that could favor the senior user." *Id.*; *see also Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir. 2017). Given TAM's own prior conclusion that AWARE-formative marks are not confusingly similar—a conclusion that TAM depended upon itself to secure registration of its WILDFIRE APP—Intterra's determination that its AWARE-formative branding would not create confusion was eminently reasonable. This factor favors Intterra.

*Likelihood of expansion.* TAM has never sold to a government agency, has no B2G infrastructure, holds no government contracts, and has presented no evidence of concrete plans (or even an intent-to-use application) to expand beyond its consumer app into the enterprise software or first-responder tool markets. Nor do its registered rights extend so far. TAM's own characterization of the B2G channel as "an entirely as-yet-untapped market" confirms that the parties are not competing in this space. ECF No. 14-1 at 24. Speculation about hypothetical future expansion cannot support a preliminary injunction. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005). This factor favors Intterra.

*Totality.* In sum, every *Sleekcraft* factor, as applied to Intterra's government agency and first responder offerings, either strongly favors Intterra or is neutral. There is absolutely no basis for enjoining Intterra from using AWARE INTEL HUB for its government agency platform or AWARE OPS for its first-responder application. The overbreadth of TAM's requested injunction—which would sweep in these entirely non-overlapping products—alone warrants denial of the motion.

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

### C.    For Intterra's Consumer-Facing AwareCA Mobile App, the Possibility of Confusion Remains Very Remote

The consumer-facing AwareCA mobile application is the only Intterra offering for which TAM even attempts to credibly argue a likelihood of confusion. But here, too, the possibility of confusion remains very remote. An analysis of each *Sleekcraft* factor confirms that TAM cannot carry its burden of showing a likelihood of confusion, no less that "an appreciable number of people" are likely to be confused. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

*Strength of the mark.* As detailed in Section IV.A, the AWARE element is dilute and inherently weak for software goods and services, given the mere descriptiveness of "aware" for applications whose purpose is to increase awareness, and also in view of the crowded field of AWARE and AWARE-formative registrations for related goods and services, and the veritable sea of AWARE apps flooding the App Store and Google Play. TAM, to secure the registered rights it now seeks to enforce, itself represented to the U.S. Patent and Trademark Office that AWARE exists in a "crowded field" and is not entitled to a broad scope of protection (and presumably only refrained from argument regarding the inherent weakness of "aware" because it had already disclaimed exclusive rights with respect to the term "wildfire" for its wildfire awareness app). Having secured its registration on that basis, TAM cannot now claim that AWARE is a strong element deserving broad protection—especially not against marks identical to or even further removed from the mark that had initially blocked their registration. This factor favors Intterra.

*Proximity of the goods.* Although both TAM's app and Intterra's AwareCA offering are both consumer-facing mobile applications available on mobile app stores, the products differ materially. TAM's WILDFIRE AWARE app focuses exclusively on alerts and information relating to wildfires, targets individual consumers in wildfire-prone areas, and requires a paid subscription for full functionality. Intterra's AwareCA platform, by contrast, is an all-hazards, all-discipline public safety application that integrates data from law enforcement, emergency management, utilities, fire service, and other disciplines—wildfires constitute less than 1% of the

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

data on the platform. It cannot be accurately characterized as a "mobile application for providing information of wildfires," any more than Amazon.com might be construed as a provider of online retail store services for selling cricket food.

AwareCA is government-branded, government-sourced, and government-authorized: it delivers official communications from first-responder agencies, attributed to those agencies, and is always presented under the official names or seals of those agencies. Wolf Decl. ¶ 3(c). And it is entirely free—no subscription is required. The distinction is qualitative and material: one is an independent consumer product; the other is a government public service. While there is some degree of overlap in that both apps address public safety, the differences in scope, sourcing, branding, and business model are substantial. This factor arguably favors Intterra, or is at least neutral.

*Similarity of the marks.* As discussed in Section IV.A, the marks are not confusingly similar when viewed in their entirety. The unitary mark, AWARECA—which adds the geographic suffix "CA" to the already-weak AWARE element—is even more visually distinct from WILDFIRE AWARE than the standalone AWARE mark that TAM, to secure it federally registered rights, represented was "not confusingly similar." TAM itself declared that "the word WILDFIRE of Applicant's Mark is the most important term" and that the marks—WILDFIRE AWARE and AWARE—create "completely different impressions." If WILDFIRE AWARE and the standalone AWARE mark are dissimilar enough to coexist on the register—as TAM argued, and as the Trademark Office agreed—then WILDFIRE AWARE and AWARECA are similarly dissimilar, even more so. Moreover, Intterra has applied to register a family of fifteen AWARE-formative marks, all following the same structure: AWARE plus a two-letter state postal code (AWARECA, AWARETX, AWAREHI, AWAREFL, etc.).[6] The existence of a family of marks reinforces that consumers will come to recognize the unique AWARE + two-letter geographical code structure as a unitary mark designating Intterra's suite of region-specific government public safety

---

[6] The sole (albeit slight) variant among the family of marks is AWAREUS, intended for federal use. *See* Neustadt Decl., Ex. J.

42

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

applications—a structure and commercial impression that is readily distinguishable from WILDFIRE AWARE.

Also, and crucially, consumers will encounter AWARECA almost exclusively in connection with government agency branding and official seals, providing additional distinguishing context. Wolf Decl. ¶ 3(c). This factor favors Intterra.

*Evidence of actual confusion.* Despite Intterra's public announcement of its AWARE-branded app on January 6, 2026, and widespread media coverage since, TAM has not identified a single instance of actual confusion—no misdirected downloads, no confused consumers, no evidence of anyone mistaking one app for the other, no one contacting Ms. Brady to ask whether she has partnered with CAL FIRE, no one congratulating her on the statewide launch—nothing. In fact, the nature of the outreach that Ms. Brady received referenced in TAM's Motion and Ms. Brady's accompanying declaration actually show a *lack* of confusion. *See* ECF No. 14-1 at 12, Brady Decl. ¶¶ 36-37. TAM concedes that this factor is "neutral at this stage." ECF No. 14-1 at 21-22. But the complete absence of any reported confusion despite months of public attention to the AWARE branding is telling. This factor is neutral at best for TAM, but the prolonged silence despite extensive publicity tilts this factor in Intterra's favor.

*Marketing channels.* TAM notes that both apps will be available on the App Store and Google Play Store. But the mere fact that two products are available on the same platform does not establish overlapping marketing channels. *Good Meat Project v. GOOD Meat, Inc.*, 716 F.Supp.3d 783, 802 (2024); *Network Automation*, 638 F.3d at 1151. The app stores host millions of applications across every conceivable category. *Apple Inc. v. Pepper*, 587 U.S. 273, 276 (2019) ("The App Store now contains about 2 million apps that iPhone owners can download"); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 930–31 (9th Cir. 2025) (The "[Google] Play Store has an enormous catalog of more than two million apps"). What matters is how the products are marketed to consumers, and the parties' marketing channels diverge significantly. TAM markets directly to individual consumers through word of mouth. Brady Decl. ¶ 9. AwareCA, by contrast, will be promoted primarily through its partner government agencies: state and regional

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

43

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

agency websites will feature links directing users to download the app from the App Store or Google Play, and the app store listings themselves will prominently reference the official agency partnerships and state-level branding. With millions of apps now available on these platforms and the difficulty consumers face in navigating that volume, consumers are far more likely to research and discover apps outside of the app stores—through social media, government communications, or news coverage—and then go to the store simply to complete the download. The primary channels of marketing are thus materially different. This factor is, at most, neutral.

*Type of goods and degree of consumer care.* TAM argues that consumers "cannot be expected to exercise extra care" because they download apps "at times of exigency and danger." ECF No. 14-1 at 22. This argument is doubly flawed. First, as the Court will surely note, TAM cites no evidence for the proposition that consumers are most likely to download emergency apps in the midst of a disaster. It is far more reasonable to presume that consumers, especially those living in areas with high risk of natural disasters, take the preparatory step of downloading such apps in advance and researching which app best meets their needs—a process reflecting a high degree of consumer care. TAM's own app store listing and its users describe and treat the WILDFIRE AWARE application as a tool for ongoing monitoring and situational awareness offering features such as saved "Home" locations, customizable alert radii, and predictive fire weather forecasts, all of which presuppose deliberate, advance setup by the user rather than panicked downloading in the middle of an emergency. Neustadt Decl., Ex. H, I. Indeed, one of the app's own user reviews is titled "Excellent Wildfire Preparedness Resource" and praises the app as a "useful part of your homes wildfire preparedness planning." Neustadt Decl., Ex. H. Other reviews confirm this pattern: one user reports tracking wildfires "every summer" and deliberately comparing multiple apps before settling on WILDFIRE AWARE; another describes setting it up proactively for family members living in fire-prone Northern California as a source of "peace of mind." Neustadt Decl., Ex. H, I. TAM's own product and its users treat WILDFIRE AWARE as a preparedness tool, one that consumers research, compare, and configure well in advance of any emergency. This is the hallmark of a high degree of consumer care. Second, to the extent

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

consumers are searching for information during an emergency, logic and reason dictate that they are most likely to turn to known, authoritative sources such as official government channels rather than searching app stores for an unfamiliar application. Consumers selecting applications on which their lives may literally depend exercise extreme care in their decisions. This factor favors Intterra.

*Intent.* As with Intterra's non-consumer-facing offerings, TAM has not adduced any evidence of bad intent in Intterra's selection of its AWARE-formative marks. TAM's narrative is the same for all of Intterra's AWARE marks—and it fails for the same reasons. The AWARE marks were selected by a government agency—not by Intterra, and not to trade on any goodwill puprotedly associated with TAM's WILDFIRE AWARE app (with respect to which, there is no evidence that the selecting government agency was aware). Intterra originally intended to use "ReadyCA" and changed course only at the direction of California state authorities, who later themselves chose the AWARE family of marks from an array of three alternatives.

In a reverse confusion case, "knowingly proceeding to use a similar mark after reasonably determining that there would be no conflict does not qualify as the kind of intent that could favor the senior user." 3 McCarthy on Trademarks and Unfair Competition § 23:10; *see also Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir. 2017). Given TAM's own prior representations to the Trademark Office—upon which its registration depended—Intterra's determination that its branding would not conflict with TAM's was eminently reasonable. This factor favors Intterra.

*Likelihood of expansion.* TAM argues that "the parties' offerings are already competing" and that Intterra's marks "would prevent TAM's legitimate business expansion." ECF No. 14-1 at 23-24. Neither contention withstands scrutiny. Even accepting, for purposes of argument, a modicum of overlap in the consumer mobile app space, the parties' products serve materially different functions: TAM's app is a wildfire-specific alert tool for individual subscribers, while AwareCA is an all-hazards government public service platform. TAM's expansion claims are entirely speculative: TAM states only that "there is no reason that WILDFIRE AWARE® could not be marketed, customized, or sold to businesses or governmental entities using other trade

45

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR<br>PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

channels." ECF No. 14-1 at 24. But TAM has never sold to a government agency, has no B2G infrastructure, and has presented no concrete plans to do so. A statement that "there is no reason" that something could happen, is not evidence that it may. Speculation about hypothetical future expansion cannot support a preliminary injunction. *Survivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005).

Moreover, nothing about Intterra's use of AWARE-formative marks for a government-distributed, all-hazards platform would prevent TAM from continuing to market WILDFIRE AWARE to individual consumers—the only market in which TAM has ever operated. This factor does not support TAM.

*Totality.* In sum, an analysis of the *Sleekcraft* factors, properly applied, demonstrates that TAM has no likelihood of success on the merits. For the vast majority of Intterra's AWARE-branded offerings—the enterprise platform sold to government agencies and the secure first-responder application—there is no possibility of confusion whatsoever, and every factor weighs decisively in Intterra's favor. For the consumer-facing AwareCA mobile app, the marks are still dissimilar, the goods differ materially, the marketing channels diverge, consumers exercise a high degree of care, there is no evidence of actual confusion, and Intterra acted without culpable intent. TAM has failed to carry its burden on any factor.

The breadth of TAM's requested injunction—which would sweep in enterprise platforms, first-responder tools, and government agency solutions where confusion is not even conceivable, under a universe of marks that bear no resemblance to WILDFIRE AWARE—only underscores that this motion is driven not by genuine concern for consumer confusion but by a desire to extract a payday and inflict harm on Intterra. TAM has not, and cannot, carried its burden of demonstrating a likelihood of success on the merits.

## IV.    TAM CANNOT ESTABLISH IRREPARABLE HARM

The Trademark Modernization Act of 2020 establishes a rebuttable presumption of irreparable harm, but only upon a finding of likelihood of success on the merits. 15 U.S.C. § 1116(a). Because TAM cannot demonstrate a likelihood of success on the merits, it is not entitled

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

to any presumption of irreparable harm. Moreover, the TMA expressly states that the presumption of harm is rebuttable. 15 U.S.C. § 1116(a). Accordingly, even if TAM were entitled to a presumption of irreparable harm—and it very clearly is not—such presumption is easily rebutted by the pertinent facts of this case.

As a threshold matter, TAM's dilatory conduct fatally undermines any claim of urgency. As detailed above, TAM learned of Intterra's AWARE branding on January 6, 2026, yet waited nearly three months to file for injunctive relief. By waiting until the eve of launch rather than moving in January, TAM ensured that an injunction would cause maximum harm to Intterra. But in doing so, TAM, in an apparently willful strategic decision, sacrificed its best chances on prevailing with respect to the balance of equities and public interest and ultimately securing relief from the grave harm it alleges. A party that genuinely believed it faced imminent, irreparable harm would not have waited three months to seek relief, after the balance of equities and public interest had tilted heavily against an injunction. TAM's delay supports the inference that TAM timed its motion to maximize leverage and cause harm, not to prevent any genuine injury.

TAM's irreparable harm arguments rest entirely on speculation. Intterra's app has not yet launched. There is no evidence of actual consumer confusion, lost sales, or diminished goodwill. TAM's own acknowledgment that the actual confusion factor is "neutral at this stage" severely undermines its claim of imminent irreparable harm. ECF No. 14-1 at 21-22. TAM has identified no impact on user retention—the metric that matters most for a mobile application's reputation. Without evidence that existing WILDFIRE AWARE users are abandoning the app or that TAM's reputation has been concretely damaged, TAM's claim of irreparable harm is precisely the kind of speculative assertion courts routinely reject. *Surfvivor Media, Inc.*, 406 F.3d 625 at 634.

Finally, as noted above, TAM admits its success is driven by word-of-mouth referrals, not advertising. ECF No. 14-1 at 9. Users who learn of WILDFIRE AWARE through personal referrals will already be familiar with TAM as the source. To the extent any user mistakenly downloads the wrong app, the apps differ so materially in content, branding, functionality, and

47

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA 94105
Tel: 415.743.6900
Fax: 415.743.6910

presentation that any accidental downloads would be immediately corrected—and such correctable confusion does not constitute irreparable harm.

## V.    IF ANY RELIEF IS GRANTED, A SUBSTANTIAL BOND SHOULD BE REQUIRED

Finally, if this Court is inclined to grant any relief, the Court should require TAM to post a bond commensurate with the potential harm to Intterra. TAM's suggestion that the bond be waived or set at a nominal amount of $1,000 is wholly inadequate. Setting aside the disproportion of TAM's proposed amount to the size of TAM's pre-motion demand to Intterra, $1000 is also entirely out of alignment with the anticipated harm to Intterra. An injunction—and particularly the overly broad injunction sought by TAM--would jeopardize tens or even hundreds of millions of dollars in government contracts, impose significant rebranding costs, delay a taxpayer-funded public safety service, and permanently shatter the priceless and irrecoverable trust essential to Intterra's and its partner agencies' success (and to public safety). A bond commensurate with these potential harms is essential to protect Intterra in the event TAM does not prevail on the merits.

## VI.    CONCLUSION

For the foregoing reasons, Intterra respectfully requests that the Court deny TAM's motion for a preliminary injunction in its entirety. TAM has not carried its burden on any of the four *Winter* factors. The requested injunction is extraordinarily broad, would inflict extraordinary harm on Intterra and the public interest, and rests perilously on a claim of likely confusion that is contradicted by TAM's own representations to the U.S. Patent and Trademark Office.

At bottom, this case is simple. TAM secured its trademark registration by representing to the federal government that WILDFIRE AWARE and AWARE are not confusingly similar—that such marks are "visually very different," that they create "completely different impressions," and that the word "aware" is "not entitled to a broad scope of protection." ECF No. 1-7 at 7. Having obtained its registration on the strength of those representations--a registration that sound public policy dictates should be limited in scope to the reaches of the registrant's own representations— TAM now asks this Court to find the exact opposite, construe its rights with excessive breadth,

48

INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION

and grant the extraordinary remedy of a preliminary injunction barring Intterra from using *any* mark at all that includes the word "aware," for *any* of its software offerings, regardless of their target audience or any other pertinent particulars. The Court should not reward that kind of gamesmanship—whether played over the three years since TAM submitted its arguments to secure federally registered rights or over the three months since TAM learned of Intterra's now-impending launch. Nor should it allow TAM to use the threat of an injunction—and a $1.5 million demand—to hold hostage a government-contracted, taxpayer-funded public safety platform that will deliver authoritative, real-time emergency information to tens of millions of California residents.

The motion should be denied.

Dated: April 10, 2026                     **HOLLAND & KNIGHT LLP**

By:     s/Daniel P. Kappes
        Daniel P. Kappes (CA Bar No. 303454)
        560 Mission Street
        Suite 1900
        San Francisco, California 94105
        Daniel.Kappes@hklaw.com

        Daniel C. Neustadt (NY Bar No. 4532958)
        *(pro hac vice pending)*
        Sara J. Benson (DC Bar No. 1767612) (*pro hac vice forthcoming*)
        800 17th Street N.W., Suite 1100
        Washington, D.C. 20006
        Telephone:   (202) 955.3000
        Dan.Neustadt@hklaw.com
        Sara.Benson@hklaw.com

        *Attorneys for Plaintiff Intterra, LLC*

Holland & Knight LLP
560 Mission Street, Suite 1900
San Francisco, CA  94105
Tel: 415.743.6900
Fax: 415.743.6910

49
INTTERRA'S MEM. OF P. & A. ISO OPPOSITION TO TAM'S MOTION FOR PRELIMINARY INJUNCTION