Rachael D. Lamkin (SBN 246066)
rachael.lamkin@bakerbotts.com
Katherine Burgess (SBN 330480)
katherine.burgess@bakerbotts.com
BAKER BOTTS L.L.P.
101 California Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 291-6200
Fax: (415) 291-6300

Julie Albert (*admitted Pro Hac Vice*)
julie.albert@bakerbotts.com
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Fax: (212) 408-2501


*Attorneys for Defendant and Counterclaim-Plaintiff*
*The Analytical Moose LLC*
*and Defendant Rachael Brady*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| INTTERRA, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>THE ANALYTICAL MOOSE LLC and RACHAEL BRADY,<br><br>        Defendants. | Case No.: 2:26-cv-00747-WBS-CSK<br><br>**DEFENDANT AND COUNTERCLAIM-PLAINTIFF THE ANALYTICAL MOOSE LLC'S REPLY IN SUPOPRT OF ITS MOTION FOR PRELIMINARY INJUCNTION**<br><br>Judge: Hon. William B. Shubb<br>Date: April 20, 2026<br>Time: 1:30 p.m.<br>Courtroom: 5, 14th Floor<br>Trial Date: N/A<br>Action filed: March 5, 2026 |

**TABLE OF CONTENTS**

I.    INTRODUCTION ....................................................................................................................1

II.   ARGUMENT........................................................................................................................4

    A.    Intterra's Launch of AWARECA, as Branded, Should Be Enjoined .....................4

        1)    Intterra's Launch of AWARECA Despite Ample Notice from TAM is Likely to Cause Irreparable Harm..................................................................4

        2)    Intterra's Launch and Use of AWARE-formative Branding is Likely to Cause Forward and Reverse Confusion with WILDFIRE AWARE®........6

        3)    Intterra Knowingly Adopted Confusingly-Similar Branding at its Peril and the Balance of Equities Favors TAM.................................................12

        4)    The Public Interest in Identifiably-Sourced Public Safety Information and Protection of Hard-Earned Trademark Rights Favors an Injunction. ...............................................................................................15

    B.    TAM Seeks Only a Rebranding for Intterra's May 1, 2026, Launch. ...................16

    C.    To the Extent the Court Determines a Bond is Required, Any Bond Should Be Nominal.................................................................................................................17

    D.    Intterra's Unsupported, Irrelevant, *Ad Hominem* Attacks Should Be Disregarded. .........................................................................................................18

III.  CONCLUSION...................................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Abbott Laboratories v. Mead Johnson & Co.*,
 971 F.2d 6 (7th Cir. 1992) ...............................................................................................15

*Accuride Intern., Inc. v. Accuride Corp.*,
 871 F.2d 1531 (9th Cir. 1989) .......................................................................................6-7

*adidas Am., Inc. v. Skechers USA, Inc.*,
 890 F.3d 747 (9th Cir. 2018) ..............................................................................................6

*AK Futures LLC v. Boyd St. Distro, LLC*,
 35 F.4th 682 (9th Cir. 2022) ...............................................................................................2

*Apple Inc. v. Pepper.*,
 587 U.S. 273 (2019) .........................................................................................................10

*Am., Inc. v. Skechers USA, Inc.*,
 890 F.3d 747 (9th Cir. 2018) ..............................................................................................6

*BNSF Ry. Co. v. Float Alaska IP, LLC*,
 No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506 (C.D. Cal. Aug. 28, 2023)................... 12-13

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
 174 F.3d 1036 (9th Cir. 1999) ......................................................................................6, 10

*Davis v. Lost Int'l LLC*,
 No. CV 12-8002 GAF (MANx), 2013 WL 12137103 (C.D. Cal. Apr. 8, 2013)......................9

*De Anda Enters., Inc. v. JL Deanda Enters., LLC*
 No. SA CV 16-2049-DOC (JCGx), 2017 WL 2960796 (C.D. Cal. Apr. 11, 2017)...............12

*Good Meat Project v. GOOD Meat, Inc.*,
 716 F.Supp. 3d 783 (N.D. Cal. Feb. 12, 2024) .................................................................11

*Halo Mgmt., LLC v. Interland, Inc.*
 308 F. Supp. 2d 1019 (N.D. Cal. 2003) .............................................................................13

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
 736 F.3d 1239 (9th Cir. 2013) ..........................................................................................15

*In re E. I. du Pont de Nemours & Co.*
 476 F.2d 1357 (C.C.P.A. 1973) ..........................................................................................8

ii

*In re Viterra Inc.*,
    671 F.3d 1358 (Fed. Cir. 2012)........................................................................................10

*Intenze Prods., Inc. v. TATLAB Corp.*,
    No. 23-cv-02265-RGK-PD, 2023 WL 5209729 (C.D. Cal. Aug. 1, 2023) ..............................5

*Kiva Health Brands LLC v. Kiva Brands Inc.*,
    402 F. Supp. 3d 877 (N.D. Cal. 2019) ..................................................................................12

*Metal Jeans, Inc. v. Affliction Holdings, LLC*,
    No. CV 15-0743, 2015 WL 3833858 (C.D. Cal. June 19, 2015) .............................................8

*Outcomes Pharm. Health Care, L.C. v Nat'l Cmty. Pharmacists Ass'n*,
    No. 4:05-cv-00682-JEG, 2006 WL 3782905 (S.D. Iowa Dec. 22, 2006) ..............................15

*Pringle v. Cardall*,
    No. 2:18-cv-02035 WBS KJN, 2020 WL 5820615 (E.D. Cal. Sep. 30, 2020) ...................3, 19

*Sports Mktg. Monterrey Grp. LLC v. Socios Servs. US Inc.*,
    No. 22-cv-08939-SI, 2023 WL 2671379 (N.D. Cal. Mar. 27, 2023) ......................................5

*StudioCanal SAS v. Hollywood Collectibles Grp. LLC*,
    No. 24-cv-11002-MWC-MAA, 2025 WL 3050216 (C.D. Cal. Jun. 30, 2025).........................5

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ...............................................................................................6

**STATUTES**

15 U.S.C. § 1116(a) ....................................................................................................................2

**OTHER AUTHORITIES**

Fed. R. Evid. 408(a)..................................................................................................................18

## I.      INTRODUCTION

For years, Intterra has known and valued TAM's WILDFIRE AWARE® app and brand, but nonetheless chose to willfully disregard those rights and adopt a confusingly similar trademark for a directly competitive offering. Intterra's Opposition amplifies the significant, likely (and presumptively) irreparable harm Intterra's actions will cause TAM and the marketplace. Despite admitting to its prior knowledge of TAM's rights and its ability to quickly pivot to new branding when faced with infringement concerns, Intterra continues unabated towards its planned May 1, 2026, launch of AWARECA. To preserve the *status quo,* Intterra should be preliminarily enjoined from launching a consumer-facing mobile application providing wildfire information under the mark AWARECA. [1]

In Opposition, Intterra and its CEO <u>admit</u> that Intterra knew of TAM's prior rights, selected AWARE as a house mark despite that knowledge, and can rebrand (and has rebranded) in the face of infringement concerns in a matter of weeks without business disruption. According to Intterra's CEO, "Intterra originally chose to name its consumer-facing mobile application 'ReadyCA.' That 'ReadyCA' branding and development effort continued through nearly all of 2025[.]" Wolf Decl. ¶¶ 16-17, Dkt. No. 21. That changed after December 18, 2025, when Intterra was "asked by the State of California to change the name of the application because of a conflict with CAL OES's existing website, ready.ca.gov, and the potential for confusion with FEMA's federal ready.gov program." *Id*. ¶ 19. Roughly three (3) weeks later, "Intterra and CAL FIRE announced the Spring 2026 launch of AwareCA on January 6, 2026." *Id*. ¶ 43. Just three (3) weeks after that, Intterra was asked to cease

---

[1] Contrary to its claims in the Complaint that "numerous agencies have begun using" its AWARE-branded software (Compl. ¶ 20), Intterra admits in Opposition that it has not yet launched any offerings under AWARE-formative marks; only AWARECA is set for imminent launch under this branding. *See* Wolf Decl. ¶ 6. TAM is not presently seeking to enjoin legacy back-end software or non-consumer internal tools, especially legacy-branded software, and, reserving all rights to seek further preliminary relief as warranted, presently seeks to enjoin only the impending launch of AWARECA, as branded. *See* Section II.B., *infra*.

and desist from infringing the WILDFIRE AWARE® trademark. Compl. Ex. E. Dkt. No. 1-5. That is, Intterra worked on its launch of ReadyCA for a "nearly year-long period" (Wolf Decl. ¶ 29), but when CAL FIRE asked them to change the brand—because it belonged to California—Intterra rebranded to AWARECA in just three (3) weeks. TAM sent Intterra a cease and desist a mere three (3) weeks later, on January 28, 2026. Compl. Ex. E. Intterra did not cease and desist.

Intterra's Opposition only reinforces the company's prior knowledge and disregard of TAM's rights. In his sworn declaration, Mr. Wolf recalls personally proposing "that Intterra purchase the rights [to the WILDFIRE AWARE®] application" (*see* Wolf Decl. ¶ 27), and admits that Intterra chose to brand its consumer-facing wildfire alert app as AWARECA despite both its actual knowledge of the WILDFIRE AWARE® app and brand and a trademark review conducted by Intterra's legal team which identified WILDFIRE AWARE® by name. *See* Wolf Decl. ¶ 22. Intterra nonetheless presented CAL FIRE with AWARE-formative branding as a replacement name for its "taxpayer-funded" initiative (Opp. at 1), including AWARECA for a consumer-facing mobile app, "subject to Intterra's diligence." Wolf Decl. ¶ 21. TAM has ample basis to demand that Intterra rebrand from AWARECA, a mark it had adopted over the course of just (3) weeks in the face of trademark concerns, which it has yet to use on any product actually available in commerce, and in which it had invested a total of three (3) weeks of post-announcement work before receiving a cease and desist demand.

Beyond its admissions, Intterra's Opposition is notable for its omissions. Intterra offers no support for its claims about either party's harm. Not only has TAM explained how the impending launch of AWARECA will harm TAM and the consuming public, *see* Prelim. Inj. Mot. at 9-11, but the law presumes that TAM will be harmed. *See AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 694 (9th Cir. 2022) (holding that, upon a showing of likelihood of success on the merits, trademark plaintiffs are "entitled to a rebuttable presumption of irreparable harm") (*citing* 15 U.S.C. § 1116(a)). Conversely, Intterra speculates that delaying or rebranding AWARECA would threaten its

2

business relationships (Opp. at 7), but provides no list of contracts, no financial projections, no termination clauses, and no declaration from CAL FIRE or any other partner. Intterra claims that an injunction "would cause harm to public safety," but can offer no evidence of how public safety is implicated when its products are not yet available to the public, acknowledging that its legacy-branded platform remains active and that its partners and the public still can (and do) access and disseminate emergency information without AWARECA. *See* Compl. ¶ 18 ("Intterra has over 350 existing government agencies leveraging its legacy software platform that is being marketed and rebranded"); Opp. at 20.

Finally, while separate from the preliminary injunction case-at-bar, it merits mention that Intterra's Opposition and Mr. Wolf's declaration contain thirty-six (36) unsupported, irrelevant *ad hominem* attacks against TAM and its founder, Ms. Brady. "[I]nflammatory language like that contained in plaintiff's Opposition generally hinders proceedings by distracting the court's attention from the issues legitimately raised by the motion and interfering with parties' willingness to engage in settlement talks or meet and confer on future disputes that arise in the course of litigation." *Pringle v. Cardall*, No. 2:18-cv-02035 WBS KJN, 2020 WL 5820615, at *3 (E.D. Cal. Sep. 30, 2020) (Shubb, J.) Intterra and Mr. Wolf's inflammatory accusations should be disregarded.

All told, Intterra invested "nearly all of 2025" on branding that used another's name and rebranded in three (3) weeks when CAL FIRE asked. Wolf Decl. ¶ 17. But when it came to the much less powerful TAM and Ms. Brady, Intterra couldn't be bothered. Instead, Intterra disregarded prior rights it had attempted to purchase, ignored TAM's timely cease and desist, and continued towards the imminent launch of AWARECA and the proposed rebranding of an entire suite of products with confusingly-similar branding, all while assuring CAL FIRE, and consequently, the taxpaying public, that Intterra had done its "diligence." *Id.* ¶ 21. On these facts, Intterra should be enjoined from using AWARECA in its upcoming May 1, 2026, launch.

TAM'S REPLY ISO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:26-CV-00747-WBS-CSK

## II.    ARGUMENT

### A.  Intterra's Launch of AWARECA, as Branded, Should Be Enjoined

#### 1)    Intterra's Launch of AWARECA Despite Ample Notice from TAM is Likely to Cause Irreparable Harm.

Unless enjoined, on May 1, 2026, Intterra will launch AWARECA, the first of a family of AWARE-formative marks, for a mobile app that it acknowledges will directly compete with TAM's WILDFIRE AWARE®. Intterra's use of a confusingly-similar trademark jeopardizes TAM's control over its brand and introduces confusion to consumers in moments when they need certainty the most. *See* Prelim. Inj. Mot. at 9-11. In response, Intterra claims that TAM delayed taking action and thus cannot be irreparably harmed, and argues that, because the irreparable harm Intterra's trademark infringement will cause has not happened yet, it is not actionable. Both of these contentions are inconsistent with on-point case law, disregard the facts, and accordingly, fall flat.

TAM acted promptly to counter Intterra's infringement. Just weeks after Intterra announced its planned use of AWARE-formative branding on January 6, 2026, Intterra received a letter on January 28 demanding that it cease its trademark infringement, advising that "[t]he similarity of the marks and services, as well as the channels of trade, creates a strong likelihood of consumer confusion" with WILDFIRE AWARE®, and noting the possibility of "seeking injunctive and monetary relief in federal court." Compl. Ex. E. In a discussion on February 6, "Intterra expressed interest in settling the matter" and TAM's counsel requested that Intterra "prepare an offer." Compl. ¶ 35. Intterra continued to march towards launch, writing on February 13 that "Intterra considered the matter closed." *Id.* TAM's counsel responded on February 18, again noting the substantial likelihood of consumer confusion, but asking for Intterra's response by March 4 to a proposal to acquire rights to the WILDFIRE AWARE® app that would "avoid protracted federal litigation." *See* Brady Decl. Ex. 8 at 4. On March 5, Intterra chose to file the Complaint. On March 15, Intterra publicly announced its intention to launch AWARECA on May 1, 2026. *See* Brady Decl. ¶¶ 40-41. TAM was served with the

4

Complaint on March 18, and Ms. Brady was served on March 19. Dkt. Nos. 7-8. On March 23, in light of Intterra's escalation and apparently imminent launch, TAM's counsel advised by letter of "the irreparable harm that Intterra's planned launch of a knowingly-infringing app will cause to TAM, Ms. Brady, and the marketplace" and provided a proposal for resolution. *See* Neustadt Decl. Ex. A at 1. On March 31, with no counterproposal from Intterra, TAM's counsel again requested settlement terms, but advised that "in light of the irreparable harm at hand and to ensure adequate time to seek and obtain injunctive relief prior to Intterra's anticipated May 1 launch, TAM expects to file counterclaims and a motion for preliminary injunction with the Court by Friday April 3." Neustadt Decl. Ex. B at 1. The motion for preliminary injunction followed. TAM's efforts to seek a resolution short of litigation do not rebut the likelihood of irreparable harm.

Courts in this District have readily granted injunctive relief in similar circumstances, including in cases where injunctive relief was not sought for twice the amount of time at issue here. *See StudioCanal SAS v. Hollywood Collectibles Grp. LLC*, No. 2:24-cv-11002-MWC-MAA, 2025 WL 3050216, at *11 (C.D. Cal. Jun. 30, 2025) (noting that a "period of negotiations and mediation does not constitute delay precluding a preliminary injunction."); *Sports Mktg. Monterrey Grp. LLC v. Socios Servs. US Inc.*, No. 22-cv-08939-SI, 2023 WL 2671379, *21 (N.D. Cal. Mar. 27, 2023) (holding same); *Intenze Prods., Inc. v. TATLAB Corp.*, No. 2:23-cv-02265-RGK-PD, 2023 WL 5209729, at *8 (C.D. Cal. Aug. 1, 2023) ("it is a stretch to suggest that six months [between learning of infringement and moving for a preliminary injunction] is inherently unreasonable"). Intterra's decision to proceed unabated towards a May 1, 2026, launch, rather than rebrand or voluntarily delay the launch to facilitate settlement negotiations, does not give rise to any claims of delay by TAM.

As to harm, TAM's motion explained, in detail, how the launch of Intterra's competing AWARECA app will cause confusion to TAM and the community. In response, Intterra contends that TAM's claims of irreparable harm are "speculative" and thus not actionable because they have not yet

5

occurred. This flies in the face of black-letter trademark law. Trademark infringement turns on the <u>likelihood</u> of confusion, an inherently forward-looking inquiry designed to prevent consumer confusion before it occurs. *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1053–54 (9th Cir. 1999). Accordingly, courts routinely grant preliminary injunctions where a defendant's use of a mark is likely to cause consumer confusion, even if no sales have yet occurred and no instances of actual confusion can be shown. *See adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755–56 (9th Cir. 2018) (affirming preliminary injunction based on a substantial likelihood of confusion, without requiring evidence of actual confusion). This is because the purpose of preliminary injunctive relief is to <u>prevent</u> imminent and irreparable trademark injury—confusion and loss of control over goodwill—that cannot be readily remedied once it materializes. Indeed, as Intterra acknowledges, where a trademark plaintiff is likely to succeed on the merits of its infringement claim, irreparable harm is presumed. The only case cited by Intterra in purported support of its position on irreparable harm, *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 628 (9th Cir. 2005), does not address irreparable harm at all and was decided fifteen years before the Trademark Modernization Act codified the statutory presumption of irreparable harm. *See id.* at 629–30 (evaluating likelihood of confusion at summary judgment). On the facts and under the presumptions to which a trademark infringement plaintiff is entitled, TAM has shown a likelihood of irreparable harm.

### 2) Intterra's Launch and Use of AWARE-formative Branding is Likely to Cause Forward and Reverse Confusion with WILDFIRE AWARE®.

Each of the *Sleekcraft* factors weighs in favor of TAM, creating an unusually strong likelihood of success on TAM's infringement claim. *See* Prelim. Inj. Mot. at 12-18. In its own analysis of the *Sleekcraft* factors, Intterra repeatedly relies on unsupported attorney argument and misapplications of law. It is axiomatic that a likelihood of confusion analysis must "focus on the realities of the marketplace, not abstract tests of similarity. *See Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d

1531, 1535-36 (9th Cir. 1989) (finding that it would be "inappropriate" to ignore marketplace realities and that a court may properly consider all eight *Sleekcraft* factors in the context of the market for the actual offerings at issue). Marketplace realities here drive the conclusion that confusion is likely. WILDFIRE AWARE® and AWARECA will directly compete, and Intterra concedes that WILDFIRE AWARE® and AWARECA share the term AWARE, serve the purpose of providing end-users with information about emergencies, including wildfires, pull from credible data sources, target the same end users, and travel through similar trade channels. Beyond AWARECA, Intterra acknowledges that all of Intterra's planned AWARE offerings are "integrated" and further the same emergency-alert goals. *See, e.g.*, Wolf Decl. ¶ 3; Opp. at 6. Intterra admits that it adopted AWARECA and other AWARE-formative branding notwithstanding actual knowledge of TAM's prior rights, *see, e.g.,* Opp. at 3; Wolf Decl. ¶¶ 22, 27, and Intterra's actions, including its decision to file fifteen AWARE-formative trademark registrations, undercut any argument that AWARE does not function as an inherently distinctive source-indicator for the offerings at issue. *See* Opp. at 41-42. In this context, TAM has a strong likelihood of success on the merits of its trademark infringement claims.

### i. TAM's Arguments Before the USPTO Establish Registrability and are Consistent With a Likelihood of Confusion Here.

WILDFIRE AWARE®, including the distinctive term AWARE, is a strong source-indicator for the services that TAM provides: "downloadable software in the nature of a mobile application for providing public information on wildfires." *See* Ex. 1, Dkt. No. 14-3 (U.S. Trademark Reg. No. 7403027). TAM obtained a federal registration for this mark, with no disclaimer of AWARE, covering these services, which confers *prima facie* evidence of the mark's inherent distinctiveness. *See id.*; Prelim. Inj. Mot. at 13-14. Intterra does not, and cannot, claim otherwise, as it asserts that "creating the Aware portfolio has provided a potential lifeline and path to profitability for our company" and that it has sought fifteen trademark registrations for AWARE-formative marks, taking the position that

AWARE is valuable and its applied-for marks are inherently distinctive. *See* Wolf Decl. ¶ 9; Opp. at 42.

Intterra looks to TAM's successful arguments in support of its WILDFIRE AWARE® application to argue that TAM's rights in WILDFIRE AWARE® are not strong enough to support its infringement claim against Intterra. TAM disagrees with Intterra's read of TAM's USPTO submission, attached as Exhibit G to Intterra's Complaint (Dkt. No. 1-7).

TAM's 2022 Office Action response does not change the conclusion that Intterra's planned use of AWARECA, by itself and as part of its "integrated" family of offerings in the wildfire and emergency alert space, is likely to cause confusion with WILDFIRE AWARE®. Intterra tries to extend TAM's specific arguments about WILDFIRE AWARE®'s lack of confusion with a third-party's registration for AWARE in connection with different goods and services into a categorical concession that there is no likelihood of confusion between WILDFIRE AWARE® and any other possible AWARE-formative mark, including AWARECA. This argument runs counter to the most basic of trademark principles: There is no mechanical test for determining likelihood of confusion and "each case must be decided on its own facts." *See, e.g., In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973). Attempts to extend prior USPTO arguments to present trademark disputes have been squarely rejected, including at the pleading stage. *See Metal Jeans, Inc. v. Affliction Holdings, LLC,* No. CV 15-0743, 2015 WL 3833858, at *3 (C.D. Cal. June 19, 2015); *see also Davis v. Lost Int'l LLC*, No. CV 12-8002 GAF (MANx), 2013 WL 12137103, at *5 (C.D. Cal. Apr. 8, 2013) ("What [defendant] ignores is that, unlike patents, trademarks are dynamic in that they can gain or lose strength over time.") (internal citations omitted).  In *Metal Jeans*, the court rejected the claim that statements to the USPTO distinguishing METAL® marks used in connection with apparel applied to all other marks containing the word "METAL" in connection with apparel. *Id.* at *3.  The Court explained, "Defendant's marks are not the same as [the marks in the office action], Plaintiff addressed [the other

8

marks] specifically in its statements to the USPTO, and Plaintiff is not bound by its previous statements concerning those marks." *Id.* As in *Metal Jeans*, TAM's statements to the USPTO about the use of AWARE more broadly, by different parties in different contexts, are not admissions that Intterra's AWARE-formative marks are not likely to cause confusion with WILDFIRE AWARE®.

TAM's arguments before the USPTO are entirely consistent with its arguments here, because the facts before the USPTO are different than the facts at-bar. TAM's WILDFIRE AWARE® application was preliminarily refused based on a purported likelihood of confusion with AWARE, a third party's registration covering situational awareness technology for <u>helicopters</u>: a "platform which provides flexible data acquisition and utilizes a situation awareness system capable of real-time GPS data collection and map generation integrated with dozens of available imaging LIDA and inertia sensors." *See* Compl. Ex. G at 11. TAM acknowledged the well-settled principle that merely being in the same class, or offering "software," is not in itself sufficient to establish confusing similarity – and explained how, given the parties' different offerings, terms are attributed different conceptual weights and, in some contexts, additional matter, like the word WILDFIRE, can be helpful to consumers to distinguish between and among the marks. *See id.* This same logic—and law—applies to the litany of unrelated AWARE trademarks scheduled in Intterra's Opposition.

The analysis is quite different when, like here, the parties offer near-identical services, and the second-comer adopted its mark with actual knowledge of the senior user's rights. Unlike the third-party application at issue in TAM's 2022 Office Action, Intterra, a direct competitor to TAM, sought to buy WILDFIRE AWARE® and now seeks to register and use AWARECA (and other AWARE-formative marks) in connection with substantially identical offerings to TAM's WILDFIRE AWARE® registration. Despite Intterra's assertion that consumers will encounter its marks "almost exclusively" in government-related contexts, AWARECA is directly targeted to lay consumers, and none of Intterra's applications include any limitation as to target markets or channels of trade, meaning

9

that, like TAM's registration, they are presumed to cover all markets and channels. *In re Viterra Inc.*, 671 F.3d 1358, 1362 (Fed. Cir. 2012) ("[A]bsent restrictions in the application and registration, goods and services are presumed to travel in the same channels of trade to the same class of purchasers."). While it argues that its mobile app and related offerings are not limited to wildfires, it does not dispute that they include wildfires. In this specific competitive context, with this junior user, this launch, and this overlap, AWARECA is confusingly close to WILDFIRE AWARE.

### ii. TAM is Likely to Prevail on its Trademark Infringement Claim.

TAM's motion explains how each of the *Sleekcraft* factors favors TAM, and Intterra fails to distinguish *Brookfield*, *Stone Creek, Marketquest*, and *Sleekcraft* itself—all of which attribute significant culpability and weight in the likelihood of confusion analysis to second-comers who adopt their mark with knowledge of another's prior rights. *See* Prelim. Inj. Mot. at 17-18.

Intterra's claim that there is no likelihood of confusion because there are many AWARE-formative mobile apps available for download is misguided for the same reasons as its invocation of third-party registrations. Intterra's purported screenshots of AWARE-formative apps include, for example, no information about what those applications actually do, their user bases, any possible agreement or dispute between any of the third-party rightsholders. The mere presence of many unrelated AWARE apps and suggests nothing about how consumers searching for wildfire-alert software encounter would compare or distinguish between two directly competing applications for wildfire-information services.

Intterra's analysis of marketing channels also misapplies the law. Indeed, Intterra cites a case acknowledging that, for iPhone users, the app store is the *only* source of apps for iPhone users, and thus confirming that a consumer will encounter both marks in the same marketing channel. *Apple, Inc. v. Pepper*, 587 U.S. 273, 276 (2019). It argues—without support—that the sheer volume of apps available on the app stores make users *more* likely to exercise heightened care (citing "logic and

reason"), but ignores that both the relative ease of searching for and downloading apps, especially those available to download *for free*, as both parties' offerings are, and the well-established case law surrounding low-cost or free products, cuts sharply against that logic. Intterra's reliance on *Good Meat Project* is also misplaced: there, the distinction between the marketing channels was on the class of consumers (plaintiff marketed to ranchers and farmers, while defendant did not) and the fact that both parties marketed on the internet was not enough to overcome that distinction, especially given that plaintiff *did not sell any products*. *See Good Meat Project v. GOOD Meat, Inc.*, 716 F. Supp. 3d 783, 801-802 (N.D. Cal. Feb. 12, 2024). These distinctions make no difference when, like here, it is undisputed that both parties market similar products to the same consumers, using the same channels of trade.

Finally, the financial information in Intterra's Opposition underscores the high likelihood of reverse confusion. *See* Prelim. Inj. Mot. at 15-16 (discussing reverse confusion). According to Intterra's CEO, "[t]oday, over 350 government agencies—including fire, EMS, law enforcement, and search-and-rescue agencies at the municipal, regional, state, and federal levels—rely on Intterra's software." Wolf Decl. ¶ 2. "The anticipated revenue from licensing of Intterra's Aware Intel Hub software is expected to yield approximately $6 million per year." Wolf Decl. ¶ 3(b). "Seventy-nine partner agencies across the state are currently in some stage of onboarding onto the platform, and by the end of 2026, Intterra expects that regional public safety agencies serving the majority of California's nearly 40 million residents will be using the Aware products." Wolf Decl. ¶ 14. "Beyond the CAL FIRE contract, Intterra has an extensive sales funnel with government customers at various stages of procurement for AWARE-branded software and services. In total, tens of millions—and potentially hundreds of millions—of dollars in government contracts are at stake." Wolf Decl. ¶ 15. With operations at this purported size and scale, with the legitimacy of purportedly hundreds of government agencies behind it, Intterra's launch will immediately eclipse WILDFIRE AWARE® and

lead users to mistakenly believe there is a relationship between TAM and Intterra when no such relationship exists.

### 3) Intterra Knowingly Adopted Confusingly-Similar Branding at its Peril and the Balance of Equities Favors TAM.

Intterra took a risk by selecting AWARE as the foundation for its suite of emergency alert software and related offerings despite its prior dealings with WILDFIRE AWARE® and increased that risk by doubling down on this branding in the face of legitimate trademark enforcement. Intterra offers no factual support for its speculation that rebranding would be "devastating," (*see* Wolf Decl. ¶ 30) nor can it, as it admits to similar urgent rebranding just four months ago. But even if rebranding does cause harm, self-inflicted harm from Intterra's intentional decision to gamble "tens of millions— and potentially hundreds of millions-of dollars in government contracts" (*see id.* ¶ 15) by refusing to rebrand from a mark it knew was spoken for does not tip the scales in Intterra's favor.

Intterra only announced its intention to use AWARE-formative branding in January 2026, has not yet launched any offerings under AWARE-formative branding, admits to its awareness of TAM's prior rights, and was given ample advance notice of its infringing conduct and multiple opportunities to resolve the matter, circumstances which regularly are found to support preliminary injunctive relief. *See* Prelim. Inj. Mot. at 19-21. In this context, Intterra's citation to *Kiva Health Brands LLC* and *De Anda Enters.*, is inapposite as both of these cases concern instances where the infringing mark was already in use and enjoining such use would disrupt the status quo. *See Kiva Health Brands LLC v. Kiva Brands Inc.*, 402 F. Supp. 3d 877 (N.D. Cal. 2019)*; De Anda Enters. Inc. v. JL Deanda Enters., LLC*, No. SA CV 16-2049-DOC (JCGx), 2017 WL 2960796 (C.D. Cal. Apr. 11, 2017). Indeed, in *Kiva Health*, the mark at issue had been in use for "about nine years." *Kiva Health*, 402 F. Supp. 3d at 899. By contrast, Intterra admits it announced its AWARE-formative branding just months ago, and that it has yet to launch any products under this branding. Wolf Decl. ¶ 3; *see BNSF Ry. Co. v. Float Alaska IP, LLC*, No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506, at *10 (C.D. Cal. Aug. 28, 2023)

12

(granting preliminary injunction when accused infringer "is just starting operations and could more easily rebrand from the outset").

Moreover, Intterra's reliance on *Halo Mgmt.* is misplaced, as Intterra does not and cannot allege any conduct by TAM that would amount to abandonment. *See Halo Mgmt., LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019 (N.D. Cal. 2003). In *Halo Mgmt.*, the court found the equities favored defendants only after finding that "[plaintiff] engaged in 'naked' licensing and that, in so doing, [plaintiff] forfeited its rights in the relevant mark." *Id.* at 1030-31. Intterra does not allege TAM has licensed its WILDFIRE AWARE® mark and failed to implement quality control, nor does Intterra allege any other circumstances that amount to willful forfeiture of rights or any other such conduct that would qualify as abandonment. Equity therefore cannot shield Intterra from "sacrific[ing] the substantial business expenditures" related to developing its AWARE-formative marks.

Intterra admits that, on multiple occasions prior to adopting AWARE-formative branding in December 2025 and announcing such branding in January 2026, it knew of and attempted to acquire WILDFIRE AWARE®. *See* Wolf Decl. ¶ 22 ("After CAL FIRE approved the name [in December 2025], Intterra's legal team conducted a trademark review. That review identified the WILDFIRE AWARE mark among numerous other marks containing the word AWARE. . . upon its mention, I discussed Intterra's prior history with Ms. Brady with our legal team"); *id.* ¶ 27 ("I offered [Ms. Brady] the Product Manager role and proposed that Intterra purchase the rights [to] her application"); *id.* ¶ 47 ("I acknowledge that TAM's WILDFIRE AWARE application has been available since November 2022"); Compl. ¶ 27 ("Intterra structured the offer to include a bonus, to be paid over a three-year period, in purported exchange for the WILDFIRE AWARE app and brand."). Intterra's acquisition offer to Ms. Brady totaled $650,000, not including up to $90,000 in potential bonuses and equity in Intterra. *See* Brady Supplemental Declaration ("Brady Supp. Decl.") Ex. AA, at 2.

Intterra's characterization of rebranding as "devastating" and as "jeopardiz[ing] tens or even

hundreds of millions of dollars in government contracts" is questionable in light of Intterra's recent rebrand from its first mark, READY, after CAL FIRE identified "conflict" and "the potential for confusion" with CAL OES's existing website, ready.ca.gov, and FEMA's federal READY.GOV program. Wolf Decl. ¶ 19. In response to that request, Intterra was able to propose three alternative trademarks (including AWARE), rebrand its offerings, and publicly announce the new branding within just three weeks. *See id.* ("Shortly after Intterra was awarded the CAL FIRE contract on December 18, 2025, we were asked by the State of California to change the name of the application[.]"); *id.* ¶ 13 ("On January 6, 2026, Intterra and CAL FIRE jointly announced that the [sic] AwareCA would serve as California's statewide public safety information platform[.]"). Intterra was able to completely rebrand ReadyCA to AWARECA in a matter of weeks and cannot plausibly assert that rebranding now—with only three months' public investment in AWARE-formative branding, in light of objection nearly from the start—would have catastrophic consequences. Intterra's suggestion that an injunction would "block[] the launch of a government-partnered emergency notification platform" (Opp. at 20) is simply incorrect—as TAM explained in its motion for preliminary injunction, "TAM seeks only to preclude Intterra from using its infringing AWARE-formative marks with its planned mobile application release—not to prevent Intterra from releasing its mobile application or from providing the public with information." *See* Prelim. Inj. Mot. at 21.

Intterra offers no actual evidence of harm to the public, no declaration from CAL FIRE, and no statement from any partner or prospective customer regarding business decisions attributable to rebranding. Intterra touts its "years and millions of dollars building a public safety platform that serves hundreds of government agencies, and through them, millions of members the public," *see* Opp. at 17, but speculates that "[s]ome partners . . . would back out if forced to rebrand" from a trademark it publicly announced just three months ago and is not yet part of an operational product. *See* Wolf Decl. ¶ 35. Even the scope of Intterra's own contracts is in doubt, as Intterra contends in its brief that "CAL

14

TAM'S REPLY ISO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:26-CV-00747-WBS-CSK

FIRE awarded Intterra a contract for this entire suite of public safety products," but its CEO's sworn statement provides that "CAL FIRE awarded Intterra a contract for the use of AwareCA only." *Compare* Opp. at 6 *with* Wolf Decl. ¶ 6. In this context, Intterra's speculation about harm caused by its own choices does not outweigh the presumptively irreparable harm its trademark infringement will cause.

**4)      The Public Interest in Identifiably-Sourced Public Safety Information and Protection of Hard-Earned Trademark Rights Favors an Injunction.**

TAM does not seek to prevent Intterra from offering its suite of software, or even its competitive mobile app. TAM only asks that Intterra do so under a trademark that is not confusingly similar to its WILDFIRE AWARE® mark, as reflected in TAM's repeated outreach to Intterra. Contrary to Intterra's disparaging assertions, TAM and Ms. Brady have no "backers," have not given "false media interviews," and have no intentions beyond stopping Intterra's adoption of a confusingly similar trademark. Wolf Decl. ¶¶ 9, 12. Neither TAM nor Ms. Brady has outside financial backing for this litigation. To the contrary, TAM is a small business of limited means, and Ms. Brady has personally invested substantial time and money into WILDFIRE AWARE®. Brady Decl. ¶¶ 25, 26. TAM has invested significant resources to obtain registration of its WILDFIRE AWARE® mark and acts here because the true public interest lies in preventing consumer confusion in life-safety apps where seconds matter. *See, e.g., Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (public interest served by clear source identification).

Unlike the "safe and effective product" in *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6 (7th Cir. 1992) or the ongoing medication therapy management services in *Outcomes Pharm. Health Care, L.C. v Nat'l Cmty. Pharmacists Ass'n*, No. 4:05-cv-00682-JEG, 2006 WL 3782905 (S.D. Iowa Dec. 22, 2006) enjoining Intterra's anticipated May 1, 2026, launch does not deprive anyone of any product or service—Intterra's AWARE product suite is not yet live, and it may freely launch its

15

app under a non-infringing brand. *See* Wolf Decl. ¶ 14. Intterra admits that even if AWARECA does not launch on May 1, 2026, as planned, its partners would still be able to provide emergency information, noting that "the 79 government agencies onboarding the platform would not lose the ability to disseminate information." *See id.* ¶ 42. The best way for Intterra to build public trust and avoid manifesting its fear of being viewed as a "bad actor," *see* Wolf Decl. ¶ 35, is to stop being a bad actor.   Any delay to allow for rebranding, settlement discussions, or litigation over applicable trademark rights is far outweighed by the public's interest in knowing exactly whose authoritative wildfire and emergency information it is receiving. The public interest is served by an injunction.

**B.  TAM Seeks Only a Rebranding for Intterra's May 1, 2026, Launch.**

Intterra's Opposition makes clear that the only imminent launch is the May 1, 2026 launch of the AWARECA mobile phone application. Intterra tells this Court, "On December 16, 2025, CAL FIRE awarded Intterra a contract for this entire suite of public safety software products." Opp. at 6:13-14. But in his sworn declaration, Mr. Wolf avers, "On December 17, 2025, CAL FIRE awarded Intterra a contract for the use of AwareCA *only*." Wolf Decl. ¶ 6 (emphasis added).

In fact, Intterra's Opposition makes clear that the products that Intterra hopes will ultimately carry the AWARE formative brand, are current "legacy" products that Intterra hopes to rebrand. Compl. ¶ 18 ("Intterra has over 350 existing government agencies leveraging its *legacy software platform* that is being marketed and rebranded as AWARE INTEL HUB.") (emphasis added). Although Intterra currently intends to rebrand its existing products to AWARE-formative brands, they have not yet done so. For example, Intterra's website currently describes, but employs different, non-AWARE-formative names for the features it intends to call AWARE OPS, AWARE + State, and AWARE INTEL HUB: First Responder App, Community App, and the Admin Portal. *See* Compl., ¶ 10 n. 1, Ex. A (screen capture of https://www.intterra.io/solutions). Because Intterra's Opposition and the documents filed therewith make clear that Intterra has not yet rebranded its old products to

AWARE-centered brands, TAM limits its request for a preliminary injunction to the most threatening act, the May 1, 2026, launch using AWARECA. Again, Intterra is free to conduct the launch under its INTTERRA house mark or another name; they have rebranded quickly before and can do it again.[2]

### C. To the Extent the Court Determines a Bond is Required, Any Bond Should Be Nominal.

As reflected in TAM's motion for preliminary injunction and its amended proposed order, TAM does not seek to prevent Intterra from offering its suite of software, or even its competitive mobile app. TAM only asks that Intterra conduct its launch with CAL FIRE under a brand that is not confusingly similar to WILDFIRE AWARE®. This narrowly-tailored injunction does not demand a significant bond. On one hand, TAM has demonstrated a strong likelihood of success on its trademark claims, and on the other, Intterra has publicly pursued this brand for only three months, has not yet launched any offering under AWARE-formative branding, and has been aware of the risks inherent to launching under the AWARECA mark for months. Intterra's admission of its ability to completely rebrand its entire product suite within weeks, without incident, obviates speculation about delays and costs.

Materially, Intterra has failed to offer any evidence in support of its claims to "devastating" harms.  Intterra sells its software platform to government agencies under a different brand name, and can continue to do so while the injunction remains pending. *See* Compl. ¶ 18 ("Intterra has over 350 existing government agencies leveraging its legacy software platform that is being marketed and rebranded as AWARE INTEL HUB.") TAM is not asking this Court to enjoin the rebranding of Intterra's old software at this time. While TAM reserves all rights to move to enjoin any such launch, Intterra does not appear to have any imminent plans to rebrand its "legacy software platform" into a public-facing product under AWARE-formative marks. But even if it has such plans, Intterra fails to

---

[2] TAM is not presently seeking to enjoin legacy back-end software or non-consumer internal tools, especially old software that has yet to be rebranded.

17

explain or evidence how enjoining the rebranding of software would cause it harm. TAM should not be forced to insulate Intterra from the self-inflicted harm of having to "divert resources" to litigate a lawsuit that Intterra, itself, initiated (but perhaps did not expect TAM to defend). *See* Compl.; Opp. at 13; Wolf Decl. ¶¶ 37-38.

In these circumstances, this Court should waive security under Rule 65(c) or otherwise impose only a nominal bond.

### D. Intterra's Unsupported, Irrelevant, *Ad Hominem* Attacks Should Be Disregarded.

Intterrra's Opposition is replete with inflammatory language and *ad hominem* attacks. Accusations employing the following words are used dozens of times throughout Intterra's Opposition and Mr. Wolf's declaration: "payday," "hostage," "windfall," "calculated campaign to cripple," "backers," "coercive tactics," "extortionate payout," "disingenuous," and "false media interviews." *See, e.g.*, Opp. at 2:21, 2:25-26, 3:4, 9:6, 16:21, 17:2, 17:8, 20:6, 49:6; Wolf Decl. ¶¶ 9-12, 46. Intterra's thematic attacks center around three unsupported themes: (1) TAM and Ms. Brady are seeking a "payday" and employing "extortion"; (2) TAM and Ms. Brady are intent on "harming" Intterra; and (3) TAM and Ms. Brady have "backers." Neither Intterra nor Mr. Wolf have a scintilla of evidence to support their attacks, but even if they were true, none are relevant to the question of whether Intterra should be enjoined from launching a competing mobile application under a confusingly-similar name.

Intterra's first theme of attack directly invites the Court to make conclusions about the merits or good-faith basis of TAM's trademark claims based on the timing and amount of a settlement proposal offered under Federal Rule of Evidence 408. Federal Rule of Evidence 408 bars use of compromise offers and statements made during compromise negotiations to "prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a). Intterra is doing exactly that. It asks the Court to infer from TAM's settlement demand and deadline that TAM's trademark claim is somehow

18

illegitimate, coercive, or not brought in good faith. Rule 408 does not permit a party to recast a prohibited merits inference as a "payday" argument and thereby smuggle settlement communications into the injunction analysis. Intterra's "payday" and "extortion" attacks are also flatly contradicted by the evidence. While irrelevant to the merits of this case, the amount of TAM's settlement demand is entirely in line with Intterra's previous offer of $650,000, plus up to $90,000 in bonuses, plus equity. *See* Brady Supp. Decl., Ex. AA, at 2. This 2024 offer long predates Intterra's willful trademark misappropriation and lawsuit against TAM and Ms. Brady and is consistent with Intterra's position that the ability to offer its services under AWARE-formative branding is valuable, including its investment in fifteen separate AWARE-formative trademark applications. And who knows what Ms. Brady's 2024 equity in Intterra would be worth now.

Intterra's remaining thematic attacks are not just unsupported and irrelevant, but odd. Intterra has zero evidence that TAM and Ms. Brady are intent on "harming" Intterra or that TAM and/or Ms. Brady have "backers" in this litigation, which is demonstrably about safeguarding TAM's hard-earned trademark rights in the face of infringement. Ms. Brady is a highly regarded public servant who began her service as a volunteer firefighter when she was 18 years old. She has achieved significant industry recognition and acclaim, including awards for developing data-driven methods to catch wildfire arsonists. *See* Brady Decl. ¶¶ 9, 24; Exs. 3-7, Dkt. Nos. 14-6, 14-7, 14-8, 14-9, 14-10. TAM is a small limited liability company formed to facilitate consulting services and other business operations. *See* Brady Decl. ¶ 10. TAM's trademark enforcement efforts were required to curb Intterra's infringement and defend marketplace goodwill earned through years of work and personal investment. TAM and its founder should not be subjected to *ad hominem* attacks for defending registered trademark rights. Ms. Brady's public service and record deserve better.

Regardless, Intterra's unsupported *ad hominem* attacks are irrelevant to the issues at-bar and should be disregarded. *Pringle,* 2020 WL 5820615, at *3 (Shubb, J.).

TAM'S REPLY ISO MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:26-CV-00747-WBS-CSK

## III.    CONCLUSION

For the reasons stated above, the Court should grant Counterclaim-Plaintiff TAM's motion for a preliminary injunction, and enjoin Plaintiff Intterra, LLC from directly or indirectly, promoting, offering, and selling a consumer-facing mobile application providing wildfire information under the mark AWARECA.

DATED:  April 14, 2026                      BAKER BOTTS L.L.P.


                                By:    */s/ Rachael D. Lamkin*
                                        Rachael D. Lamkin (SBN 246066)
                                        rachael.lamkin@bakerbotts.com
                                        Katherine Burgess (SBN 330480)
                                        katherine.burgess@bakerbotts.com
                                        BAKER BOTTS L.L.P.
                                        101 California Street, Suite 3200
                                        San Francisco, CA  94111
                                        Telephone: (415) 291-6200
                                        Fax: (415) 291-6300

                                        Julie Albert (*admitted Pro Hac Vice*)
                                        julie.albert@bakerbotts.com
                                        30 Rockefeller Plaza
                                        New York, NY 10112
                                        Telephone: (212) 408-2500
                                        Fax: (212) 408-2501

                                        *Attorneys for Defendant and Counterclaim-Plaintiff*
                                        *The Analytical Moose LLC*
                                        *and Defendant Rachael Brady*

20

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record are being served with a copy of the foregoing document via the Court's CM/ECF system on April 14, 2026 pursuant to Local Rule 135.

/s/ Rachael D. Lamkin
Rachael D. Lamkin