UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

INTTERRA, LLC,

                    Plaintiff,

        v.

THE ANALYTICAL MOOSE LLC and
RACHAEL BRADY,

                    Defendants.

No. 2:26-cv-00747-WBS-CSK

MEMORANDUM AND ORDER DENYING
DEFENDANTS' MOTION FOR
PRELIMINARY INJUNCTION

----oo0oo----

        This action commenced on March 5, 2026, when plaintiff Interra, LLC ("Intterra") filed a complaint seeking declaratory and injunctive relief requesting this court to, among other things, declare that its use of its "AWARECA" mark does not infringe upon defendants The Analytical Moose ("TAM") and Rachael Brady's alleged trademark rights in their "WILDFIRE AWARE" mark. (See Docket No. 1 at 18.)

        On April 3, 2026, TAM and Brady filed an answer and counterclaims.  (Docket No. 12.)  TAM now moves for preliminary

1

injunctive relief on two of those counterclaims:  A federal trademark infringement counterclaim brought pursuant to the Lanham Act, 15 U.S.C. § 1114; and a common-law trademark infringement counterclaim.  (Docket No. 14.)  Specifically, TAM asks this court to enjoin Intterra from launching its mobile application titled "AWARECA" on May 1, 2026, and using "AWARE-formative branding," because permitting Intterra to do so would infringe upon TAM's "WILDFIRE AWARE" mark.  (See generally id.)

The issue before the court is thus whether TAM is entitled to preliminary injunctive relief on its trademark infringement counterclaims.

I.   Background

Intterra, founded in 2010, is a technology company designed to "connect[] and serve[] communities" by "support[ing] public service agencies on the front lines of response to public safety threats."  (Docket No. 1 (Compl.) at 3.)  Intterra "markets and sells its software exclusively to governmental public safety agencies," such as fire and police departments at various levels of state and federal government.  (Id. at 4.)

In 2024, Intterra began to develop a mobile application "through which its governmental agency customers could securely share real-time information with the public."  (Id.)  While this application is "intended for use by the general public," its key functionality "necessarily depends on integration with [governmental] agencies' data sources."  (Id.)

The following year, Intterra began to offer this new mobile application through its typical business-to-government

2

marketing channel:  by submitting bids for government contract awards.  (Id. at 5, 7.)  Specifically, Intterra "markets and supplies" this application "to its governmental customers under the mark AWARE, and an AWARE-formative mark customized for each state . . . such as AWARECA for California."  (Id. at 5.)  While Intterra originally chose the name "ReadyCA" for its application, it adopted the "AWARE" brand at the urging of the State of California due to concerns of conflict with the existing state-government website ready.ca.gov.  (Declaration of Robert P. Wolf (Docket No. 21) ¶ 16.)

On December 20, 2025, Intterra filed fourteen trademark applications for a "number of its AWARE-formative marks, including . . . the word mark AWARECA."  (Id. at 5.) Approximately two weeks later, Intterra announced that the California Department of Forestry and Fire Protection ("CALFIRE") "had selected Intterra's mobile application to be California's statewide public safety information platform."  (Id. at 6.)

On January 28, 2026, counsel for Rachael Brady sent Intterra a cease-and-desist letter alleging that she is "the owner of the federally recognized trademark 'Wildfire Aware,' used in connection with a mobile application providing wildfire information and alerts" and demanding that Intterra cease use of the "AWARE," "AWARECA," and "AWARECALIFORNIA" marks, any confusingly similar marks, and any products or services using the complained-of marks; and abandon the AWARECA mobile application. (Id. at 7-8.)  WILDFIRE AWARE is a mobile application designed to "provide crucial information" regarding wildfires to potentially

3

affected communities.  (Docket No. 14-1 at 9.)  According to Brady, WILDFIRE AWARE "pulls from various data sources, including the National Weather Service and the National Wildfire Coordination Group, to display authoritative information graphically, with accessibility and speed at top of mind," and "presents information at all relevant times."  (Id.)  Brady offers the WILDFIRE AWARE application through her company, The Analytical Moose LLC ("TAM").  (See id.)

The cease-and-desist letter did not mark the first interaction between the parties, however.  In 2024, when Intterra began the development process for its mobile application, the company offered to hire Brady as a product manager to lead that application's development.  (Docket No. 1 at 8.)  Intterra was aware that Brady had developed the WILDFIRE AWARE application.  (See id.)  Indeed, Interra alleges that because Brady "had made significant financial and personal investments in developing the WILDFIRE AWARE app and brand, and also that Ms. Brady, in dedicating her full professional attention to the product management role going forward, would no longer be able to develop or maintain her WILDFIRE AWARE application," it structured its offer to Brady "to include a bonus, to be paid over a three-year period, in purported exchange for the WILDFIRE AWARE app and brand."  (Id.)

Brady declined Intterra's offer of employment in November 2024, and again on March 3, 2025.  (Id. at 9.)  On March 15, 2026, Intterra's Chief Executive Officer "publicly announced Intterra's plans to launch its AWARE-branded app for public use

4

on May 1, 2026." (Docket No. 14-5 (Decl. of Rachael Brady ("Brady Decl.")) at 8.) Brady filed the instant motion for preliminary injunction through counsel shortly thereafter, in which she seeks an order of this court "enjoin[ing] Plaintiff Intterra, LLC . . . from, directly or indirectly, promoting, offering, and selling software and related products and services in the field of wildfire alerts and emergency notification under AWARE-formative branding, including its planned launch of AWARECA on May 1, 2026." (Docket No. 14 at 28.)

II.  Legal Standard

TAM, as the party "seeking a preliminary injunction," must "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). A preliminary injunction is an "extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).

III. Irreparable Harm

"[A]n unjustified delay in seeking an injunction may undermine a movant's argument that [they] will suffer irreparable harm in the absence of a" preliminary injunction. Zamfir v. Casperlabs, LLC, 528 F. Supp. 3d 1136, 1151 (S.D. Cal. 2021) (collecting cases); see also, e.g., Hanginout, Inc. v. Google,

5

Inc., 54 F. Supp. 3d 1109, 1132 (S.D. Cal. 2014) (same) (collecting cases).

Here, TAM learned of Intterra's plans to launch the AWARECA application on January 6, 2026.  (Brady Decl. at 7; Docket No. 20 at 51.)  But TAM did not file the instant motion seeking to enjoin that launch until April 3, 2026, nearly three months later.  (Docket No. 14.)  While TAM responds that it was engaged in negotiations with Intterra for much of those three months (see Docket No. 26 at 8-9), this argument cannot overcome the fact that "unreasonable delay in a trademark infringement case is measured from when the [movant] knew or should have known about its potential cause of action," SunEarth, Inc. v. Sun Earth Solar Power Co., 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012), which TAM itself acknowledges was January 6, 2026.

Excusing TAM's delay on the grounds that TAM was engaged in settlement negotiations could also incentivize parties to gain tactical advantage by ostensibly engaging in such negotiations for lengthy periods of time, all the while planning to litigate their dispute.  Indeed, at oral argument, counsel for Intterra emphasized that TAM did not file the instant motion until approximately one month before AWARECA's projected launch date, i.e., until Intterra had taken significant steps and incurred substantial obligations that it would not have had it not planned to launch AWARECA on May 1, 2026.

The court is not in a position to opine on TAM's motives.  That said, the court observes that TAM also filed the instant motion for preliminary injunction a full month after

6

Intterra filed its declaratory relief action (see Docket Nos. 1, 14), which would appear to undercut TAM's argument that its delay was solely attributable to being engaged in settlement negotiations.  Moreover, as another court has noted, "a party suffering irreparable harm would and should seek injunctive relief rather than, or in addition to, engaging in negotiations." Ronaldo Designer Jewelry, Inc. v. Cox, No. 1:17-cv-2 DMB DAS, 2017 WL 3879095, at *11 (N.D. Miss. Sept. 5, 2017); see also Apple, Inc. v. Samsung Elecs. Co., No. 11-CV-01846-LHK, 2011 WL 7036077, at *22 n.21 (N.D. Cal. Dec. 2, 2011), aff'd in part, 678 F.3d 1314 (Fed. Cir. 2012) (finding party's argument that delay in seeking injunctive relief was due to being "engaged in negotiations" "lack[ed] merit").  TAM did not do so here.

Delaying seeking injunctive relief -- particularly when the matter at hand is complex, fact-intensive, and time-sensitive -- also places the court at a distinct disadvantage in having to reach a conclusion on the motion on short notice.  It is no secret that this court is one of the busiest courts in the nation.  S & J Rentals, Inc. v. Hilti, Inc., 294 F. Supp. 3d 978, 989 (E.D. Cal. 2018) (England, J.).  Accordingly, in order for this court to accommodate urgency, the circumstances must truly be pressing, and TAM's multiple-month filing delay suggests that its circumstances are not.

Most importantly, the court strives to correctly apply the law to its decisions.  Even though this is a motion for preliminary injunctive relief, the court "does not have the luxury of treating its first decision as a dress rehearsal for

7

the next time.  The court is required to 'get it right' the first time," even under the expedited timeline it has been forced to adhere to.  In re JSJF Corp., 344 B.R. 94, 103 (B.A.P. 9th Cir. 2006), aff'd and remanded, 277 F. App'x 718 (9th Cir. 2008).

In considering TAM's unjustified delay, which counsels against a finding of irreparable harm, see Zamfir, 528 F. Supp. 3d at 1151 (S.D. Cal. 2021), alongside the court's opinion that TAM is not likely to succeed on the merits of its trademark infringement counterclaims, as discussed below, preliminary injunctive relief is not warranted here.

IV.   Likelihood of Success on the Merits

Likelihood of success on the merits is "the most important factor in determining whether a preliminary injunction is warranted."  Garcia v. County of Alameda, 150 F. 4th 1224, 1230 (9th Cir. 2025) (internal citations and quotation marks omitted).  A mere possibility of success is insufficient to fulfill this factor; rather, TAM must demonstrate "a strong likelihood of success on the merits" on its trademark infringement counterclaims against Intterra.  Save Our Sonoran, Inc. v. Flowers, 408 F. 3d 1113, 1120 (9th Cir. 2005). In order to prevail on its trademark infringement counterclaims, TAM "must show that it is (1) the owner of a valid, protectable mark, and (2) that the alleged infringer" -- here, Intterra -- "is using a confusingly similar mark."  Grocery Outlet Inc. v. Albertson's Inc., 497 F.3d 949, 951 (9th Cir. 2007) (per curiam). The parties' dispute is focused on the second factor.

Whether Intterra is using a confusingly similar mark is

8

assessed using the Sleekcraft factors, which include the:  (1) strength of the movant's mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) types of goods and consumer's degree of care; (7) opposer's intent in selecting the mark; and (8) likelihood of expansion of the product lines.  See AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979).

The Sleekcraft factors are "non-exhaustive" and "should be applied flexibly, particularly in the context of Internet commerce."  Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1149 (9th Cir. 2011).

a.   Strength of "AWARE"

Typically, courts analyze the strength of a mark "along the following spectrum: arbitrary and fanciful marks are the strongest, suggestive marks fall in the middle, descriptive marks are presumptively weak, and generic marks are not entitled to trademark protection at all."  Masters Software, Inc. v. Discovery Commc'ns, Inc., 725 F. Supp. 2d 1294, 1299 (W.D. Wash. 2010).   TAM focuses its strength arguments on the "AWARE" portion of its mark -- the only commonality between the two marks at issue -- and argues that it has "exclusive rights" to that term "for software apps in the context of public safety." (Docket No. 14-1 at 19.)  Intterra responds that "'AWARE' is [an] inherently weak" source identifier, both because it is "highly descriptive," and, more crucially here, because it is "dilute[d]" by "common third-party use."  (Docket No. 20 at 26-27.)

TAM does not place the AWARE mark on the spectrum from

9

arbitrary to generic in its discussion of this factor; instead, TAM references the arguments it made to United States Patent Office ("USPTO") after initially being denied federal trademark registration due to its similarity to another, existing "AWARE" mark.  (Id. at 19.)  Here, TAM asserts that, in its arguments to the USPTO, it did not "disclaim[] the term AWARE," that "AWARE" was "the predominant term" of its mark, and that its "arguments in support of registration affirm the strength of [its] exclusive rights to AWARE."  (Id.)

However, it appears that the opposite occurred.  In its communications with the USPTO, TAM took pains to differentiate its mark from a pre-existing "AWARE" mark by asserting that "the word WILDFIRE . . . is the most important term for the purpose of informing consumers."  (Docket No. 1-7 at 9.)  TAM then added that finding confusion based on the common usage of AWARE "seems highly inconsistent with prior decisions of the USPTO," which had previously registered many "marks with the term AWARE," before listing eleven (11) such examples.  (Id. at 12-15.)  TAM pointed to this "crowded field" for the "AWARE" mark and argued that "[g]iven the widespread use of the term," they should be permitted to "come closer" to using it without causing confusion. (Docket No. 1-7 at 15-16.)

TAM's argument to the USPTO -- that the source-identifier "AWARE" is entitled to little protection -- is strikingly applicable here.  Indeed, it appears that the field for "AWARE" is now even more crowded than TAM realized:  Intterra cites no less than thirty-one (31) "AWARE" marks, many of which

10

correspond to emergency preparedness products.  (Docket No. 20 at 29-34.)  As Intterra points out, and as TAM ultimately admits, this widespread usage of the "AWARE" mark makes it "merely one of a crowd of marks."  J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:85 (4th Ed. 2012).  And where TAM's "mark resides in a crowded field, hemmed in on all sides by similar marks on similar goods, that mark is weak as a matter of law."  Reserve Media, Inc. v. Efficient Frontiers, Inc., No. 15-cv-5072 DDR AGRX, 2017 WL 123420, at *8 (C.D. Cal. Jan. 11, 2017) (internal citations omitted); see also M2 Software, Inc., 421 F. 3d at 1088 ("Use of similar marks by third-party companies in the relevant industry weakens the mark at issue."); Jupiter Hosting, Inc. v. Jupitermedia Corp., No. 04-cv-1820 CW, 2004 WL 3543299, at *3 (N.D. Cal. Nov. 9, 2004) ("Where the market is inundated by products using the particular trademarked word, there is a corresponding likelihood that consumers will not likely be confused by any two in the crowd."  (citing Entrepreneur Media, Inc. v. Smith, 279 F. 3d 1135, 1144 (9th Cir. 2002)).

In light of the "AWARE" mark's presence in a crowded field, the court agrees with Intterra that the mark is inherently weak.  This factor therefore weighs in favor of Intterra.

b.    Proximity of the Goods

"The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function."  Network Automation, Inc., 638 F. 3d at 1150.  TAM argues that both parties "will use AWARE-formative marks for . . . publicly

11

available mobile applications intended to provide users with [public safety] alerts." (Docket No. 14-1 at 20.) Intterra advances two counter-arguments regarding this factor: (1) its platform "is an all-hazards, all-discipline" application, for which "wildfires constitute less than 1% of the data," and (2) it is integrated with government agencies and correspondingly "is a government public service," not a consumer-facing product. (Id. at 45-46.)

While Intterra's application may encompass a broader range of functions than TAM's, the relevant inquiry is whether the products share an overlapping purpose, not whether one product does more than the other. See Brookfield Commc'ns, Inc. v. West Coast Ent. Corp., 174 F.3d 1036, 1056 (9th Cir. 1999) (finding proximity where a broader business included a function that overlapped with a narrower product, because "the products [were] used for similar purposes"). Both applications here provide emergency preparedness alerts, including wildfire alerts; the fact that wildfire monitoring constitutes a minute portion of Intterra's application's offerings does not necessarily destroy that overlap. See Ironhawk Techs., Inc. v. Dropbox, Inc., 2 F.4th 1150, 1164 (9th Cir. 2021) (finding a jury question on relatedness where broader platform encompassed the narrower product's core function). As to the class of purchasers, Intterra's integration with government agencies distinguishes the parties' primary markets, but both products are ultimately

available for download on app stores.[1]  On balance, this factor is likely neutral; at best, it weighs slightly in TAM's favor.

c.   Similarity of the Parties' Marks

"In determining whether marks are similar enough to confuse consumers, the court must consider their sight, sound, and meaning as they appear in the marketplace."  Masters Software, Inc., 725 F. Supp. 2d at 1302.  When assessing similarity, the marks are "considered in their entirety."  Prolacta Bioscience, Inc. v. Prolact Ltd., No. 2:24-cv-10392 WLH, 2025 WL 2078270, at *16 (C.D. Cal. June 18, 2025) (citing Ironhawk Techs., 2 F. 4th at 1164).

As with the first factor, the arguments TAM made to the USPTO serve as a counterpoint to the arguments it makes here. TAM noted that "the term WILDFIRE . . . is not at all present in the ["AWARE"] Mark of the Cited Registration," and argued that "the shared formative term 'AWARE' alone was [not] enough for . . . [the marks] to be confusingly similar."  (Docket No. 1-7 at 9.) The same is true here:  The term "WILDFIRE" does not appear in Intterra's mark, and if it is the case -- as TAM then argued and the USPTO agreed -- that the addition of the term "WILDFIRE" renders it "markedly different" from "AWARE," it is certainly enough to be distinguished from the variations used by Intterra, such as "AWARECA," "AWARE INTEL HUB," and "AWARE OPS."  (Docket

---

[1]   As discussed below with regard to the "marketing channels" factor, mobile application stores are "ubiquitous" marketing platforms; accordingly, that both applications are present on these application stores is unremarkable.  Cf. Network Automation, Inc., 638 F. 3d at 1151 (observing "ubiquitous" nature of mobile phone application stores within trademark infringement context).

No. 20 at 5.)  This factor thus weighs in favor of Intterra.

        d.   Evidence of Actual Confusion

Because Intterra has yet to launch its application, "consideration of this factor is necessarily conjectural." Cf. Nova Wines, Inc. v. Adler Fels Winery LLC, 467 F. Supp. 2d 965, 980 (N.D. Cal. 2006).  Accordingly, the court "affords this factor little weight," and finds it to be neutral.  Cf. id. at 980-81; Network Automation, Inc., 638 F. 3d at 1151 ("importance" of evidence of action confusion is "diminished at the preliminary injunction stage").

        e.   Marketing Channels

"In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1130 (9th Cir. 2014).  In the Sleekcraft era, "convergent marketing channels increase[d] the likelihood of confusion." 599 F. 2d at 353.  "Today," however, "it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." Network Automation, Inc., 638 F. 3d at 1151.

TAM argues that this factor weights in its favor because both the WILDFIRE AWARE application and Intterra's yet-to-launch application will be "marketed and available for download" on mobile phone application stores.  (Docket No. 14-1 at 22.)  However, mobile phones' application stores constitute precisely the kind of "ubiquitous marketing channels" that do not

14

"shed much light on the likelihood of consumer confusion." Network Automation, Inc., 638 F. 3d at 1151; see also Good Meat Project v. GOOD Meat, Inc., 716 F. Supp. 3d 783, 802 (N.D. Cal. 2024) ("Merely showing that both businesses advertise on the internet is insufficient to show marketing channel convergence.").

Moreover, as noted above, TAM markets the WILDFIRE AWARE application to individual consumers, whereas Intterra markets its application to governmental agencies, who may, in turn, recommend that individual consumers download that application. (See Brady Decl. at 5; Docket No. 20 at 47-48.) Given the incongruence between the "parties' customer bases," this factor weighs slightly in favor of Intterra. See Pom Wonderful LLC, 775 F. 3d at 1130.

f. Types of Goods and Consumer's Degree of Care

"Low consumer care . . . increases the likelihood of confusion." Playboy Enters., Inc. v. Netscape Commc'ns Corp., 354 F.3d 1020, 1028 (9th Cir. 2004). The degree of care expected of a "reasonably prudent consumer depends on the circumstances." Brookfield Commc'ns, Inc., 174 F.3d at 1060. A customer is expected to be "more discerning" and "less easily confused" when purchasing "expensive items"; conversely, "when dealing with inexpensive products, [a] customer[] [is] likely to exercise less care." Id.

TAM argues that consumers are likely to exercise less care when determining whether to download WILDFIRE AWARE or AWARECA because such consumers will inevitably be doing so during

15

"moments of intense urgency and stress, including impending wildfires." (Docket No. 14-1 at 22.) But, as Intterra points out, TAM has not offered evidence in support of its claim that consumers are "most likely to download emergency apps in the midst of a disaster," as opposed to well before disaster strikes, particularly if they "liv[e] in areas with high risk of natural disasters." (Docket No. 20 at 48.)

The court is not currently in a position to discern the juncture at which a consumer is most likely to download an emergency preparedness application. That being said, given the obvious importance of such applications, and the fact that "[a] consumer's care generally intensifies with the importance of the product," Elevate Fed. Credit Union v. Elevations Credit Union, 67 F.4th 1058, 1072 (10th Cir. 2023), this factor weighs slightly in favor of Intterra.

g.    Intent

In determining Intterra's intent, "[t]he relevant question is whether [they] intended to profit by confusing consumers concerning the endorsement of" their product. White v. Samsung Elecs. Am., Inc., 971 F.2d 1395, 1400 (9th Cir. 1992), as amended (Aug. 19, 1992) (quotations omitted). Intterra's "intent to confuse constitutes probative evidence of likely confusion: Courts assume that the [their] intentions were carried out successfully." Playboy Enterprises, Inc., 354 F. 3d at 1028 (footnote omitted).

As mentioned above, Intterra originally chose the name "ReadyCA" for its application; it pivoted to the "AWARE" family

16

of names (including "AWARECA") only upon the urging of the State of California.  (Declaration of Robert P. Wolf (Docket No. 21) ¶ 16.)  This fact cuts against TAM's claim that Intterra "intended to profit" by confusing customers regarding the origins of its application.  See White, 971 F. 2d at 1400.

Further, TAM would be hard-pressed to now argue Intterra acted in bad faith without calling into question the motivations governing its own, prior actions.  As discussed earlier, in 2023, TAM successfully argued to the USPTO that a "crowded field" exists for the "AWARE" mark and that it should therefore be permitted to register its own "WILDFIRE AWARE" mark, even though it knew that a registered trademark with the word "AWARE" corresponding to a product providing "computer hardware, software, and sensors, used to provide real-time or near-real-time GPS information regarding emergency incidents" existed. (See Docket No. 1-7 at 7.)  TAM cannot legitimately condemn Intterra for seeking to do precisely what it, itself, did just three years ago.[2]  Accordingly, this factor does not weigh in favor of TAM.

h.    Likelihood of Expansion

This factor concerns "whether existence of the allegedly infringing mark is hindering [TAM's] expansion plans." Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1056 (C.D. Cal. 2013).  For this factor to "weigh[] in favor of a finding of infringement," TAM must demonstrate "a strong

[2]    Moreover, at oral argument, counsel for Intterra represented that Intterra consulted and relied upon TAM's representations to the PTO as part of their due-diligence process.

17

possibility of expansion into competing markets." M2 Software, Inc., a Delaware corporation v. Madacy Ent., a corporation, 421 F.3d 1073, 1085 (9th Cir. 2005) (alteration and emphasis in original).

TAM concedes that its "offerings are currently targeted towards" individual consumers but avers that "there is no reason that" the WILDFIRE AWARE application "could not be . . . sold to businesses or governmental entities." (Docket No. 14-1 at 24.) The Ninth Circuit has repeatedly held that mere "interest in expanding [a] product line" absent "concrete evidence of expansion plans" is insufficient to tilt this factor in the movant's favor. Surfvivor Media, Inc. v. Survivor Prods., 406 F.3d 625, 634 (9th Cir. 2005). Thus, this factor weighs in favor of Intterra, too. See id.; see also Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1152 (9th Cir. 2002) (absent evidence of intent to expand into overlapping product lines, likelihood of expansion factor weighs "against finding likely confusion").

            i.    Totality

Having considered the Sleekcraft factors, at most one of which weighs in favor of TAM, the court finds that TAM is not likely to succeed on the merits of its claims that Intterra's "AWARE" family of marks infringes upon its mark.

IT IS THEREFORE ORDERED that defendants' motion for preliminary injunction (Docket No. 14) be, and the same hereby is, DENIED.

Dated:  April 22, 2026

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE
18